**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | ) | |
| **OPPORTUNITY COMMISSION,** | ) | |
| | ) | **CIVIL ACTION NO. 3:10-250** |
| **Plaintiff,** | ) | |
| | ) | **JUDGE KIM R. GIBSON** |
| **v.** | ) | |
| | ) | |
| **GRANE HEALTHCARE CO. and** | ) | |
| **EBENSBURG CARE CENTER, LLC,** | ) | |
| **d/b/a CAMBRIA CARE CENTER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION**</u>

## I.     INTRODUCTION

This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Fed. R. Civ. Pro. 56. (ECF Nos. 92, 95). The Plaintiff seeks partial summary judgment on threshold issues relating to liability. (ECF No. 95). The Defendants move for summary judgment with respect to all claims brought against them. (ECF No. 92). For the reasons that follow, the Plaintiff's motion for partial summary judgment (ECF No. 95) will be granted in part and denied in part, and the Defendants' motion for summary judgment (ECF No. 92) will be denied.

## II.     BACKGROUND

Grane Healthcare Company ("Grane") is an organization maintaining management contracts with several different entities. (ECF No. 115 at 1-2 ¶ 1.) Ross Nese ("Nese") serves as Grane's President. (*Id.* at 2 ¶ 6.) Len Oddo ("Oddo") is Grane's Chief Operating Officer. (*Id.* at 2 ¶ 2.) In that capacity, Oddo implements Grane's management

contracts. (*Id.* at 2 ¶ 4). He also serves as the Vice President of the Ebensburg Care Center, LLC ("ECC"). (*Id.* at 2 ¶ 3). Oddo reports to Richard Graciano ("Graciano"), who serves as Grane's Chief Executive Officer ("CEO"). (*Id.* at 2 ¶ 5).

During the fall of 2009, Grane purchased the LaurelCrest Nursing and Rehabilitation Center ("LCNRC") from Cambria County. (ECF No. 115 at 2 ¶ 7). In connection with the purchase, the ECC was designated to become the owner and operator of a new facility known as the Cambria Care Center ("CCC"). (*Id.* at 2-3 ¶ 8). This arrangement was scheduled to become effective on January 1, 2010. (*Id.*).

Grane has a management consulting agreement with the CCC. (ECF No. 115 at 3 ¶ 9). According to the agreement, Grane was responsible for recruiting and hiring more than 300 employees to staff the CCC and care for its 200 residents. (*Id.* at 5 ¶¶ 16-17). To fulfill that obligation, Grane invited the LCNRC's employees to apply for positions with the CCC. (*Id.* at 5 ¶ 18). The application process began in October 2009, when the LCNRC's employees were informed of the impending sale. (*Id.* at 6-7 ¶¶ 20, 23). Beth Lengle ("Lengle"), Grane's Vice President of Nursing Services, was in charge of processing the applications. (*Id.* at 5-6 ¶ 19). Individuals interested in applying for positions with the CCC were instructed to report to a conference room located within the LCNRC in order to complete the required paperwork. (*Id.* at 8 ¶ 28). Pennsylvania's Older Adults Protective Services Act [35 PA. STAT. § 10225.101 *et seq.*] requires covered healthcare facilities to consider the "criminal history record[s]" of all prospective employees in connection with the application process. 35 PA. STAT. § 10225.502(a)(1). In accordance with that mandate,

Lengle reviewed the "criminal history record" of each individual seeking employment with the CCC. (ECF No. 115 at 18 ¶¶ 56-57).

Grane typically requires every applicant to undergo a test for illegal drugs. (ECF No. 115 at 10 ¶ 33). Registered nurse Deborah Hoover ("Hoover"), a nurse consultant for Grane, was responsible for administering the tests conducted on the LCNRC employees seeking employment with the CCC. (*Id.* at 10 ¶ 34). Urine samples submitted by the applicants were screened for illicit substances. (*Id.* at 11 ¶¶ 37-39). Forms provided to the applicants requested information about their medications. (*Id.* at 115 ¶ 35). When an applicant's drug test yielded a positive result, Lengle crosschecked the test result with the list of the applicant's medications to determine whether the positive finding was attributable to a prescribed medication. (*Id.* at 12 ¶ 41). An applicant was deemed to have passed the drug test if his or her disclosed medications corresponded with the positive test result. (*Id.* at 12 ¶ 42). Grane maintained a policy of refusing to hire any applicant who was using a controlled substance without a prescription. (*Id.* at 11 ¶ 40).

Corporate Care Services ("CCS") was contracted to conduct pre-employment physical examinations of the CCC's incoming employees. (ECF No. 115 at 8-9 ¶ 29). LCNRC employees interested in being considered for positions with the CCC were instructed to complete pre-placement evaluation forms provided by CCS. (*Id.* at 9 ¶ 30). Each form solicited information about an applicant's medical history. (*Id.* at 9 ¶ 31). A separate portion of the form was designed to record the results of a physical examination. (*Id.* at 9 ¶ 31). Every applicant was required to undergo a medical examination, regardless of whether he or she was seeking to become a member of the CCC's medical staff. (*Id.* at

19 ¶ 60). Charlene McFeeley ("McFeeley"), a nurse practitioner employed by CCS, performed physical examinations of the LCNRC employees who were seeking employment with the CCC. (*Id.* at 20 ¶¶ 63-64). After examining each prospective employee, McFeeley provided a written indication as to whether the individual was able to perform the "essential functions" of his or her desired position. (*Id.* at 20-21 ¶ 65). Healthcare facilities such as the CCC are required to screen employees and contractors "with direct consumer contact" for tuberculosis. 35 PA. STAT. § 448.806(D.1)(5). Tuberculosis screenings were performed as a part of the CCC's application process. (ECF No. 115 at 18 ¶ 55).

More than 300 LCNRC employees applied for positions with the CCC. (ECF No. 115 at 21 ¶ 68). The applicants were examined by McFeeley during the fall of 2009. (ECF No. 98-3 at 5). Grane ultimately hired roughly 225 of the applicants to work for the CCC. (ECF No. 115 at 21 ¶ 68). Although most of the successful applicants were offered positions in person, there were situations in which individuals were offered positions by telephone. (*Id.* at 21 ¶ 69).

The CCC began its operations on January 1, 2010. (ECF No. 115 at 5 ¶ 16). Shortly thereafter, several unsuccessful applicants for employment filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Grane and the ECC had violated the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12101 *et seq.*] by conducting pre-offer medical examinations of prospective employees and declining to hire some of them because of actual or perceived disabilities. (ECF No. 116-24). The EEOC commenced this action against Grane and the ECC on September 30, 2010,

seeking injunctive and monetary relief to remedy the alleged violations of the ADA. (ECF No. 1). Grane and the ECC answered the EEOC's complaint two months later. (ECF No. 8). On September 14, 2012, the EEOC filed a motion for partial judgment on the pleadings. (ECF No. 60). Grane and the ECC responded to the motion by seeking permission to amend their answer. (ECF No. 64). The motion for partial judgment on the pleadings was denied without prejudice in a memorandum opinion and order dated March 15, 2013. (ECF No. 86). Grane and the ECC filed their amended answer three days later. (ECF No. 87). The parties filed cross-motions for summary judgment on July 8, 2013. (ECF Nos. 92, 95). Those motions are the subject of this memorandum opinion.

## III.    STANDARD OF REVIEW

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d

Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by merely reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

IV.     **JURISDICTION AND VENUE**

The Court has jurisdiction to entertain the EEOC's claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3), and 42 U.S.C. § 12117(a). Venue is proper under 28 U.S.C. § 1391(b).

V.      **DISCUSSION**

Title I of the ADA contains provisions governing the conduct of covered employers in relation to their current and prospective employees. 42 U.S.C. §§ 12111-12117. Title I's anti-discrimination provision, codified at 42 U.S.C. § 12112(a), provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of

disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." The term "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The "discrimination" prohibited by § 12112(a) is defined broadly enough to include a covered entity's failure or refusal to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity," or its "den[ial of] employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation[s] to the physical or mental impairments of the employee or applicant . . . ." 42 U.S.C. § 12112(b)(5)(A)-(B). In this context, "reasonable accommodations" may include "job restructuring," a "part-time or modified" work schedule, a "reassignment to a vacant position," or the "acquisition or modification of equipment or devices." 42 U.S.C. § 12111(9)(B).

Since § 12112(a) prohibits only discrimination "on the basis of disability," an individual must be "disabled" to enjoy statutory protection thereunder. *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012). "[A] physical or mental impairment that substantially limits one or more [of an individual's] major life activities" qualifies as a

"disability" under the ADA.[1]  42 U.S.C. § 12102(1)(A).  It is axiomatic that an employer cannot discriminate against an applicant for employment "on the basis of disability" without *knowing* that he or she is "disabled."  *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996).  To provide prospective employees with prophylactic protection against the forms of "discrimination" proscribed by Title I, Congress has taken steps to limit the information available to covered employers at critical stages of the hiring process.  The provisions of the ADA pertaining to medical examinations and inquiries are codified at 42 U.S.C. § 12112(d), which provides:

**(d) Medical examinations and inquiries.**

(1) In general.  The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries.

(2) Preemployment.
　　(A) Prohibited examination or inquiry.  Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.
　　(B) Acceptable inquiry.  A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

(3) Employment entrance examination.  A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

---

[1] The ADA Amendments Act of 2008 broadened the category of individuals entitled to statutory protection under the ADA by expanding the definition of the term "disability."  Pub. L. No. 110-325, § 4; 122 Stat. 3553, 3555-3557 (2008).  The statutory revisions contained in the ADA Amendments Act became effective on January 1, 2009.  Pub. L. No. 110-325, § 8; 122 Stat. 3553, 3559 (2008).  Every act of discrimination alleged in the EEOC's complaint occurred subsequent to that date.  (ECF No. 1 ¶ 12).

     (A) all entering employees are subjected to such an examination regardless of disability;

     (B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—

          i. supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

          ii. first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

          iii. government officials investigating compliance with this Act shall be provided relevant information on request; and

     (C) the results of such examination are used only in accordance with this title.

(4) Examination and inquiry.

     (A) Prohibited examinations and inquiries. A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

     (B) Acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

     (C) Requirement. Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

42 U.S.C. § 12112(d). This statutory framework is designed to shield information about an applicant's medical condition from his or her prospective employer until *after* an offer of employment is made.

Before an offer of employment is extended, an employer may not ask a job applicant to undergo a medical examination or inquire as to whether he or she "is an individual with a disability." 42 U.S.C. § 12112(d)(2)(A). This prohibition precludes the utilization of investigative techniques that could identify applicants with disabilities and exclude them from further consideration. *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 (10th Cir. 1998). Once an offer of employment has been extended, a prospective employee may be asked to undergo a medical examination. 42 U.S.C. § 12112(d)(3). An "entrance examination" is permissible under the ADA if "all entering employees are subjected to such an examination regardless of disability," the applicable confidentiality requirements are adhered to, and the results of the examination are "used only in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(A)-(C). After an employee's duties have commenced, the employer may not ask him or her to undergo another medical examination or inquire as to whether he or she is disabled "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). An employer remains free to inquire as to the ability of an applicant or employee "to perform job-related functions" at all times. 42 U.S.C. § 12112(d)(2)(B), (4)(B).

Given that § 12112(d)(3)(C) permits the results of an "entrance examination" to be "used only in accordance with" Title I's anti-discrimination provision, an employer may not rely on the results of a *lawful* medical examination or inquiry to deny employment to an individual unless the examination or inquiry reveals that an impairment suffered by the individual would preclude him or her from performing the "essential functions" of the job in question. *Holiday v. City of Chattanooga*, 206 F.3d 637, 640-48 (6th Cir. 2000). A

plaintiff asserting a claim under § 12112(d)(3)(C) must ordinarily show that he or she is "disabled," since § 12112(a) only prohibits "discriminat[ion] against a qualified individual on the basis of disability." *O'Neal v. City of New Albany*, 293 F.3d 998, 1009-10 (7th Cir. 2002). Unlike § 12112(a), which aims to protect a discrete class of "disabled" persons from discrimination, § 12112(d) contains no language limiting the category of applicants and employees entitled to statutory protection. *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 969 (8th Cir. 1999). Consequently, an individual who is subjected to an *unlawful* medical examination or inquiry can successfully assert a claim under § 12112(d) without establishing the existence of a statutory "disability." *Pennsylvania State Troopers Association v. Miller*, 621 F. Supp. 2d 246, 252 (M.D. Pa. 2008). In this vein, an applicant who is rejected by an employer based on information gleaned from an illegal pre-offer medical examination or inquiry may seek redress under § 12112(d)(2)(A) even if that information does not reveal a "disabling" medical condition. *Griffin*, 160 F.3d at 593-94.

It is undisputed that the LCNRC employees seeking positions with the CCC were subjected to pre-offer medical examinations and inquiries prohibited under the ADA. (ECF No. 131 ¶¶ 1-2). The EEOC asserts § 12112(d) claims against the Defendants based on those examinations and inquiries. (ECF No. 1 ¶ 12(c)-(d)). According to the EEOC, discovery has revealed that 26 unsuccessful applicants were "disabled" within the meaning of the ADA during the relevant period of time. (ECF No. 114 at 20-22). The Defendants concede that those individuals were statutorily "disabled" for purposes of the

pending motions for summary judgment.[2]  (ECF No. 130 at 1).  In addition to the §
12112(d) claims premised on the unlawful medical examinations and inquiries, the EEOC
brings § 12112(a) claims on behalf of the 26 "disabled" applicants who were not offered
positions with the CCC.  (ECF No. 1 at ¶ 12(g)).

The motion for partial summary judgment filed by the EEOC relates only to the
claims arising under § 12112(d).  (ECF No. 95).  Since it is undisputed that illegal pre-offer
medical examinations and inquiries were conducted in connection with the CCC's hiring
process, the EEOC seeks an order enjoining the Defendants from violating § 12112(d) in
the future.  (ECF No. 95-1 at 9).  The EEOC also requests that "further proceedings" be
held "to determine individualized remedies for the aforementioned violations of the
ADA."  (*Id.*).  The Defendants broadly move for summary judgment with respect to all
claims asserted against them in this case.  (ECF No. 92).

A.      The EEOC's Standing to Assert ADA Claims on Behalf of the Aggrieved
        Applicants

A federal court operating under the strictures of Article III of the Constitution
"generally may not rule on the merits of a case without first determining that it has
jurisdiction over the category of claim in suit."  Sinochem International Co., Inc. v. Malaysia
Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007).  Like all other Article III tribunals

---

[2] A party may stipulate to certain facts solely for purposes of a motion for summary judgment.
FED. R. CIV. P. 56(c)(1)(A).  Since the concession concerning the protected status of the twenty-
six individuals identified by the EEOC as "disabled" is limited to this stage, the Defendants
remain free to argue, at a later stage, that some or all of those individuals were not "disabled"
at the time of the challenged personnel decisions.  At this time, however, the Court assumes
*arguendo* that each individual identified as "disabled" by the EEOC was under a "disability"
as defined by the ADA at the time of his or her rejection.  42 U.S.C. § 12102(1).

established by Congress, this Court exercises "[t]he judicial Power of the United States." U.S. CONST., ART. III, § 1. This "judicial Power" is validly exercised only where a live "case" or "controversy" exists between the parties. *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (2013). The power vested in a federal court "exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). An action does not constitute a justiciable "case" or "controversy" for constitutional purposes unless the person bringing the action has the proper legal "standing" to do so. *Flast v. Cohen*, 392 U.S. 83, 95 (1968). To satisfy the Constitution's "requirement of standing," "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). "This triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998).

The Defendants move for summary judgment on the ground that the EEOC lacks standing. (ECF No. 93 at 9-15). This attack on the EEOC's standing is predicated on a belief that none of the applicants were "injured" by the unlawful medical examinations and inquiries challenged in this case. (ECF No. 111 at 2-5). In *Tice v. Centre Area Transportation Authority*, 247 F.3d 506, 519-20 (3d Cir. 2001), the Third Circuit held that a plaintiff proceeding with a claim under § 12112(d) must "demonstrat[e] the existence of an injury-in-fact" in order to obtain relief. Relying on *Tice*, the Defendants maintain that

the EEOC lacks standing to assert § 12112(d) claims in this case because no "injuries" resulted from the improper medical examinations and inquiries. (ECF No. 93 at 11).

By relying on *Tice* to challenge the EEOC's standing in this case, the Defendants conflate the "injury" necessary to satisfy the jurisdictional prerequisites of Article III with the "injury" needed to justify an award of damages under the ADA. "An injury need not be economic or tangible in order to confer standing." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995). The "injury" required under Article III generally consists of "an invasion of a legally protected interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, (1992). The invasion of legal rights conferred upon an individual by statute can provide him or her with standing to seek redress in federal court. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982). In certain instances, federal courts can "vindicate[] deprivations of certain 'absolute' rights that are not shown to have caused actual injury through the award of a nominal sum of money." *Carey v. Piphus*, 435 U.S. 247, 266 (1978). A violation of § 12112(d) occurs as soon as an employer conducts an unlawful medical examination or initiates a prohibited medical inquiry. *Katz v. Adecco USA, Inc.*, 845 F. Supp. 2d 539, 545 n.7 (S.D.N.Y. 2012). Article III's injury-in-fact requirement can be satisfied by "an identifiable trifle of injury." *NCAA v. Governor of New Jersey*, 730 F.3d 208, 219 (3d Cir. 2013). The "injuries" complained of here are clearly sufficient to satisfy the Constitution's jurisdictional prerequisite.

The standing inquiry required under Article III "is augmented by consideration of prudential limitations" on the exercise of a federal court's jurisdiction. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998). The "judicially-imposed limits on

14

the exercise of federal jurisdiction" include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen*, 468 U.S. at 751. Unlike the jurisdictional limitations inherent in Article III, which exist as a matter of constitutional mandate, the prudential limitations on the exercise of federal adjudicatory jurisdiction "can be modified or abrogated by Congress." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). Congress has specifically vested the EEOC with the authority to remedy violations of Title I. *See* 42 U.S.C. § 12117(a). Unlike a private party, the United States sustains injuries to its sovereignty from the mere violation of its laws. *Vermont Agency of Nat. Res. v. United States*, 529 U.S. 765, 771 (2000). It is undisputed that the Defendants violated the ADA more than 300 times. (ECF No. 131 ¶¶ 1-3). Under these circumstances, it is obvious that the EEOC has standing to bring this action to vindicate the statutory rights of the aggrieved individuals.

### B. The Defendants' Coverage under Title I

Title I's prohibitions apply to "covered entit[ies]." 42 U.S.C. § 12111(2). An "employer" is a "covered entity" within the meaning of the ADA. 42 U.S.C. § 12111(2). The term "employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person . . . ." 42 U.S.C. § 12111(5)(A). The EEOC alleges that Grane is liable for violating the ADA because

it acted as the CCC's agent in relation to the hiring process at issue. (ECF No. 1 ¶ 7). It is further alleged that the CCC independently qualifies as an "employer" for purposes of Title I.[3] (*Id.* ¶ 8). The Defendants maintain that, during the relevant period, they were not "employers" subject to the ADA's prohibitions.[4] (ECF No. 111 at 5-8).

Oddo testified that Grane had acted as the CCC's "managing agent" during the period falling between the acquisition and the opening of the facility. (ECF No. 133-3 at 4). The parties agree that Grane, in its capacity as an "agent," was "responsible for recruiting and selecting" the CCC's "initial complement of employees." (ECF No. 131 at ¶¶ 5-6). It is undisputed that Grane independently employed enough people to qualify for coverage under Title I. (ECF No. 131 ¶ 4). The EEOC argues that Grane is amenable to suit under the ADA because of its status as the CCC's agent. (ECF No. 96 at 7-8). The Defendants contend that since the CCC did not open until January 1, 2010, it was not an "employer" during the course of the preceding hiring process. (ECF No. 111 at 5-8). They further assert that Grane cannot be held liable under the present circumstances, since it

---

[3] The EEOC has named the ECC, which does business under the fictitious name of the "Cambria Care Center," as a defendant in this action. (ECF No. 1 ¶ 8). For the sake of clarity, the Court will refer to the prospective employer as the CCC, since that is where the LCNRC employees were seeking employment.

[4] The Defendants previously sought leave to move for the dismissal of the claims asserted against the CCC in a supplemental motion for summary judgment, contending that the CCC had not been an "employer" at the time of the statutory violations alleged in the complaint. (ECF No. 113). The request for leave to file a supplemental motion for summary judgment was denied on August 23, 2013. (ECF No. 128). At this time, the Court will address the issues concerning the Defendants' coverage under the ADA only to the extent that they relate to the EEOC's motion for partial summary judgment. (ECF No. 96 at 6-10; ECF No. 111 at 5-8; ECF No. 129 at 4-11).

was neither an agent of an "employer" nor a "joint employer" during the relevant period of time. *Id.*

The EEOC reads Title I's definition of the term "employer" to render an "agent" liable for its own discriminatory conduct. (ECF No. 96 at 7-8). The statute could be understood to operate in this manner. Nevertheless, the ADA's use of the word "agent" has more frequently been invoked to determine the extent of a covered employer's liability for the misconduct of its employees. *Roman-Oliveras v. Puerto Rico Electric Power Auth.*, 655 F.3d 43, 50-52 (1st Cir. 2011). Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*] defines the term "employer" in the same way as Title I of the ADA. 42 U.S.C. §§ 2000e(b), 12111(5)(A). In a series of decisions interpreting Title VII's statutory definition, the Supreme Court has consistently construed the word "agent" to mean that a traditional employer's liability for the actions of its *employees* (*i.e.*, its "agents") must be determined in accordance with agency law principles. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 144 (2004); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754-64 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986). This reading of the statutory language suggests that Congress intended to hold traditional employers liable for the actions of their agents in certain circumstances. *Huston v. Proctor & Gamble Paper Products Corp.*, 568 F.3d 100, 106 (3d Cir. 2009); *Knabe v. Boury Corp.*, 114 F.3d 407, 411 (3d Cir. 1997); *Craig v. Y&Y Snacks, Inc.*, 721 F.2d 77, 80-81 (3d Cir. 1983). It does not inevitably compel the conclusion that the ADA and Title VII impose direct liability upon the agents themselves. *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996) (remarking that "the 'agent' language was included to ensure *respondeat superior* liability of the

employer for the acts of its agents"). If read literally, the statutory definitions would appear to impose liability upon all agents of covered employers, including individual employees. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313-14 (2d Cir. 1995). Nonetheless, the Third Circuit has held that individual "agents" cannot be sued under Title VII. *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 184 (3d Cir. 1997); *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996). The Civil Rights Act of 1991 measures the maximum amount of compensatory and punitive damages available to an aggrieved employee by reference to the number of employees working for his or her employer. 42 U.S.C. § 1981a(b)(3). The Court of Appeals has relied on this "sliding scale of damages" as a basis for inferring that "Congress did not contemplate that such damages would be assessed against individuals who are not themselves the employing entity." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir. 1996). In light of these principles, a reasonable argument could be made that Title I's statutory definition does not impose liability upon covered agents. *Tomka*, 66 F.3d at 1313 (observing that Title VII's definition could be read to mean that "discriminatory personnel actions taken by an employer's agent only create liability for the employer-entity").

Notwithstanding the interpretive theory that Congress used the word "agent" solely to define a traditional employer's liability for discriminatory actions taken by its employees, some federal courts have concluded that an agent otherwise falling within the definition of the term "employer" can be sued for discriminatory conduct directed at an

individual technically "employed" by another entity.[5]  *Nealey v. Universal Health Servs., Inc.*, 114 F. Supp. 2d 1358, 1368-70 (S.D. Ga. 2000).  The Third Circuit has indicated that an agent can be properly named as a defendant in an action arising under Title I.  *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 177 (3d Cir. 2002).  In *DeVito v. Chicago Park District*, 83 F.3d 878, 882 (7th Cir. 1996), the Seventh Circuit concluded that an agent satisfying the employee-numerosity requirement could be sued under the ADA for discriminatory conduct perpetrated against a plaintiff employed by a distinct entity.  The reasoning employed in *DeVito* appears to remain viable in the Seventh Circuit.  *Alam v. Miller Brewing Co.*, 709 F.3d 662, 668 (7th Cir. 2013) (citing cases "for the proposition that Title VII plaintiffs may maintain a suit directly against an entity acting as the agent of an employer").  The rule prohibiting the imposition of liability upon individual agents reflects the desire of Congress to "str[ike] a balance between the goal of stamping out all discrimination and the goal of protecting small entities from the hardship of litigating discrimination claims."  *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1281 (7th Cir. 1995).  Those objectives are not in conflict when the "agent" engaging in discriminatory conduct falls within the applicable statutory definition.  *Nealey*, 114 F. Supp. 2d at 1368-69.  Accordingly, the Court is convinced that an "agent" independently satisfying the ADA's coverage criteria is amenable to suit by an individual formally

---

[5] Title I defines the term "employee" as "an individual employed by an employer."  42 U.S.C. § 12111(4).  This definition is "completely circular" and sheds no light on the question of agency liability in this case.  *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444-45 (2003); *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992).

"employed" by a different entity.[6]  *Myers v. Garfield & Johnson Enters., Inc.*, 679 F. Supp. 2d 598, 611-12 (E.D. Pa. 2010).

Grane satisfies the ADA's employee-numerosity requirement.  (ECF No. 131 ¶ 4).  It is undisputed that Grane, in its capacity as an "agent," directly controlled the applicants' access to "employment opportunities" with the CCC.  *Alam*, 709 F.3d at 669.  The only remaining question is whether the EEOC must independently establish the CCC's status as an "employer" in order to hold Grane liable as an "agent."

The EEOC concedes that every alleged act of discrimination in this case occurred before January 1, 2010.  (ECF No. 96 at 9 n.2).  The CCC was not operational before that date.  (ECF No. 133-3 at 4).  The CCC's status as an "employer" during the hiring period turns on whether it had 15 or more employees for each working day in each of 20 or more calendar weeks in 2008 or 2009.  42 U.S.C. § 12111(5)(A).  Given that the CCC did not employ anyone prior to 2010, it is not clear how the EEOC believes that the CCC qualifies as a "covered entity."  (ECF No. 1 ¶ 10).  In determining Grane's potential liability as an

_____

[6] The EEOC appears to base its theory of agency liability on *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119-20 (3d Cir. 2013).  (ECF No. 96 at 7-8).  It is not entirely clear whether *Covington* is squarely applicable to this case.  The principal defendant in *Covington* qualified as an "employment agency" under Title VII.  *Covington*, 710 F.3d at 119.  The term "employment agency" is defined as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person."  42 U.S.C. § 2000e(c).  The ADA incorporates this definition by reference.  42 U.S.C. § 12111(7).  The Court does not understand the EEOC to argue that Grane qualified as an "employment agency" during the relevant period.  Instead, the EEOC seeks to hold Grane liable as an "agent" of a distinct "employer."  ECF No. 96 at 7.  In light of this difference, the language in *Covington* relied upon by the EEOC does not necessarily support its theory of agency liability.  *Covington*, 710 F.3d at 119-20.  Nonetheless, the adoption of that theory in other cases suggests that it should be applied in this case.  *DeVito v. Chicago Park District*, 83 F.3d 878, 882 (7th Cir. 1996); *Nealey v. Univ. Health Servs., Inc.*, 114 F. Supp. 2d 1358, 1368-69 (S.D. Ga. 2000).

"agent" of the CCC, the Court will assume *arguendo* that the CCC was not an "employer" within the meaning of Title I when the alleged acts of discrimination took place.

The ADA's statutory definition requires Grane to be an "agent" *of an employer* to be liable under Title I. 42 U.S.C. § 12111(5)(A). This question must be answered in relation to the calendar year in which the challenged "discrimination" occurred. *EEOC v. Metro. Atlanta Girls' Club, Inc.*, 416 F. Supp. 1006, 1011-12 (N.D. Ga. 1976). The parties agree that Grane acted as the CCC's "agent" in 2009. (ECF No. 131 ¶ 6). Assuming that the CCC did not become an "employer" until 2010, the instant case presents the question of whether an entity independently satisfying the employee-numerosity requirement can be sued in its capacity as a *present* "agent" of a *future* "employer."

In *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997), the Supreme Court construed the word "employees" appearing in Title VII's anti-retaliation provision to include both current and former employees of a covered employer. Speaking through Justice Thomas, the Supreme Court explained that Title VII's definition of the term "employee" "lack[ed] any temporal qualifier and [wa]s consistent with either current or past employment." *Robinson*, 519 U.S. at 342. The Supreme Court observed that the word "employees" found in the language defining the term "employment agency" was most naturally read to include "prospective employees." *Id.* at 343 n.3. This observation has been relied on as a basis for broadening the category of "employment agencies" falling within the coverage of Title VII. *Veasy v. Teach for Am., Inc.*, 868 F. Supp. 2d 688, 695-96 (M.D. Tenn. 2012); *Scaglione v. Chappaqua Cent. Sch. Dist.*, 209 F. Supp. 2d 311, 315-16 (S.D.N.Y. 2002).

The statutory definition presently at issue imposes a "temporal qualifier" on an entity's status as an "employer." *Robinson*, 519 U.S. at 342. An entity is covered only if it "has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5)(A). The statutory language, however, does not clearly establish a corresponding "temporal qualifier" on the agency relationship. *Robinson*, 519 U.S. at 342. The decisions extending liability to "agents" under the theory advanced by the EEOC suggest that an agent's coverage under the relevant statutory provisions turns on its *own* satisfaction of the employee-numerosity requirement. *DeVito*, 83 F.3d at 882; *Nealey*, 114 F. Supp. 2d at 1368-69. The parties agree that Grane was independently covered under Title I in 2009, and that its agency relationship with the CCC predated January 1, 2010. (ECF No. 131 ¶¶ 4, 6). The Defendants concede that the CCC became an "employer" on that date. (ECF No. 111 at 5). Since the statutory language does not state that an entity must be an "agent" of a *current* "employer" in order to be a "covered entity," Grane can be held liable for the discriminatory acts allegedly committed in its capacity as an existing "agent" of a *future* "employer." 42 U.S.C. § 12111(5)(A). The alternative reading of the statute would create a gap in coverage not intended by Congress. *EEOC v. Wyoming*, 460 U.S. 226, 233 (1983). Given that Grane, a covered "employer" itself, was knowingly hiring employees for a distinct entity that was likewise destined to fall within Title I's coverage, "the broader context of the statute as a whole" suggests that the EEOC's theory of agency liability should carry the day in this case.[7] *Robinson*, 519 U.S. at 341.

---

[7] Given its control over the staffing process, which involved the hiring of more than 300

The documentary record suggests that the asset purchase agreement transferring the LCNRC's assets from Cambria County to Grane was executed on September 11, 2009. (ECF No. 133-7 at 2). Ebensburg Associates, LCC ("Ebensburg"), an affiliate of Grane, was designated to accept title to the real property. (*Id.*). The ECC, a separate Grane affiliate, was designated to accept title to the remaining assets. (*Id.*). This information was conveyed in an email authored by Theresa Creagh ("Creagh"), Grane's General Counsel and Secretary. (*Id.*). On October 2, 2009, the ECC was organized as a limited liability company in accordance with 15 PA. CONS. STAT. § 8913. (ECF No. 133-4 at 2-3). Pennsylvania law provides for the registration of fictitious business names. 54 PA. CONS. STAT. § 311. The name "Cambria Care Center" was registered as the ECC's fictitious name on November 5, 2009. (ECF No. 133-6 at 3-4). In an affidavit submitted to the National Labor Relations Board ("NLRB") on January 26, 2010, Oddo stated that Grane did not own the CCC. (ECF No. 98-2 ¶ 2). He further declared that Grane had a "contractual relationship" with Ebensburg and the ECC to manage the CCC, and that the ECC was responsible for the CCC's operations. (*Id.*).

The EEOC correctly points out that the CCC was "a legal entity as early as October 2009." (ECF No. 129 at 5). As an existing "entity," the CCC was able to engage in an agency relationship with Grane, an independently "covered entity," to facilitate the recruitment and selection of employees. (ECF No. 131 ¶¶ 4-6). The CCC's status as a "legal entity," however, does not warrant the conclusion that it was a "covered entity"

employees, Grane was clearly on notice in 2010 that its existing agency relationship was with an entity that would be covered under Title I. (ECF No. 115 ¶¶ 16-18).

23

under Title I. 42 U.S.C. § 12111(2). An entity is subject to the ADA's provisions only if it "has 15 or more employees for each working day in each of 20 or more calendar weeks *in the current or preceding calendar year*." 42 U.S.C. § 12111(5)(A)(emphasis added). "[A]n employer 'has' an employee if [it] maintains an employment relationship with that individual." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997). Since the CCC *had* no employees until 2010, it did not fall within the statutory definition in 2009. It is not entirely clear how the EEOC believes that the CCC independently qualified as an "employer" during the relevant period, aside from its relationship with Grane. The "temporal qualifier" enacted by Congress must be enforced. *Robinson*, 519 U.S. at 342.

In an attempt to link the Defendants together for liability purposes, the EEOC maintains that they acted as a "joint employer" in connection with the hiring process. (ECF No. 96 at 8-10). The Defendants contend that the EEOC "cannot raise the joint employer theory for the first time at [this] stage." (ECF No. 111 at 7). A plaintiff cannot assert an unpled claim in a brief supporting or opposing a motion for summary judgment. *Nykiel v. Borough of Sharpsburg*, 778 F. Supp. 2d 573, 587 (W.D. Pa. 2011); *Johnson v. Cmty. College of Allegheny Cnty.*, 566 F. Supp. 2d 405, 449 (W.D. Pa. 2008). The "joint employer" theory advocated by the EEOC, however, does not constitute a new claim. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995). The EEOC's claims against the Defendants, which arise under the ADA, are concededly before the Court. *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 330-31 (2010). "Once a claim is properly presented, a party can make any argument in support of that claim." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). The complaint filed in this case alleges that the Defendants were all entities

24

"covered" under Title I. (ECF No. 1 ¶¶ 4-10). At the pleadings stage, the EEOC was not required to "pin [its] claim for relief to a precise legal theory." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011). Consequently, the EEOC is not precluded from arguing that the Defendants may be held liable as "joint employers."

In *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997), the Third Circuit recognized that two employers could be viewed as "joint employers" if they "exercise[d] significant control over the same employees." The EEOC relies on the reasoning employed in *Graves* to hold the Defendants collectively liable for any ADA violations perpetrated during the hiring process. (ECF No. 96 at 8-9). The situation in this case, however, is meaningfully different from the situation in *Graves*. The defendants in *Graves* independently satisfied the criteria for coverage under Title VII. *Graves*, 117 F.3d at 724 (describing the employers in question as "the judicial branch of the Commonwealth of Pennsylvania" and "Dauphin County," both of which had enough employees to satisfy Title VII's employee-numerosity requirement). The instant case is different because the EEOC is attempting to aggregate the employees of Grane with those of the CCC (which had no employees at the time of the alleged discriminatory conduct) to establish each entity's coverage under the ADA. This factor distinguishes the instant case from some of the cases relied upon by the EEOC. *King v. Chrysler Corp.*, 812 F. Supp. 151, 153-54 (E.D. Mo. 1993). Since the dispute between the parties centers on whether the CCC was subject to Title I's requirements rather than on whether an employment relationship existed between the CCC and a particular individual, greater scrutiny of this issue is required. *Butterbaugh v. Chertoff*, 479 F. Supp. 2d 485, 492 (W.D. Pa. 2007).

In *Grane Health Care v. NLRB*, 712 F.3d 145, 155 (3d Cir. 2013), which also arose out of labor disputes stemming from Grane's acquisition of the LCNRC, the Court of Appeals affirmed a finding by the NLRB that Grane and the CCC constituted a "single employer," thereby rendering them jointly and severally liable for certain violations of the National Labor Relations Act ("NLRA"). The holding in *Grane*, however, lacks dispositive force in this case for two reasons. First, the Court of Appeals was required to review the NLRB's factual findings pursuant to the evidentiary standard of "substantial evidence," which is highly deferential. 29 U.S.C. § 160(e). In this case, the CCC's coverage under Title I is "an element of [the EEOC's] claim for relief" that must be established based on the evidence contained in the record. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006). Second, the test for determining whether two entities constitute a "single employer" for purposes of the NLRA does not apply in cases involving anti-discrimination statutes such as the ADA and Title VII. In the present context, the more exacting test announced in *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 84-89 (3d Cir. 2003), governs the question of whether Grane's employees can be added to the CCC to bring the CCC within Title I's coverage at the time of the alleged discrimination. *Myers*, 679 F. Supp. 2d at 608 (explaining that *Nesbit* addresses "the specific situation in which a plaintiff seeks to evade Title VII's minimum size requirements by 'consolidating' a defendant with an affiliated entity, thus allowing the employees of both entities to count toward the statutory minimum").

The existing record does not shed much light on the terms of the asset purchase agreement, the relationship between Grane and its affiliates, or the circumstances in which the Defendants have collectively engaged in the management of the facility at

issue. The ADA's 15-employee coverage requirement must be "strictly construed." *Nesbit*, 347 F.3d at 85. That requirement "relates to the substantive adequacy" of the EEOC's case. *Arbaugh*, 546 U.S. at 504. Since there are unresolved questions as to whether Grane and the CCC constituted a "single employer" during the 2009 hiring process, the EEOC's motion for partial summary judgment will be denied with respect to the CCC.

C.       **The EEOC's Satisfaction of the Applicable Conditions Precedent**

The ADA incorporates Title VII's remedial scheme in cases involving employment discrimination. 42 U.S.C. § 12117(a). The statutory protocol imposes certain conditions precedent on the EEOC's ability to commence an action. *EEOC v. Allegheny Airlines & Steward & Stewardess Div.*, 436 F. Supp. 1300, 1304 (W.D. Pa. 1977). The process is initiated "[w]hever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer . . . has engaged in an unlawful employment practice." 42 U.S.C. § 2000e-5(b). After receiving a charge of discrimination, the EEOC is required to "make an investigation thereof." *Id.* If the EEOC "determines after such investigation that there is reasonable cause to believe that the charge is true," it must "endeavor to eliminate [the] unlawful employment practice by informal methods of conference, conciliation, and persuasion." *Id.* The EEOC may commence an enforcement action only if it has been unable to secure an acceptable "conciliation agreement" from the offending employer. 42 U.S.C. § 2000e-5(f); *EEOC v. Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 73 (3d Cir. 1984). "EEOC enforcement actions are not limited to the claims presented by the charging parties. Any violations that the EEOC ascertains in the course

of a reasonable investigation of the charging party's complaint are actionable." *Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 331 (1980).

Once a charge of discrimination is filed, "the EEOC is in command of the process" and exclusively exercises "the authority to evaluate the strength of the public interest at stake." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 291 (2002). A court entertaining a subsequent action brought by the EEOC may not "inquire into the sufficiency of [its] investigation." *EEOC v. Keco Indus., Inc.*, 748 F.2d 1097, 1100 (6th Cir. 1984). An inquiry of that kind "would propel the court into the domain which Congress has set aside exclusively for the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "[I]f the investigation gives rise to a reasonable belief that the charge is true" and subsequent attempts at conciliation are unsuccessful, the EEOC may "sue any of the alleged offenders." *EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 832 (7th Cir. 2005). The EEOC's "preadjudication finding of reasonable cause" is not subject to judicial review. *Georator Corp. v. EEOC*, 592 F.2d 765, 767 (4th Cir. 1979).

The Defendants move for summary judgment on the ground that the EEOC never investigated whether the unsuccessful applicants were not hired because of information revealed by the unlawful medical examinations and inquiries, or because of actual or perceived disabilities. (ECF No. 93 at 31-35). As an initial matter, the argument advanced by the Defendants, if meritorious, would not implicate the more than 300 § 12112(d) claims asserted in this case. A § 12112(d) violation occurs as soon as "an employer conducts an improper medical examination or asks an improper disability-related question, regardless of the results or response." *Green v. Joy Cone Co.*, 107 F. App'x 278,

280 (3d Cir. 2004)(unpublished). The manner in which the illegally obtained information was used (or not used) has no bearing on whether the underlying prophylactic provisions were violated. *Katz*, 845 F. Supp. 2d at 545 n.7. The issues raised by the Defendants relate solely to the subset of claims arising under § 12112(a). In any event, the Defendants' contention that the § 12112(a) claims were never investigated is refuted by the record.

Alan L. Archer ("Archer"), the EEOC investigator deposed by the Defendants, testified that he had "looked at the evidence holistically" in order to determine whether unsuccessful applicants to the CCC had been turned away because of disabling medical conditions. (ECF No. 100-2 at 10). He stated that his investigation had revealed the existence of "identified medical conditions" suffered by a majority of the unsuccessful applicants, leading him to believe that several personnel decisions had been made based on impermissible factors. (*Id.* at 9-10). The Supreme Court has recognized that "a policy of discriminatory decisionmaking" can sometimes give rise to an inference that "individual employment decisions were discriminatorily based." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 362 (1977). The EEOC's finding of "reasonable cause" is not judicially reviewable. *EEOC v. Johnson Co.*, 421 F. Supp. 652, 657 (D. Minn. 1975). The Defendants cannot evade the applicable limits on judicial review merely by contending that the multiple claims asserted in this case should have been investigated on a piecemeal basis. *Serrano v. EEOC*, 699 F.3d 884, 904-05 (6th Cir. 2012). A claim is subject to dismissal only "if it is evident that the [EEOC] failed to even undertake an investigation" of the matter. *EEOC v. James Julian, Inc.*, 736 F. Supp. 59, 61 (D. Del. 1990). This Court has already declared that it "[w]ould not examine the adequacy of [the] EEOC's

investigation." (ECF No. 86 at 8). The Defendants recite a litany of questions that, in their view, should have been asked and answered during the course of Archer's investigation. (ECF No. 93 at 32-34). Since "[t]he statute clearly makes the EEOC the master of its own case," further consideration of the Defendants' argument would contravene the express will of Congress. *Waffle House*, 534 U.S. at 291.

### D. The EEOC's Request for Injunctive Relief

As discussed earlier, issues of material fact exist as to whether the CCC was a "covered entity" under the ADA at the time of the alleged discriminatory acts. The CCC's coverage under Title I is a "substantive ingredient" of the EEOC's claims. *Arbaugh*, 546 U.S. at 503. Because the CCC's coverage has not been established as a matter of law, the EEOC's motion for partial summary judgment will be denied with respect to the CCC. Nonetheless, the record establishes that Grane, a "covered entity," violated § 12112(d) more than 300 times. (ECF No. 131 ¶ 2). Thus, the EEOC's motion for partial summary judgment will be granted with respect to Grane's liability for the established violations.

The EEOC asks that Grane be permanently enjoined from perpetrating further violations of § 12112(d). (ECF No. 95-1 at 9). The statutory provision upon which this request is based provides as follows:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible

for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1). Given that this statutory language only requires a finding that the offending employer has engaged in "an unlawful employment practice charged in the complaint," "[i]t is clear that the EEOC may obtain equitable relief that protects a class of persons from unlawful employment discrimination without citing numerous instances of such discrimination." *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 468 (6th Cir. 1999). Once a finding of intentional discrimination has been made, it is generally incumbent upon the employer to demonstrate that "the discrimination is unlikely to continue." *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013).

The Defendants argue that the statutory violations established in this case were "merely technical" violations of the kind at issue in *Tice*, and that no relief is warranted. (ECF No. 93 at 11). This assertion is unavailing. *Tice* involved allegations that a covered employer had "improperly commingl[ed] the medical records of employees with nonconfidential files." *Tice*, 247 F.3d at 519. Unlike the situation in *Tice*, which concerned only misplaced medical records, the instant case goes to the heart of what Congress intended to accomplish by prohibiting pre-offer medical examinations and inquiries.

Unlike many other legal proscriptions, which recognize prohibited conduct by reference to a defendant's actions, statutes prohibiting discriminatory practices in the employment setting typically define unlawful conduct by reference to a covered employer's "mental processes." *United States Postal Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). An otherwise lawful employment action becomes unlawful only when it is

31

taken "on the basis of a discriminatory criterion." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984). Because the outward *actions* prohibited by anti-discrimination statutes are facially legal, employers are sometimes able "to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996). Victims of discrimination "often come to the legal process without witnesses and with little direct evidence indicating the precise nature of the wrongs [that] they have suffered." *Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987). Since an educated employer engaged in discriminatory practices will usually know "not to leave the proverbial 'smoking gun' behind," discriminatory conduct can sometimes go undetected and unremedied. *Aman*, 85 F.3d at 1082.

The ADA's prohibition against pre-offer medical examinations and inquiries is prophylactic in nature. Congress was concerned that medical information gleaned from such examinations and inquiries could be used to exclude disabled applicants from further consideration for employment. (ECF No. 140-1 at 39). In order to discriminate against an applicant "on the basis of disability," an employer must *know* that the applicant is disabled. *Geraci*, 82 F.3d at 581. By denying employers access to medical information until after offers of employment are made, § 12112(d) aims to ensure that such information does not infect the employee-selection process. (ECF No. 140-1 at 39).

"Once an offer of employment has been made, a prospective employee may be asked to undergo a medical examination, provided that 'all entering employees are subjected to such an examination regardless of disability,' the confidentiality requirements

of § 12112(d)(3)(B) are adhered to, and the results of the examination are 'used only in accordance with' Title I." *Chedwick v. Univ. of Pittsburgh Med. Ctr.*, Civil Action No. 07-806, 2011 WL 1559792, at *11, 2011 U.S. Dist. LEXIS 43239, at *33-34 (W.D. Pa. Apr. 21, 2011). With the caveat that the information obtained from the examination (and accompanying inquiries) cannot be used to unlawfully discriminate against a "disabled" individual in violation of § 12112(a), the employer "may condition [its] offer of employment on the results of [that] examination." 42 U.S.C. § 12112(d)(3). If the offer of employment is withdrawn because of medical information discovered through the use of a post-offer examination or inquiry, the rejected individual remains free to pursue an ADA claim premised on the theory that the offer was withdrawn "for reasons not in accordance with" Title I. *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 963 n.7 (10th Cir. 2002). In that scenario, the factual issue typically centers on whether the "disability" detected by post-offer testing renders the individual unable to perform the "essential functions" of the desired position, "with or without reasonable accommodation[s]." 42 U.S.C. §§ 12111(8), 12112(b)(5). The rejected applicant does not normally have to contend with assertions that he or she was rejected for "legitimate, nondiscriminatory reasons" other than his or her medical condition, since the employer's initial decision to extend an offer of employment will have preceded the discovery of the relevant medical information. In this way, § 12112(d) deters covert discrimination against disabled applicants by forcing employers to make hiring decisions *before* procuring the information upon which discriminatory decisions could be based. *Griffin*, 160 F.3d at 594 (remarking

that "Congress wished to curtail all questioning that would serve to identify and exclude persons with disabilities from consideration for employment").

This case does not involve misplaced medical files or fleeting questions technically constituting medical inquiries. *Tice*, 247 F.3d at 519-20. The existing record demonstrates that the LCNRC employees seeking employment with the CCC were subjected to a formalized process consisting of unlawful pre-offer medical examinations and illicit solicitations of detailed medical information. The individuals who were subjected to these illegal examinations and inquiries, including those who were ultimately rejected, were deprived of the prophylactic protection from discrimination that § 12112(d) was designed to create. Congress sought "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). Covered employers cannot erode those standards by procuring detailed medical information about applicants for employment and contending, at the end of the day, that such information has never been used to the detriment of those applicants. If it were otherwise, disabled individuals would be vulnerable to several forms of discrimination that the ADA was designed to prevent. Since most employment decisions involve elements of discretion, it is relatively easy for an employer to "concoct a plausible reason for not hiring" a particular individual. *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir. 1987). A decision declaring the admitted § 12112(d) violations to be "harmless" would seriously undermine the ADA's policy of prophylactic deterrence.

The testimonial record indicates that pre-offer medical examinations were performed on the LCNRC employees seeking jobs with the CCC because several positions

needed to be filled in a short period. (ECF No. 99-2 at 2 ¶¶ 9-11; ECF No. 99-3 at 3-4). If no relief is provided in this case, the Defendants may persist in the belief that they are free to ignore the ADA's prophylactic protections in the name of expedience, as long as they do not base their personnel decisions on impermissible factors. The mandate of Congress cannot be cast aside without consequence. The EEOC's motion for partial summary judgment will be granted to the extent that it seeks an order enjoining Grane from violating § 12112(d)'s prohibitions against pre-offer medical examinations and inquiries. (ECF No. 95-1 at 9). The requested relief will be denied with respect to the CCC, since its coverage under Title I remains in dispute.

### E. The Availability of Money Damages

In *General Telephone Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 333-34 (1980), the Supreme Court held that the EEOC "may seek specific relief for a group of aggrieved individuals without first obtaining class certification pursuant to Federal Rule of Civil Procedure 23." Therefore, the EEOC need not satisfy Rule 23's prerequisites to seek relief for the applicants who were unlawfully subjected to pre-offer medical examinations and inquiries. *EEOC v. Pitre, Inc.*, 908 F. Supp. 2d 1165, 1173 (D.N.M. 2012). To obtain relief for a particular individual, however, the EEOC must establish each element of his or her claim. *EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 929 (N.D. Iowa 2009).

A violation of § 12112(d) occurs as soon as a covered employer "conducts an improper medical examination or asks an improper disability-related question, regardless of the results or response." *Green*, 107 F. App'x at 280. The parties do not dispute that

more than 300 statutory violations occurred in this case. (ECF No. 131 ¶ 2). Those violations obviously satisfy the statutory predicate for injunctive relief. 42 U.S.C. § 2000e-5(g)(1). In addition to equitable relief, the EEOC seeks awards of money damages on behalf of individuals aggrieved by the Defendants' conduct. (ECF No. 1 at 6-7, ¶¶ A-I).

Title VII's remedial scheme is available to plaintiffs aggrieved by ADA violations committed in the employment setting. 42 U.S.C. § 12117(a). Before 1991, plaintiffs proceeding under Title VII could only seek "equitable" remedies. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 252 (1994). Backpay was the primary form of monetary relief available to aggrieved individuals. *Id.* at 252-53. Section 102 of the Civil Rights Act of 1991 added compensatory and punitive damages to the remedies otherwise available under Title VII and the ADA.[8] Pub. L. No. 102-166, § 102; 105 Stat. 1071, 1072-74 (1991).

The relevant statutory language, codified at 42 U.S.C. § 1981a(2), permits a "complaining party"[9] to "recover compensatory and punitive damages" from a covered entity responsible for violating § 102 of the ADA. The provisions governing medical examinations and inquiries are included within § 102. Pub. L. No. 101-336, § 102; 104 Stat. 327, 331-33 (1990). The compensatory damages available to individuals aggrieved by violations of Title I include remuneration for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). Punitive damages may be awarded upon a

---

[8] Title I of the ADA became effective on July 26, 1992. By that time, the Civil Rights Act of 1991 had already been signed into law. Pub. L. No. 102-166; 105 Stat. 1071, 1100 (1991).

[9] The EEOC qualifies as a "complaining party" under this statutory provision. 42 U.S.C. § 1981a(d)(1)(B).

showing that the covered entity has "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The term "discriminatory practice" is defined broadly enough to include intentional violations of § 12112(d)(2)(A). 42 U.S.C. §§ 1981a(a)(2), (d)(2). The total amount of compensatory and punitive damages available to "each complaining party" is capped at anywhere from $50,000 to $300,000, depending on the number of individuals employed by the covered entity.[10] 42 U.S.C. § 1981a(3)(A)-(D).

The Civil Rights Act of 1991 permits any party to "demand a trial by jury" "[i]f a complaining party seeks compensatory *or* punitive damages" under Title I. 42 U.S.C. § 1981a(c)(1)(emphasis added). The disjunctive wording of this language suggests that a plaintiff can seek an award of punitive damages without seeking an award of compensatory damages. *Harding v. Provident Life & Accident Ins. Co.*, 809 F. Supp.2d 403, 415-16 (W.D. Pa. 2011) (interpreting a statutory phrase in which the word "or" was used to separate two alternatives). Several Courts of Appeals have concluded that punitive damages may be assessed under the relevant statutory provisions even if no compensatory damages are awarded. *Abner v. Kansas City S. R.R. Co.*, 513 F.3d 154, 159-60 (5th Cir. 2008); *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 534-35 (6th Cir. 2005); *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir. 2001); *Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1009-10 (7th Cir. 1998).

---

[10] Because "backpay" and "interest on backpay" are excluded from "compensatory damages" under 42 U.S.C. § 1981a(b)(2), such awards do not count against the applicable cap.

The EEOC maintains that it can recover punitive damages for each applicant who was subjected to an illegal pre-offer medical examination or inquiry. (ECF No. 114 at 17-18). This position appears to be predicated on a belief that an individual who is unlawfully subjected to such an examination or inquiry need not suffer "actual harm" in order to recover punitive damages. (*Id.* at 17). In *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 562 (5th Cir. 1998), the Fifth Circuit held that a plaintiff seeking monetary relief for an improper medical examination or inquiry must demonstrate "something more than a mere violation" of § 12112(d). The Fifth Circuit went on to explain that a monetary award under § 12112(d) must be premised on "a cognizable and compensable injury arising out of the medical examination [or] inquiry." *Armstrong*, 141 F.3d at 562. The reasoning employed in *Armstrong* was adopted by the Third Circuit in *Tice*. *Tice*, 247 F.3d at 520. Nevertheless, the Third Circuit expressly limited its holding by clarifying that it was not defining the type of "injury" that a plaintiff must show to recover money damages. *Id.* at 520 n.12 ("We do not reach any conclusion with respect to the correctness of these courts' determinations as to whether the plaintiffs in those cases alleged the existence of a redressable 'injury' within the meaning of the ADA; we merely agree that in the absence of injury—however defined—no claim can lie for a violation of § 12112(d).").

As discussed earlier, *Tice* involved the mere misplacement of medical records in files containing nonconfidential information. *Tice*, 247 F.3d at 519. The plaintiff in that case could not even establish that someone had improperly viewed his medical records. *Id.* at 520. The instant case is distinguishable from *Tice* because the LCNRC employees seeking employment with the CCC were subjected to searching examinations and

inquiries at a time when hiring decisions were being made. It is at least arguable that the "inconvenience" of undergoing an unlawful medical examination can constitute an "injury" sufficient to render an offending employer liable in damages. 42 U.S.C. § 1981a(b)(3).

In any event, the holding in *Tice* simply does not speak to the question of when a plaintiff can recover punitive damages for a violation of § 12112(d). A plaintiff seeking punitive damages under Title I must demonstrate that the offending employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [his or her] federally protected rights." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. American Dental Association*, 527 U.S. 526, 536 (1999), the Supreme Court construed this language to mean that a covered employer must "discriminate in the face of a perceived risk that its actions will violate federal law" in order to be liable for punitive damages. This standard focuses on an employer's subjective state of mind. *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 573 (3d Cir. 2002). The terms "malice" and "reckless indifference" pertain not merely to an employer's awareness of its own discriminatory conduct, but rather to its "knowledge that it may be acting in violation of federal law." *Kolstad*, 527 U.S. at 535. A covered entity is not liable for punitive damages if it is unaware of the federal law giving rise to the plaintiff's cause of action, or if it honestly believes the unlawful conduct to be permissible. *Alexander v. Riga*, 208 F.3d 419, 432 (3d Cir. 2000). In *Tice*, there was no allegation that the covered employer had consciously perceived a risk that it was violating the ADA by commingling confidential medical records with other documents. *Tice*, 247 F.3d at 519-20. The Court of Appeals was simply not presented with

a situation involving a plaintiff with no compensable injury who could nevertheless satisfy the "higher standard" necessary to qualify for punitive damages. *Kolstad*, 527 U.S. at 534.

"Extra-statutory requirements for recovery should not be invented." *Timm*, 137 F.3d at 1010. The statutory language does not condition an award of punitive damages on a showing of tangible harm. 42 U.S.C. § 1981a(b)(1). It is worth noting that the term "discriminatory practice" is defined more broadly in relation to Title I than it is in relation to Title VII. Although the term includes only "discrimination" in the Title VII context, it is broad enough to encompass "violations" of the ADA that might not constitute "discrimination." 42 U.S.C. § 1981a(1)-(2), (d)(2). The breadth of this language, which specifically defines a term appearing in the portion of the statute governing awards of punitive damages, suggests that Congress intended to provide for assessments of punitive damages against employers responsible for intentionally violating Title I's prophylactic provisions. 42 U.S.C. § 1981a(b)(1), (d)(2). Precluding awards of punitive damages in cases involving no "easily quantifiable physical and monetary harm would quell the deterrence that Congress intended" to provide when it enacted § 12112(d). *Abner*, 513 F.3d at 163. The statutory caps on damages "ensure against limitless awards in cases of insubstantial harm."[11] *Tisdale*, 415 F.3d at 534. The "higher standard that a plaintiff must

---

[11] In cases governed by state law, the Supreme Court has held that "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). The constitutionality of an assessment of punitive damages depends, in part, on "the relationship between the penalty and the harm to the victim caused by the defendant's actions." *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 435 (2001). Any

satisfy to qualify for a punitive award" guarantees that any award of punitive damages under § 12112(d)(2)(A) will be "based on something more than a mere violation of that provision." *Kolstad*, 527 U.S. at 534; *Armstrong*, 141 F.3d at 562. Accordingly, the EEOC can seek punitive damages on behalf of the applicants who were unlawfully subjected to pre-offer medical examinations and inquiries even if those applicants are not otherwise entitled to compensatory damages. *Cush-Crawford*, 271 F.3d at 359.

The "mere existence" of a statutory violation provides no guarantee that an applicant is eligible for an award of punitive damages. *Alexander*, 208 F.3d at 432. To recover punitive damages for the aggrieved individuals, the EEOC will need to demonstrate that the Defendants subjectively disregarded a risk that their conduct violated Title I. *Kolstad*, 527 U.S. at 536-537. Furthermore, the EEOC will have to establish that the actions of the offending individuals can be imputed to the Defendants under the standard announced in *Kolstad*. *Id.* at 539-46. At this time, no opinion is expressed as to whether punitive damages will ultimately be awarded in this case.

---

constitutional concerns about the imposition of excessive punitive damages awards in the present context are substantially mitigated by the statutory caps. *EEOC v. Autozone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013)(recognizing that the existence of a statutory cap "suggests that an award of damages at the capped maximum is not outlandish"). Nevertheless, the Ninth Circuit recently concluded that an award of punitive damages falling within the applicable statutory cap can still protrude "outside of constitutional limits." *Arizona v. ASARCO, LLC*, 733 F.3d 882, 892 (9th Cir. 2013). At this time, the Court expresses no opinion as to whether the Due Process Clause of the Fifth Amendment imposes limits on the amounts of punitive damages recoverable in this case beyond those already imposed by statute. 42 U.S.C. § 1981a(b)(3)(A)-(D). If punitive damages are ultimately awarded for individuals who have not suffered tangible injuries, the Defendants remain free to challenge the amounts of those awards on constitutional grounds.

The EEOC need only establish that injuries flowed from the statutory violations in order to recover compensatory damages for the aggrieved applicants. *Garrison*, 287 F.3d at 963. If the Defendants had complied with Title I's statutory mandate limiting medical examinations to the post-offer stage, any applicant rejected on the basis of information uncovered during the course of such an examination would have had to establish the existence of a "disability" in order to assert an "improper use" claim under § 12112(d)(3)(C). *O'Neal*, 293 F.3d at 1009-10; *Chedwick*, 2011 WL 1559792, at *11-14, 2011 U.S. Dist. LEXIS 43239, at *35-45. Since the examinations in this case were *illegally* conducted at the pre-offer stage, the EEOC can seek backpay and compensatory damages on behalf of *any* applicant rejected based on unlawfully procured medical information, regardless of whether his or her injuries are attributable to "discrimination based on a disability." *Garrison*, 287 F.3d at 963. Moreover, recovery may be sought for less tangible injuries caused by the examinations and inquiries, irrespective of whether those injuries manifested themselves in the form of personnel decisions. *Tice*, 247 F.3d at 519 (suggesting that an "emotional" injury could constitute "actual damage").

In accordance with the EEOC's request, further proceedings will be conducted to address the issue of damages. Since the CCC's coverage under Title I has not been established, the upcoming proceedings will need to facilitate the resolution of that issue as well. The Court expresses no opinion as to whether any monetary awards are justified in this case. As the case progresses, each party will be afforded an opportunity to assert its position on how the remaining proceedings should be conducted.

## F.     The Disability-Based Discrimination Claims

In addition to the § 12112(d) claims arising from the unlawful medical examinations and inquiries, the EEOC brings § 12112(a) claims on behalf of 26 applicants who were allegedly denied employment opportunities with the CCC because of actual or perceived disabilities.[12]  (ECF No. 1 ¶ 12(g)).  A plaintiff attempting to proceed with a discrimination claim under § 12112(a) must establish that he or she is "disabled" within the meaning of the ADA.  *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509-10 (3d Cir. 2009).  For purposes of summary judgment, the Defendants concede that 26 individuals identified by the EEOC were "disabled" during the course of the challenged hiring process.  (ECF No. 130 at 1).  With respect to the § 12112(a) claims, the motion for summary judgment filed by the Defendants relates primarily to the issue of causation.[13]  (ECF No. 93 at 16-27).

The Defendants advance their arguments in accordance with the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  (ECF No. 93 at 5-6).  It is not entirely

---

[12] The EEOC initially identified 27 "disabled" applicants.  (ECF No. 114 at 20-21).  One of those applicants was Therese Dow ("Dow").  *Id.* at 21 n.5.  Discovery later revealed that Dow had received an offer of employment, but that the offer had been rescinded based on the results of a post-offer functional agility test.  (ECF No. 100-5 at 2; ECF No. 116-4 at 11-12).  The EEOC is no longer pursuing a failure-to-hire claim on Dow's behalf.  (ECF No. 114 at 21 n. 5).  The remaining claim pertaining to Dow arises solely under § 12112(d).

[13] The Defendants ask that summary judgment be entered in their favor with respect to disability-based discrimination claims asserted on behalf of applicants who received offers of employment.  (ECF No. 93 at 16).  No such claims are being asserted in this case.  The EEOC brings § 12112(a) claims only on behalf of applicants who were allegedly denied employment opportunities because of actual or perceived disabilities.  (ECF No. 1 ¶ 12(g)).  The claims brought on behalf of the successful applicants arise only under § 12112(d).  (*Id.* ¶ 12(c)-(e)).

clear whether that framework is suited for a case such as this, which involves a series of hiring decisions involving a large number of applicants. In *Serrano v. EEOC*, 699 F.3d 884, 894-896 (6th Cir. 2012), the Sixth Circuit held that a case need not arise under 42 U.S.C. § 2000e-6 in order to proceed under the framework utilized in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). In some respects, the *Teamsters* framework may not be an appropriate fit for claims arising under the ADA. *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 183-98 (3d Cir. 2009). Nonetheless, the Court is not convinced that the individual § 12112(a) claims asserted in this case can be considered on a piecemeal basis, without regard to the evidentiary record as a whole. *Teamsters*, 431 U.S. at 358 n.44 (noting that *McDonnell Douglas* had "involved an individual claimant seeking to prove one instance of unlawful discrimination"). At the present stage, however, the claims will be evaluated under the standards discussed in *McDonnell Douglas* and *Burdine*. To account for the fact that the disability-based discrimination claims asserted in this case all arise from the same hiring process, the Court will consider the overall context of the case in determining whether triable issues exist in relation to the claims brought on behalf of specific applicants. *Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006) (explaining that "the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales").

In an employment discrimination case of this kind, the plaintiff must establish a *prima facie* case of illegal discrimination. *McDonnell Douglas*, 411 U.S. at 802. If a *prima facie* case is established, the defendant must articulate legitimate, nondiscriminatory

reasons for treating the plaintiff in an adverse manner. *Id.* at 802-03. If the defendant articulates such reasons, the plaintiff must then demonstrate that the reasons given by the defendant are merely a pretext for unlawful employment discrimination. *Id.* at 804-05. Evidence suggesting that an employer's stated reasons for an adverse employment action are unworthy of credence is one form of circumstantial evidence that a plaintiff can use to establish the existence of intentional discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

The plaintiff's burden of establishing a *prima facie* case of disparate treatment is not onerous. *Burdine*, 450 U.S. at 253. To establish a *prima facie* case of discrimination, the plaintiff need only show that: (1) he or she was a member of a statutorily protected class; (2) he or she was aggrieved by an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of illegal discrimination. *Shah v. Bank of Am.*, 598 F. Supp. 2d 596, 604 (D. Del. 2009). The specific elements of a *prima facie* case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999). The *prima facie* inquiry "remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003). Because the *prima facie* inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value*, not whether they fit into a mechanical formula." *Cobetto v. Wyeth Pharm.*, 619 F. Supp. 2d 142, 153 n.3 (W.D. Pa. 2007) (emphasis in original) (citation omitted). A *prima facie* case "raises an inference of discrimination"

sufficient to shift the burden of production to the defendant. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). This inference is based on an assumption that certain actions, if left unexplained, "are more likely than not based on the consideration of impermissible factors." *Id.*

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Burdine*, 450 U.S. at 254-55. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254. The inquiry concerning whether the defendant has met its burden "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original). The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, *if taken as true*, would *permit* a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Id.*

If the defendant meets its burden of production, the dispositive factual issue is framed with "sufficient clarity" to provide the plaintiff with "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-56. To establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the factfinder that a discriminatory animus was the *real reason* for the adverse employment action at issue. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Liability cannot be

established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken based on an impermissible discriminatory criterion. *St. Mary's Honor Ctr.*, 509 U.S. at 519 ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis in original). Nevertheless, evidence suggesting that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's *prima facie* case, may sufficiently undermine the employer's credibility to enable a reasonable factfinder to conclude that illegal discrimination has occurred. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000). Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas-Burdine* burden-shifting framework requires a court to ration the evidence presented in a particular case among the *prima facie* and pretext stages of the analysis. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination. *Reeves*, 530 U.S. at 147. Circumstantial evidence is not only sufficient to sustain a finding of liability for intentional discrimination, "but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace*, 539 U.S. at 100, quoting *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 508 n.17 (1957). Depending on the circumstances of the particular case, a plaintiff can sometimes prevail based on circumstantial evidence without introducing "additional, independent evidence of discrimination." *Reeves*, 530

U.S. at 149. Whether summary judgment is warranted in a given case depends upon the strength of the plaintiff's *prima facie* case, the probative value of the evidence discrediting the defendant's proffered reasons for the challenged employment action, and the presence or absence of additional evidence that may properly be considered by a court in determining whether a judgment as a matter of law is appropriate. *Id.* at 148-49.

For present purposes, the Defendants concede that the 26 unsuccessful applicants identified by the EEOC were "disabled" at the time of their rejection. (ECF No. 130 at 1). The EEOC would ordinarily need to demonstrate that the Defendants were aware of the applicants' disabilities as a part of its *prima facie* case. *Geraci*, 82 F.3d at 581; *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 932-933 (7th Cir. 1995). Under the present circumstances, however, the Defendants' awareness of the disabilities can be inferred from the fact that each applicant was unlawfully subjected to a pre-offer medical examination. *Sedelnik v. City of Bridgeport*, 837 F. Supp. 2d 12, 18 (D. Conn. 2011) (permitting knowledge of an individual's protected status to be inferred from an employer's access to personnel records procured during the course of an interviewing process). The employees who were not hired obviously suffered adverse employment actions. *Putaro v. Carlynton Sch. Dist.*, 615 F. Supp. 2d 390, 396 (W.D. Pa. 2009); *Johnson v. Cmty. College of Allegheny Cnty.*, 566 F. Supp. 2d 405, 430 (W.D. Pa. 2008). In an affidavit executed on July 8, 2013, Lengle acknowledged that she had reviewed the medical records to determine whether each applicant had been cleared to work for the CCC. (ECF No. 99-2 ¶¶ 43-44). At a minimum, the circumstances surrounding the hiring process give rise to an inference of

discrimination sufficient to shift the burden of production to the Defendants. *Burdine*, 450 U.S. at 254-56.

Rebecca Nelen ("Nelen") served as the LCNRC's Director of Nursing in 2009. (ECF No. 116-11 at 4). In her affidavit, Lengle declared that 12 of the individuals identified as "disabled" by the EEOC were not hired because they had received "poor references" from Nelen. (ECF No. 99-2 ¶¶ 34-35). During a deposition, however, Nelen testified that it was not her practice to "give references." (ECF No. 116-11 at 6). She denied that she had provided Lengle with "references" in connection with Grane's hiring process.[14] (*Id.* at 6-7).

After discovery began in this case, the Defendants provided the EEOC with documentary evidence suggesting that Clay Sidor ("Sidor") had not been hired because of information obtained through a criminal background check. (ECF No. 98-12 at 8). Nonetheless, the record indicates that Sidor had no criminal record. (ECF No. 116-44 at 7). Kristopher Przybylek ("Przybylek"), Grane's Vice President of Nutritional Services,

---

[14] Lengle declared that a thirteenth applicant, Dana Fresch ("Fresch"), had been denied employment because of a "poor reference" from the LCNRC's Director of Housekeeping, Greta Jones ("Jones"). (ECF No. 99-2 ¶ 36). The EEOC asks the Court to strike the portion of Lengle's affidavit pertaining to Fresch on the ground that Jones was not identified as a potential witness at a time when she could have been deposed. (ECF No. 114 at 29-30). The Court need not consider the EEOC's objection at this time, since the Defendants' motion for summary judgment will be denied in any event. Because the EEOC has cast doubt on the Defendants' asserted reasons for rejecting the 12 applicants alleged to have received negative references from Nelen, a reasonable trier of fact may infer that the similar reason given for Fresch's rejection is not credible. *Fuentes v. Perskie*, 32 F.3d 759, 764 n.7 (3d Cir. 1994) (explaining that "the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available"). If the Defendants attempt to call Jones as a witness at a later stage, the EEOC can raise its objection at that time. (ECF No. 114 at 29).

later testified that Sidor had not been hired because of a negative reference provided by his supervisor, Kari Shirk ("Shirk"). (ECF No. 98-14 at 4). Shirk denied that Przybylek had asked her about her subordinates. (ECF No. 116-16 at 5-6).

Documentary records provided by the Defendants suggest that Sue Schoenfeld ("Schoenfeld") was selected for a position with the CCC, but that she had failed to return Grane's telephone calls.[15] (ECF No. 98-12 at 7). Lengle testified that she had no recollection as to whether Schoenfeld had been contacted and offered a position. (ECF No. 116-4 at 19-20). Schoenfeld testified that she had never received a telephone call concerning the status of her application. (ECF No. 116-20 at 3). She responded in the affirmative when asked whether she would have accepted an offer of employment. *Id.*

Brenda Kelly ("Kelly") was among the LCNRC employees seeking positions with the CCC. (ECF No. 98-12 at 5). Kelly fractured her left heel on September 5, 2009. (ECF No. 98-5 at 4). As a result of her injury, Kelly was placed on "modified duty" for a period of six weeks. *Id.* On November 13, 2009, McFeeley performed a physical examination of Kelly in connection with the hiring process. (ECF No. 116-19 at 9-13). On the pre-placement evaluation form, it was noted that Kelly had been on "modified duty" during the six weeks following the heel fracture, but that she was doing "100% better" after her recovery. (*Id.* at 9). Kelly testified that she had received clearance to return to her regular duties on the night before the examination. (*Id.* at 3).

---

[15] Documentary evidence supplied by the Defendants also suggests that Nora Nyland ("Nyland") declined an offer of employment. (ECF No. 98-12 at 7). For purposes of summary judgment, however, the Defendants concede that no offer of employment was extended to Nyland. (ECF No. 93 at 25; ECF No. 114 at 45).

In her affidavit, Lengle stated that Kelly had not been hired because the CCC had no positions available for someone who needed to be on "modified duty." (ECF No. 99-2 ¶ 70). This statement is problematic for several reasons. First, the record indicates that Kelly was no longer on "modified duty" at the time of her physical examination, which preceded the opening of the CCC. (ECF No. 116-19 at 3-4). Second, the reason given for Kelly's rejection appears to contradict a critical assertion in Lengle's affidavit. Lengle declared that she had looked at the completed physical examination forms only to see whether each prospective employee had been cleared by McFeeley. (ECF No. 99-2 ¶ 43). The last page of Kelly's examination form indicates that she was cleared to perform the "essential functions" of her desired position. (ECF No. 116-19 at 13). The notation relating to Kelly's time on "modified duty" appears four pages earlier. *Id.* at 9. Kelly provided the information about her injury in response to an "inquiry" as to whether she had ever been injured at work. *Id.* In light of this documentary evidence, a reasonable factfinder could infer that Lengle was making hiring decisions on the basis of medical information procured through the unlawful medical examinations and inquiries. The asserted reason for Kelly's rejection could likewise give rise to an inference that the Defendants were unwilling to provide "disabled" applicants with the "reasonable accommodations" required under Title I. 42 U.S.C. §§ 12111(9), 12112(b)(5).

Christine Berish ("Berish"), an LCNRC employee, applied for a position with the CCC. (ECF No. 99-2 ¶ 58). On November 3, 2009, she went on medical leave because of a brain aneurysm. (ECF No. 116-17 at 3, 6). Because of her absence, Berish did not undergo a medical examination in connection with the hiring process. (ECF No. 99-2 ¶ 58). She

returned to work on December 7, 2009. (ECF No. 116-17 at 3). Berish testified that she had spoken with Grane officials about completing the physical examination upon her return, but that she had been "cut off" and told that she would be contacted if they were interested in hiring her. (*Id.* at 3-5). Lengle testified that Berish would have been hired if her "requirements" had been completed. (ECF No. 116-4 at 15). It appears that Berish was not hired precisely *because* she had not undergone a pre-offer medical examination. (ECF No. 99-2 ¶¶ 58-60). The ADA's "prohibition against discrimination" specifically incorporates the provisions governing "medical examinations and inquiries." 42 U.S.C. § 12112(d)(1). Consequently, Berish's failure to undergo an *illegal* pre-offer medical examination provided no *lawful* basis for the rejection of her application.[16]

The Defendants have submitted evidence suggesting that four of the "disabled" applicants may have been denied employment opportunities with the CCC because Grane had decided to eliminate their positions. (ECF No. 98-2 at 7-9; ECF No. 99-2 ¶¶ 61-69). Given the inconsistencies in the reasons given for the rejection of other applicants, however, the evidence in the record need not be isolated with respect to each person for whom the EEOC is seeking relief. *Teamsters*, 431 U.S. at 360. In *Fuentes v. Perskie*, 32 F.3d 759, 764 n.7 (3d Cir. 1994), the Third Circuit recognized that, if a plaintiff "manages to cast doubt on a fair number" of the reasons for an adverse employment action proffered by a defendant, he or she "may not need to discredit the remainder" of those reasons in order

---

[16] The Defendants appear to be under the mistaken understanding that no relief can be sought on Berish's behalf because she never underwent a pre-offer medical examination. (ECF No. 93 at 24-25). Since the pre-offer examinations performed on the applicants were prohibited under the ADA, the Defendants were not free to discriminate against Berish because of her failure to appear for such an examination. 42 U.S.C. § 12112(d)(1).

to defeat a motion for summary judgment. The record reveals the existence of genuine factual disputes as to whether the Defendants were unlawfully discriminating against "disabled" applicants in connection with the challenged hiring process. The EEOC has the unique ability to pursue "relief for a group of aggrieved individuals" without moving for class-certification under Rule 23. *General Telephone*, 446 U.S. at 324. Since it is undisputed that the LCNRC employees seeking positions with the CCC were unlawfully subjected to pre-offer medical examinations and inquiries, further proceedings must be conducted to determine whether some or all of the aggrieved individuals are entitled to monetary relief. If "disabled" employees were rejected based on medical information procured in connection with the examinations and inquiries, the Defendants' liability under § 12112(a) may turn on the same facts as those surrounding the issue of damages allegedly resulting from the admitted § 12112(d) violations. *Garrison*, 287 F.3d at 963. In light of the evidence creating an inference that the overall hiring process may have been tainted by the infusion of illegally obtained medical information, none of the § 12112(a) claims will be dismissed at this time. Once a framework for the proceedings designed to address the issue of damages is established, the Court will be in a better position to determine whether those same proceedings can be utilized to resolve some or all of the pending § 12112(a) claims. In the meantime, the Defendants' motion for summary judgment will be denied in all respects.[17]

---

[17] Because the Defendants are moving for dismissal, the evidence must be viewed in the light most favorable to the EEOC. *Mitchell v. Miller*, 884 F. Supp. 2d 334, 375 n.22 (W.D. Pa. 2012). Defendants have made certain concessions solely for purposes of the summary judgment motions. FED. R. CIV. P. 56(c)(1)(A). Those concessions are not binding in future proceedings.

### G. The Dispute Concerning the Pre-Offer Drug Testing

Under Title I, "any employee who is currently engaging in the illegal use of drugs" is not considered "a qualified individual with a disability" entitled to protection from discrimination.  42 U.S.C. § 12114(a).  The ADA specifically permits a covered entity to "hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee."  42 U.S.C. § 12114(c)(4).  The Third Circuit has construed these statutory provisions to mean that the ADA does not require covered employers to reasonably accommodate individuals whose shortcomings are attributable to ongoing "drug and alcohol addiction."  *Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998).  A separate provision of Title I specifically provides that "a test to determine the illegal use of drugs shall not be considered a medical examination" within the meaning of § 12112(d).  42 U.S.C. § 12114(d)(1).  The statutory definition of the term "illegal use of drugs" expressly excludes "the use of a drug taken under supervision by a licensed health care professional."  42 U.S.C. § 12111(6)(A).

Four of the individuals identified as "disabled" by the EEOC were apparently denied positions with the CCC because their drug tests had yielded "positive" results. (ECF No. 99-2 ¶ 55).  John Martin ("Martin"), a licensed clinical laboratory scientist, testified that prescribed medications taken by the four unsuccessful applicants could have resulted in false findings that they were using illegal drugs.  (ECF No. 116-8 at 5-7).  He further stated that "alternate methods" of testing were needed to confirm the

"presumptive[ly] positive" results.  (*Id.* at 8).  Hoover testified that she had discarded the applicants' urine samples immediately after "testing" them for evidence of illicit drug use.  (ECF No. 116-9 at 6, 9).  The four applicants all testified that the "positive" test results had resulted from the use of legal medications.  (ECF No. 101-5 at 2; ECF No. 116-47 at 5-7; ECF No. 116-48 at 3-7; ECF No. 116-49 at 5).

The Defendants argue that the drug tests conducted on the applicants' urine specimens did not constitute "medical examinations" prohibited by § 12112(d), even if they detected evidence of legally prescribed medications.  (ECF No. 141 at 6).  The EEOC counters that argument by pointing to the legislative history of the ADA, which suggests that the language permitting the use of a pre-offer "test to determine the illegal use of drugs" was not intended to allow a covered entity to utilize a test that detects the use of both legal and illegal drugs.  (ECF No. 140-1 at 44).  According to the EEOC, the tests conducted on the applicants' urine specimens constituted "medical examinations" even if they were only *intended* to detect evidence of illegal drug use.  (ECF No. 114 at 32-33).

The provision of Title I governing the use of drug tests "is given more precise content by the neighboring [provisions] with which it is associated."  *United States v. Williams*, 553 U.S. 285, 294 (2008).  The language excluding users of illegal drugs from the category of persons entitled to statutory protection is limited by a rule of construction extending protection to any individual who "is erroneously regarded as engaging in such use, but is not engaging in such use."  42 U.S.C. § 12114(b)(3).  "A sensible reading of the statute instructs that an employer may only rely on a test for illicit drug use to make employment decisions based on that illicit use."  *Connolly v. First Personal Bank*, 623 F.

Supp. 2d 928, 931 (N.D. Ill. 2008). Consequently, a pre-offer drug test "may not be administered under the guise of testing for illicit drug use when in fact the results are used to make employment decisions based on both legal and illegal drug use alike." *Id.*

There may be instances in which narrowly tailored drug tests do not constitute "medical examinations" even though they have the incidental effect of detecting evidence of legal drug use. The tests conducted in this case, however, clearly qualified as "medical examinations" governed by § 12112(d). Each applicant's physical examination included a urinalysis. (ECF No. 116-48 at 11). Hoover testified that each urine sample was tested for both medical and drug-use purposes before being discarded. (ECF No. 116-9 at 7-9). She explained that the samples were tested for "elements" like "glucose" and "blood." (ECF No. 116-9 at 8). Since the pre-offer examinations and inquiries conducted in this case were obviously designed to elicit medical information extending far beyond evidence of illegal drug use, the tests performed on the applicants' urine specimens did not fall within the ADA's exception permitting "test[s] to determine the illegal use of drugs." *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1215-16 (11th Cir. 2010).

The Court acknowledges that two of the unsuccessful applicants may have been rejected because of their failure to disclose certain medications on their pre-placement evaluation forms. Linda Sidor ("Linda") testified that she had taken a dose of Percocet shortly before her physical examination in order to alleviate cold-related symptoms.[18] (ECF No. 116-48 at 3-5). Percocet was not listed on her evaluation form. (*Id.* at 8). Linda

---

[18] Linda apparently received a prescription for Percocet after sustaining serious head injuries in an automobile accident. (ECF No. 116-48 at 7).

explained that she had listed only her daily medications on the form, and that she had not been using Percocet on a regular basis at the time of the examination. (*Id.* at 5). Chelsea Siska ("Siska") was evidently reluctant to disclose that she was using methadone in connection with a lawful drug rehabilitation program. (ECF No. 116-49 at 5). She testified that methadone had not yielded "positive" test results on previous occasions. (*Id.*).

Linda's "positive" test result caused the LCNRC to suspend her until the matter could be resolved. (ECF No. 134-4 at 4). After passing a subsequent drug test, Linda was allowed to return to work. (*Id.* at 4-5). She continued to work for the LCNRC until December 29, 2009. (*Id.* at 5). The results of the follow-up drug test requested by the LCNRC were apparently not forwarded to Lengle. In an affidavit executed on September 3, 2013, Lengle declared that she had not sought additional information from Siska because the completed pre-placement evaluation form had not listed any medications that could have caused someone to test "positive for methadone." (ECF No. 134-2 ¶¶ 17-18).

A plaintiff cannot normally establish an actionable violation of an anti-discrimination statute merely by showing that the challenged employment action was taken based on a mistaken factual premise. *Venter v. Potter*, 694 F. Supp. 2d 412, 423 (W.D. Pa. 2010). Under the present circumstances, however, the EEOC can pursue remedies for any injuries flowing from the admitted violations of § 12112(d). *Garrison*, 287 F.3d at 963. The portions of the examination forms requesting information about the applicants' medications clearly constituted pre-offer "medical inquiries" prohibited under the ADA. *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 343-45 (D.C. Cir. 2003). To the extent that Linda and Siska failed to disclose medications that could have explained their "positive" test results,

they simply provided incomplete answers to the Defendants' *illegal* pre-offer inquiries. The Defendants are not entitled to summary judgment merely because Lengle may have "mistakenly" relied on incomplete medical information that never should have been solicited in the first place. (ECF No. 130 at 18-22). The ADA was violated as soon as the LCNRC employees seeking employment with the CCC were presented with pre-offer inquiries. *Green*, 107 F. App'x at 280. Even if Lengle mistakenly relied on incomplete medical information in making certain personnel decisions, the EEOC can seek damages for any injuries that were proximately caused by the acknowledged § 12112(d) violations. *Griffin*, 160 F.3d at 595.

## VI. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment (ECF No. 92) will be denied, and the EEOC's motion for partial summary judgment (ECF No. 95) will be granted with respect to Grane and denied with respect to the CCC. Grane will be immediately enjoined from conducting pre-offer medical examinations and inquiries prohibited under § 12112(d). In the near future, a status conference will be scheduled to facilitate discussions concerning the upcoming proceedings to resolve the disputed factual issues in this case.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **EQUAL EMPLOYMENT**<br>**OPPORTUNITY COMMISSION,** | )<br>)<br>) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **GRANE HEALTHCARE CO. and** | ) |
| **EBENSBURG CARE CENTER, LLC, d/b/a** | ) |
| **CAMBRIA CARE CENTER,** | ) |
| | ) |
| **Defendants.** | ) |

**CIVIL ACTION NO. 3:10-250**

**JUDGE KIM R. GIBSON**

#### ORDER

NOW, this $\underset{\text{day of March 2014, it is}}{6 +h}$ **HEREBY ORDERED** that the Defendants' motion for summary judgment (ECF No. 92) is **DENIED**.

It is **FURTHER ORDERED** that the Plaintiff's motion for partial summary judgment (ECF No. 95) is **GRANTED** with respect to Defendant Grane Healthcare Company ("Grane") and **DENIED** with respect to Defendant Ebensburg Care Center, LLC d/b/a Cambria Care Center.

Grane has repeatedly violated the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 *et seq.*] by subjecting more than 300 applicants for employment with the Cambria Care Center to pre-offer medical examinations and inquiries prohibited by federal law. Pursuant to the authority vested in this Court by 42 U.S.C. §§ 2000e-5(g)(1) and 12117(a), Grane is **PERMANENTLY ENJOINED** from conducting pre-offer medical examinations and inquiries proscribed by 42 U.S.C. § 12112(d)(2)(A). Grane shall not conduct medical examinations or inquiries of job applicants before extending bona fide offers of employment to those persons.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**