IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | |
| | ) | CIVIL NO. 3:10-250 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| | ) | |
| GRANE HEALTHCARE CO. and | ) | |
| EBENSBURG CARE CENTER, LLC, | ) | |
| d/b/a CAMBRIA CARE CENTER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

### I. INTRODUCTION

This matter comes before the Court upon conclusion of a bench trial held December 17 and 18, 2014, and January 20, 21, 22, 27, and 28, 2015. The parties submitted their Proposed Findings of Fact and Conclusions of Law on June 10, 2015, and submitted responses thereto on July 10, 2015.

### II. FINDINGS OF FACT

#### a. Chelsea Siska

Chelsea Siska was employed at Laurel Crest from 2008 until December 2009. She held the position of Certified Nurse Aide. She obtained her CAN certification through a vo-tech program paid for by Laurel Crest in 2008. Her job duties included bathing,

feeding, and mobilizing residents and performing other activities of daily living with the residents.

Ms. Siska applied for a position with Defendants seeking a CNA position at Cambria Care Center. As part of the application process, Siska was required to undergo a physical examination and urine drug test. Siska was also required to fill out a medical questionnaire as part of the application process. (Ex. P-74). At the time of Siska's application for employment, she was recovering from drug addiction. She testified that she was receiving medical methadone treatment at the time. She testified that she did not disclose the methadone prescription because she did not think it would show up in the drug test, and she did not think it was anybody's business to know the problems she had experienced in the past. Siska's urine test revealed the presence of methadone in her system. (Tr. Vol. I at 114:12-17, Ex. P-93). The methadone that Siska was taking did not inhibit her from performing the job duties of a CNA. (Tr. Vol. I. at 22:18-20). Siska was not offered a position by either Grane or Cambria Care Center. (Tr. Vol. I at 21:13-15). Siska was not hired because she failed the drug test. (Tr. Vol. VII at 78:3-12 and Defendants' Ex.166). Beth Lengle did not follow up with Ms. Siska to see if she was treating with legally prescribed methadone. (Tr. Vol. VII at 79:13-15). Lengle would hire someone if they were prescribed methadone legally and disclosed it. (Tr. VII at 90:24-25).

In approximately June of 2010, Siska obtained a part-time position at Cambria Residential Services in Johnstown, Pennsylvania, as a home health caregiver, which eventually turned into a full-time position. (Tr. Vol. I at 21:21-22:5). Siska earned about $7/hour working part-time at Cambria Residential Services. (Tr. Vol. I at 32:10-11). Her

pay rate went up to $8.20/hour after four to five months when she became a full-time employee and began working forty (40) hours per week. (*Id.* at 32:14-17, 32:23-25). As a full-time employee, Siska received healthcare benefits for herself and her daughter. She did not participate in the health benefits at Laurel Crest. (Tr. Vol. I at 33:16-25). Siska worked at Cambria Residential Services for approximately nine months. (Tr. Vol. I at 25:19; 33:1-7). She earned $8,310.24 from Cambria Residential Services in 2010. (Tr. Vol. I at 23:9-18; Ex. P-75). Siska earned $3,844.58 from Administrative Services Company in 2010. (Ex. P-75).

In 2011, she left Cambria Residential Services and began working for AceraCare Hospice, because she needed a better-paying job. (Tr. Vol. I at 25:20-25). Siska's hourly rate at AceraCare was approximately $10 per hour. (Tr. Vol. I at 26:1-2). Siska received medical, vision and dental benefits for her and her daughter at AceraCare. She was not eligible for a 401(k) when she first started there. (Tr. Vol. I at 34:13-19). She earned $20,298.38 from AceraCare in 2011. (Ex. P-75). While working at AceraCare in 2011, Siska also had a second job waitressing. As a waitress, she earned approximately $2 per hour, plus tips. (Tr. Vol. I at 22:11-19). She earned $902.64 in 2011 from her waitressing job at Michelle Kubat. (Ex. P-75). Siska did not hold a second job waitressing when she worked at Laurel Crest because the pay was good and was enough for her and her daughter. (Tr. Vol. I at 26:19-24). Her AceraCare Hospice job required her to do a lot of driving, which resulted in a lot of wear and tear on her car, which she had to use for her job. (Tr. Vol. I at 27:3-11). Siska continued to work for AceraCare in 2013 for the same hourly rate. (Tr. Vol. I at 27:12-17).

In or around early summer 2013, Siska returned to Cambria Residential Services, where she worked part-time. She earned approximately $7.40/hour for about four months, until a full-time position opened. (Tr. Vol. I at 27:18-28:8). Siska continued working as a waitress in 2013 as a second job. (Tr. Vol. I at 27:10-13). Siska earned $5,852.18 at Cambria Residential Services in 2013. (Ex. P-75). She also earned $902.25 waitressing at Michelle Kubat in 2013. (Ex. P-75; Chapman Ex. 18).

In 2014, Siska took a job at Maple Winds in Portage as a certified nurse's assistant, earning $9.00/hour during the probation period. She only worked there for three months and did not complete the probation period due to ongoing problems with her car. (Tr. Vol I at 28:24-30:2).

Siska intended to spend her career as a CNA at Cambria Care Center, as she lives close to the facility and can walk to work if need be. The pay rate was perfect for her and her daughter, and it was the only job she had that had a retirement plan with a 401(k). (Tr. Vol. I at 30:6-20). The average hourly wage paid to CNAs at Cambria Care Center was $11.88 per hour, forty hours per week. (Chapman Ex. 2; Chapman Ex. 18).

**b. Ellen Dinsmore**

Ellen Dinsmore worked as a Nurse Aide at Laurel Crest from 1972 through 1975. (Tr. Vol. I at 49:13-18). She left in 1975 to raise her two children from 1975 to 1990. (Tr. Vol. I at 49:19-21, 49:25-50:3). Dinsmore returned to Laurel Crest as a Nurse Aide on April 15, 1990. (Tr. Vol. I at 49:11-12, 50:9-11). She worked at Laurel Crest until December 31, 2009. (Tr. Vol. I at 50:14-15). She was in the laundry for the last five years of her employment. (*Id.* at 50:16-18).

As a Nurse Aide, Dinsmore's job duties were to help feed, dress, and wash between eight and ten residents per day, and to assist the residents with other activities of daily living. (Tr. Vol. I at 50:21-24). Dinsmore's job in the laundry department was to collect, sort, wash and dry the residents' laundry, including sheets, bed linens, and personal clothing in commercial washers and dryers, and then return the laundry to the floors. (Tr. Vol. I at 51:6-12). Dinsmore's position in the laundry department was full-time, and she worked 4 a.m. to noon. (*Id.* at 51:13-16). Her last pay rate in the laundry was $11.40 an hour. (*Id.* at 52:2-6).

Dinsmore applied for a job with Grane as a Nurse Aid, in housekeeping or laundry. (*Id.* at 52:20-23; Ex. P-16). She was required to undergo a physical, a drug test, and a TB test as part of the application process. (*Id.* at 53:5-8). Dinsmore was also required to fill out a questionnaire asking for "Medications Currently Used," prior to her physical exam. (*Id.* at 53:13-25). At the time of her application, Dinsmore was being treated with Chantix to stop smoking, Nexium for esophageal reflux, Metformin for Type 2 Diabetes, Fluoratine for depression and anxiety, Simvastatin for high cholesterol, Meloxicam, and Hydrocodone for pain in her lower left abdomen, which was later attributed to rheumatoid arthritis. (*Id.* at 54:19-56:11, Ex. P-17). She currently suffers from rheumatoid arthritis, but had not been diagnosed with it at the time. (*Id.* at 56:12-16).

At the time of Dinsmore's medical examination, she told the physician's assistant performing the examination that she had suffered a torn meniscus as a result of a work-related injury several years prior. (Tr. Vol. I at 56:19-57:9, 57:22-25, 58:13-16; Ex. P-17). Dinsmore had stated on her application that she had suffered an injury to her knee. (Tr.

Vol. I at 59:6-8). The physician's assistant asked Dinsmore to write down exactly what had happened to her knee. (*Id.* at 58:21-59:3). Dinsmore wrote that while working in the Alzheimer's behavior unit she was kicked by a resident while feeding him, catching her knee and hyperextending it. As a result, her meniscus was torn, her tibia was fractured, and her ACL ligament was torn. She was also taken out of work. (*Id.* at 59:23-60:4). Dinsmore returned to work after being off for seven weeks, first working light duty for approximately a year, and then going back to full duty. (*Id.* at 60:7-25). She did not have any restrictions when she returned to work. (*Id.* at 61:1-2). The physician's assistant performing the exam made Dinsmore squat and walk, which she was unable to do. (*Id.* at 61:7-16). The physician's assistant informed her that she was going to send her to Creighton, which was a rehabilitation-like center. She told her that they wanted to perform a work simulation, but was 99% sure that Dinsmore would not pass it. (*Id.* at 61:17-20). Dinsmore was never sent to Creighton. (*Id.* at 62:1-2).

Dinsmore also participated in a drug test involving a urine specimen sometime before December 31, 2009. (*Id.* at 63:21-64:9). Though she did not learn the results of the drug test in 2009, she has since learned that she tested positive for THC, which is a substance in marijuana. (*Id.* at 64:11-22). Dinsmore stated that she was not using marijuana at any time in 2009. (*Id.* at 64:23-24). Dinsmore was not offered a position at Cambria Care Center. (*Id.* at 66:3-4). Nobody from Grane ever came to Dinsmore to ask if she had used THC. (*Id.* at 66:5-7). Dinsmore tried to find employment with the County because she was seven months shy of having life-time benefits. (*Id.* at 66:13-19). She needed a job with benefits because her husband was sick and needed benefits. (*Id.* at 67:2-

6). Dinsmore had benefits at Laurel Crest, and her husband was covered by her benefits. (*Id.* at 67:7-10). In September of 2010 Dinsmore applied for Social Security Disability, and was granted benefits that were retroactive to June 2010. (*Id.* at 67:14-68:5). Dinsmore was unable to work as of June 2010 because of her rheumatoid arthritis. (*Id.* at 68:4-20).

The hourly rate paid to laundry aides at Cambria Care Center was $10.25/hour, forty hours per week. (Chapman Ex. 6; Ex. P-126).

### c. Mary Jane Grove

Mary Jane Grove was employed at Laurel Crest from 1981 until December 2009. (Tr. Vol. I at 79:17-18; 90:19-21). She worked as a nurse's aide for four years, then transferred to switchboard for a couple of years, then joined the secretarial pool. The last job she had was a management and staffing position. (*Id.* at 79:17-24). She worked in the secretarial pool off and on for about 20 years. (*Id.* at 79:25-80:1). She performed administrative duties while working in the secretarial pool. (*Id.* at 80:2-12). Grove took a management position in September of 2009. (*Id.* at 80:13-15). She started working in the staffing office on September 28, 2009, drawing up three-week schedules for all the nursing aides, nursing and unit clerks, and granting vacation and personal days. (*Id.* at 81:2-8). After being informed that she would have to fill out an application to work for Grane, Grove applied for staffing and secretarial pool positions. (*Id.* at 81:9-21). She did not interview for either of those positions. (*Id.* at 81:22-24). Grove was informed that she would have to undergo a physical examination. (*Id.* at 82:4-8). Grove also underwent a urine drug test. (*Id.* at 83:21-84:3).

Grove was required to fill out a form with medical information about herself as part of the application process. (*Id.* at 84:11-14). The form included a section entitled "Medications Currently Used," in which she wrote Benicar, Effexor XR, and Nexium. (*Id.* at 84:22-85:4). Grove had been taking the Benicar for high blood pressure for several years, had been taking Effexor for anxiety for probably two years, and Nexium for Gastroesophageal Reflux Disease. (*Id.* at 85:5-86:12). Grove had not been given an offer of employment prior to filling out the form, undergoing the physical exam or drug test. (*Id.* at 86:15-24). She was never told what the results of her drug test were, and nobody ever followed up with her to state that she had to have a second or follow-up drug test. (*Id.* at 86:25-87:6).

Grove's drug test tested positive for PCP. (*Id.* at 87:11-13). Grove did not find out until the filing of this lawsuit that she was not hired because she had failed her drug test. (*Id.* at 87:21-88:5). The reason given by Grane for not hiring Grove was that she had failed the drug test. (Ex. D-197). Grove denied that she had taken PCP, LSD or angel dust during the period of time in 2009. She also denied ever having taken PCP or any illegal drug. (*Id.* at 90:8-18). Grove testified that she did not immediately begin to look for employment after leaving her job at Laurel Crest because she was very depressed. (*Id.* at 91:2-4). After that she went to Penn Highlands for two months to take classes in Excel in order to update herself on the computer, and then she started applying for jobs in different places. (*Id.* at 91:4-9). Grove applied for jobs at Conemaugh Hospital to be a secretary, at Sheetz and other places. (*Id.* at 91:10-13). She was hired at United Cerebral Palsy (UCP), but did not start the job because her nephew was killed the night before she started. (*Id.* at 91:13-

16). She applied mostly for secretarial jobs. (*Id.* at 91:17-18). Grove applied for jobs by looking in newspapers and on the internet. (*Id.* at 91:19-21). She did not sign up with the unemployment office or search for jobs through CareerLink. (*Id.* at 91:22-24). Around April 2010, Grove decided to babysit her great-niece and nephew rather than continue looking for work. (*Id.* at 98:22-99:12).

Grove applied for retirement in 2011. Her mother's health was bad, and she wanted to be available for her. (*Id.* at 92:2-7). She started getting her first check in August 2011. (*Id.* at 92:8-9). Grove testified that not being hired at Cambria Care Center affected her a lot, which is why she gave up looking for a job. (*Id.* at 92:10-14).

The average hourly rate for a staffing position was $13.77 per hour, forty hours per week. (Ex. P-126).

### d. Christine Berish

Christine Berish began working as a Certified Nurse Aide (CNA) at Laurel Crest in September 2007. (*Id.* at 117:16-24). She obtained her certification by taking classes at Laurel Crest. Her duties as a CNA were completing residents' daily activities of living, bathing, feeding, dressing, changing, helping residents do exercises, getting them ready for appointments, doing their hair and showering. (*Id.* at 118:2-8). Her rate of pay at Laurel Crest as a CNA was $10/hour. (*Id.* at 119:2-9). She worked first shift, full-time, with life insurance, health insurance, vision, and dental benefits, as well as 401(k). (*Id.* at 119:10-18).

Berish's last day of employment with Laurel Crest was December 31, 2009 because she was not hired by Grane. (*Id.* at 118:10-13). She filled out an application for a position

as a Certified Nurse's Aide with Grane. (*Id.* at 118:14-18). Berish filled out the job application on October 27, 2009. (*Id.* at 118:18-119:1).

Berish suffered a brain aneurism on November 3, 2009, which required her to take a medical leave. (*Id.* at 120:7-13). Since having the aneurism, Berish has had chronic migraines and expressive aphasias, meaning that she sometimes has trouble getting her words out if she is too stressed or too tired. (*Id.* at 122:8-14).

Berish was never offered a job by Grane or Cambria Care Center. (*Id.* at 122:15-17). She did not participate in the physical exams administered to applicants because she was not given the opportunity to do so. (*Id.* at 122:15-22). Berish approached Deb Hoover in the hallway when she came back from her medical leave, informed her that she had just come back from medical leave and had not participated in the pre-employment physical and drug screen yet. She told her that she wanted the opportunity to participate. (*Id.* at 122:23-123:4). Hoover then introduced Berish to Angel Waddell, and informed Waddell that Berish had just come off of medical leave and that she needed to take the pre-employment physical and drug screen. (*Id.* at 123:5-8). Waddell told Berish that she would get an opportunity to do so. Hoover told Berish to go up to her floor to work, and that they would come find her when they were ready for her. (*Id.* at 123:8-11). This occurred on December 7. (*Id.* at 123:12-13). They never came to get her for the exam. (*Id.* at 123:16-17). Berish again approached Hoover and Waddell to tell them that nobody had come to get her and that she wanted to partake in the drug screen and pre-employment physical in order to keep her job. Hoover said that when they were ready for her they would come get her, and told her to go to her floor to work. (*Id.* at 123:18-124:2). Berish testified that

she had wished to become employed at Cambria Care Center. (*Id.* at 124:3-4). Defendants' asserted reason for not hiring Berish was that her application for employment had been rescinded. (Ex. D-166).

Berish realized that she would not be hired when Cambria Care Center started offering everybody else jobs, but she was not offered one. (*Id.* at 124:5-7). On March 3, 2010, Berish began attending a full-time program to earn her Licensed Practical Nurse (LPN) certification. (Tr. Vol. I at 124:9-13). Berish had considered pursuing her LPN part-time if she got a job at Grane. (*Id.* at 124:14-17). She went to school full-time to get her LPN in order to finish in a year. (*Id.* at 124:18-22). She obtained her LPN in February of 2011 and was able to obtain employment on March 3, 2011 at Valley View Nursing Home. (*Id.* at 124:23-125:5; Ex. P-3). Berish's total earnings for 2011 were $22,773.92. (Ex. P-3). Her rate of pay was $15.50 an hour, plus a shift differential because she was working second shift. (Tr. Vol. I at 125:14-18). Berish continued working as an LPN, full-time, second shift, for Valley View in 2012. (Tr. Vol. I at 125:23-126: 7). In 2012, her total earnings were $35,261.17. (Ex. P-3). Berish worked for Valley View until August 2013. (*Id.* at 126:15-16). Berish left Valley View in August 2013 to work at Primary Health Network. (Tr. Vol. I at 126:23-24). Her rate of pay at Primary Health Network is $16 an hour. (*Id.* at 126:25-127:2). She works full-time daylight and has benefits. (*Id.* at 127:3-8).

Between July 2012 and the time of trial, Berish's actual earnings exceeded what she would have earned had she been employed as a CAN at Cambria Care Center. (Chapman Ex. 1).

Berish testified that not being hired to work at Cambria Care Center affected her and her whole family, especially her children. (*Id.* at 127:9-17).

The average hourly rate for a CAN at Cambria Care Center was $11.88/hour, forty hours per week. (Chapman Ex. 1; Chapman Ex. 23).

### e. Gloria Thomas

Gloria Thomas began working at Laurel Crest as a Nurse Aide in 1983. (Tr. Vol. II at 4:3-9). She worked there as a nurse's aide for a year and a half. (Tr. Vol. II at 4:10-11). Her job duties were to take care of the patients, to bathe them, feed them, weigh them, and take them to the bathroom. (Tr. Vol. II at 4:12-15). In 1984, Thomas became a unit clerk at Laurel Crest. (*Id.* at 4:19-21). Her job duties as a unit clerk included doing the filing, greeting everyone who came onto the unit and directing them to where they needed to go, ordering supplies and ordering blood work. (Tr. Vol. II at 4:22-5:1). After about a year, Thomas worked in utilization review, which involved answering the telephones, scheduling meetings, and copying information for insurances. (*Id.* at 5:2-9). Thomas stayed in utilization review for about 21 years. (*Id.* at 5:10-11). In 2008, Thomas returned to the position of unit clerk at Laurel Crest, where her job duties were the same as they had been in her previous tenure as a unit clerk. (*Id.* at 5:13-18). Her last pay rate was $13.95 and she worked full-time, from 8:30 a.m. to 4:30 p.m. (*Id.* at 5:19-24). Thomas's employment at Laurel Crest ended on December 31, 2009. (*Id.* at 5:25-6:1).

Thomas applied for a job with Grane/Cambria Care Center as a unit clerk as well as a case management technician. (*Id.* at 6:4-22; Ex. P-79). Thomas was required to undergo a medical examination as part of the application process. (Tr. Vol. II at 7:6-8). She

was also required to fill out a detailed medical questionnaire. (Tr. Vol. II at 7:11-18; Ex. P-31). Thomas was required to fill out a section entitled "Medications Currently Used," in which she disclosed that she was using Glucotrol, Byetta, Prinivil, HCTZ, Actos, Glumetza, and Lipitor. (*Id.* at 7:21-24). Thomas took Glucotrol for Type 2 Diabetes, which she was diagnosed with in 1997, Byetta for Diabetes, Prinivil for hypertension, which she was diagnosed with around 1996, HCTZ for hypertension, Actos for diabetes, Glumetza for diabetes, and Lipitor for cholesterol. (*Id.* at 7:21-9:11; Ex. P-31). Thomas also did a urine test as part of her application. (*Id.* at 9:20-22). Thomas was not offered a job by Grane or Cambria Care Center. (*Id.* at 10:12-13). Thomas was not given a reason for why she was not hired. (*Id.* at 11:8-9). Defendants' asserted reason for not hiring Thomas was that her position as unit clerk was eliminated. (Ex. P-111; Ex. D-166). There are no case management technicians at Cambria Care Center. (*Id.* at 52:20-22). At trial, Lengle testified that Thomas had not received as good a reference as the other two unit clerks she had hired. (*Id.* at 52:4-13).

Thomas looked for a job between January 1, 2010 and May 2011. She first found a job in May 2011. She searched for jobs by looking in the Tribune Democrat, the Altoona Mirror and her local weekly paper. (Tr. Vol. II at 11:17-20). Thomas also registered on state unemployment and civil service websites, and took the Pennsylvania civil service test. (Tr. Vol. II at 11:21-22). She applied for secretarial and clerical positions. (Tr. Vol. II at 11:23-25). Thomas was hired part-time in May 2011 in a family practitioner's office, earning $10.36/hour, working around 25 to 30 hours per week. (*Id.* at 12:3-12). She worked there for two weeks, and then resigned because she did not care to work for the family

practitioner. (Tr. Vol. II at 12:12-15). In October 2011, Thomas found another job, working at the front desk for an optometrist named Dr. Seymour. (Tr. Vol. II at 12:16-22). The job was full-time for thirty to thirty-five hours per week, and she continues to work there now. (*Id.* at 12:23-13:3). Thomas's first rate of pay with Dr. Seymour was $10/hour. (Tr. Vol. II at 13:4-5). Six months after Thomas started there, she received a pay increase to $11. (*Id.* at 13:8-9). She continued to receive additional $.50 pay increases every six months, and currently earns $12.50/hr. (Tr. Vol. II at 13:12-17). Thomas's employer will pay towards her hospitalization. (*Id.* at 13:18-21). He also gives Thomas a free eye exam every year and a pair of glasses. (*Id.* at 14:2-8). Thomas had health benefits, vacation days and personal days at Laurel Crest. (*Id.* at 13:22-14:1).

In 2011, Thomas earned a total of $3,110.30. (Chapman Ex. 20). 175. In 2012, Thomas earned a total of $18,875.16. (Chapman Ex. 20). 176. In 2013, Thomas earned a total of $19,199.20. (Chapman Ex. 20). 177. In 2014, Thomas earned a total of $19,156.93. (Chapman Ex. 20).

As a result of not being hired by Grane or Cambria Care Center, Thomas felt distraught, could not sleep, and was nervous all the time. (Tr. Vol. II at 15:11-17).

The hourly rate paid to unit clerks at Cambria Care Center was $11.15/hr., forty hours per week. (Chapman Ex. 20, Chapman Ex. 2).

Lengle testified that if an applicant did not test positive for a controlled substance, she did not look at any of the pages of the medical questionnaire other than the back page, which stated whether there were any medical contraindications or whether the applicant could not perform the essential functions. (Vol. VII at 28:9-20).

### f. Shirley Strittmatter

Shirley Strittmatter began employment at Laurel Crest in June 2002 as the administrative assistant to the director of nursing. (Tr. Vol. II at 22:17-24). As an administrative assistant to the director of nursing, Strittmatter helped with the administration, helped change policies, did clerical duties, mail, typing, and helped with Department of Health visits. (Tr. Vol. II at 22:25-23:4). In approximately 2008 or 2009, Strittmatter transferred to the staffing office as a staffing clerk, where she made sure that the each floor of the facility had nursing coverage and she processed vacation requests for the nursing department. (Tr. Vol. II at 23:9-18). As a staffing clerk, Strittmatter worked full-time, first shift, earning $13.23/hour. (Tr. Vol. II at 23:22-25; 24:1-2). The staffing clerk position was Strittmatter's last job at Laurel Crest. (*Id.* at 24:3-4). Her job had benefits, including vacation, personal days, health insurance and retirement. (*Id.* at 24:5-9). Her last day of employment with Laurel Crest was December 31, 2009. (*Id.* at 24:10-12).

Strittmatter applied for employment with Grane. (Tr. Vol. II at 24:15-24; Ex. P-76). She indicated on her application under "Employment Desired" that her first choice was "staffing clerk," and her second choice was "clerk/clerical." (Tr. Vol. II at 25:1-11; Ex. P-76). Strittmatter was not interviewed for a position, and nobody at Grane or Cambria Care Center ever met with her to tell her what jobs would be available. (*Id.* at 25:12-16). As part of the application process, Strittmatter had to undergo a physical examination and a urine drug test. (*Id.* at 25:17-25; 27:4-8). As part of the medical examination, Strittmatter was required to fill out a detailed medical history. (Tr. Vol. II at 27:22-28:5; Ex. P-77). Under the section on the application entitled "Medications Currently Used" she disclosed that

she was treating with Coumadin for a heart valve transplant that she had undergone due to heart damage she had suffered as a result of a bout with rheumatic fever around age 12. (*Id.* at 28:10-22). She also disclosed that she was treating with Zetia for high cholesterol, which she was diagnosed with around 2003 or 2004. (*Id.* at 28:23—29:2). She further disclosed that she was treating with Metoprolol to treat her occasional irregular heartbeats, which she was diagnosed with in or around the 1990s. (*Id.* at 29:3-9). Strittmatter further disclosed on her form that she had neck problems due to degenerative disease, ongoing back pain/sciatica, and panic attacks. (Tr. Vol. II at 29:19-30: 7; 63:3-4 and Ex. P-77). Around May 2009 Strittmatter took a stress-related medical leave of absence from her job at Laurel Crest. (Tr. Vol. II at 31:5-32: 6). She was off work until July 2009, at which point she returned to work without any restrictions. (Tr. Vol. II at 32:15-22). Strittmatter was not offered a job by Grane or Cambria Care Center. (Tr. Vol. II at 33:3-5).

Strittmatter had medical and dental benefits at Laurel Crest, as well as personal days, holidays, and a 401(k). (Tr. Vol. II at 34:15-24).

Defendants' asserted reason for not hiring Strittmatter was that her position was eliminated. (Ex. P-111; Ex. D-166). Lengle testified that Strittmatter was in the secretarial pool staffing, and while Laurel Crest had three in that position, Grane was only hiring one person for that position. (Vol. VII at 47:23-48:6). According to Lengle, Strittmatter received a decent reference, but the reference for the person who was hired was better. (*Id.* at 49:1-10; 50:14-20). Lengle does not remember whom she hired for the position, though she does remember that the person had dark hair, wore glasses, and was tall and thin. (*Id.* at 50:8-13).

Strittmatter immediately began a full-time job at $8.25/hour at the District Attorney's Office on December 31, 2009. (Tr. Vol. II at 33:21-24; 34:3-4, 34:11-14). Strittmatter decided to leave the District Attorney's Office upon learning that they would not pay for her health insurance when she retired. (*Id.* at 35:3-13). Strittmatter left the District Attorney's Office in September 2010, and began working full-time at Appalachian Youth Services in December 2010. (Tr. Vol. II at 35:14-21; 36:3-4). Her rate of pay at Appalachian Youth Services was $11 or $12/hour. (Tr. Vol. II at 35:22-25). She worked there until April 2013, when she was laid off. (Tr. Vol. II at 36:5-6, 9-10). She had benefits at Appalachian Youth Services. (*Id.* at 36:7-8). She has not been able to find another job since working for Appalachian Youth Services. (*Id.* at 36:11-12). She has been looking for jobs by signing up with CareerLinks, applying for clerical or secretarial jobs in offices, and going on interviews. (*Id.* at 36:15-37:4). She is not looking for jobs now, because she has had a couple of medical problems as of June 2014 that prevent her from actually obtaining a job. (*Id.* at 37:5-14).

Strittmatter earned a total of $18,468.64 in 2010, $24,734.43 in 2011, $26,105.18 in 2012, and $8,769.09 in 2013. (Chapman Ex. 19).

Strittmatter testified that not receiving a job offer from Grane or Cambria Care Center was very stressful because she needed a job. She also testified that undergoing the physical was humiliating. (Tr. Vol. II at 37:22-38:9).

The hourly rate for a staffing coordinator at Cambria Care Center was $13.77 per hour, forty hours per week. (Chapman Exhibit 2, Chapman Exhibit 19).

Strittmatter does not consider herself disabled, has never told any of her supervisors that she has a disabling condition, and never told anyone at Laurel Crest that she could not do her job. (Tr. Vol. II at 52:18-53:53:6). No one at Laurel Crest ever told her that she was disabled or that they considered her to be disabled. (*Id.* at 53:7-9). Strittmatter testified that her neck condition affects her ability to work. When she is bent over her computer for a long time, it bothers her. Her neck hurts, she gets headaches, and sometimes if she bends very far, it can make her dizzy. She does not take medication for those conditions. (*Id.* at 64:18-65:8).

Strittmatter's Corporate Care Services Form indicates there are no medical contra-indications to performing the essential functions of her job. (Ex. D-67).

### g. Richard O'Hara

Richard L. O'Hara is a high school graduate with certificates from Johnstown Vo-Tech in electrical, heating and air conditioning. (Tr. Vol. II at 66:8-23). He started working at Laurel Crest in July of 1983 as a nurse's aide. (Tr. Vol. II at 67:4-8). He worked as a nurse's aide for about six months until he was laid off. (*Id.* at 67:11-13). He then worked in dietary, as a nurse's aide again, in the boiler house, and finally in maintenance, where he remained for the rest of his employment at Laurel Crest. (Tr. Vol. II at 68:9-24). O'Hara's duties in maintenance included basic repair and maintenance jobs, including mechanical repair of laundry and kitchen equipment. (Tr. Vol. II at 68:25-69:11). O'Hare applied for employment with Grane after learning that the facility would be sold. (Tr. Vol. II at 69:12-24). He applied for jobs in security and maintenance. (Tr. Vol. II at 69:25-71:3, Ex. P-54). Nobody from Grane or Cambria Care Center sat down with O'Hara to ask him about his

experience and the kind of things he had done in the facility, nor did anybody ask him about his interest in the security job versus the maintenance position. (*Id.* at 71:14-20). O'Hara found out from the security guards he knew at Grane that their positions were eliminated. (*Id.* at 71:21-72:1). After submitting his application for employment, O'Hara underwent a physical examination and filled out a questionnaire with the medications for which he had a prescription. (*Id.* at 72:9-16; Ex. P-55). He disclosed that he was on Warfarin Sodium, which is a blood thinner, baby aspirin for thinning of blood, Lisinopril for high blood pressure, Lopressor for irregular heartbeat and blood pressure, Plavix for stents in his heart, Synthroid for a slow thyroid, and Zocor for cholesterol. (*Id.* at 73:3-14). O'Hara also disclosed on the form that he had knee and leg problems, which he had suffered since childhood. (*Id.* at 73:15-74:15; Ex. P-55). O'Hara further disclosed on the form that he had had a heart attack, and that he has stents and takes medication for it. (*Id.* at 74:16-22). O'Hara continues to receive treatment for his heart problems. (*Id.* at 74:23-75:5).

O'Hara had another heart incident in January 2009 which required stents to be reinstalled. (*Id.* at 77:17-20). He had another heart incident in April 2009 while he was at work, which caused him to take a medical leave for several months. (Tr. Vol. II at 77:21-78:23; Ex. P-55). When he returned to work in August or September of that year, he did not have any restrictions on his ability to perform his job. (*Id.* at 78:24-79:1).

O'Hara testified that the people performing his medical exam would have asked him about his medications because he knew he was going to take a drug test and wanted to make sure that they knew what medications he was on. (*Id.* at 80:18-23).

O'Hara did not receive an offer of employment prior to filling out the medical questionnaire or undergoing the physical exam. (*Id.* at 80:23-81:4). At no time did he receive an offer of employment from Grane or Cambria Care Center. (*Id.* at 81:5-7). O'Hara's employment at Laurel Crest terminated at the end of 2009. (*Id.* at 81:8-9). Nobody ever told O'Hara why he was not being hired. (*Id.* at 82:11-12).

After his employment ended at Laurel Crest, O'Hara started looking for another job in the fall of 2010. (*Id.* at 82:13-25). O'Hara tried to find a job by going to CareerLinks, filling out his resume online, filling out applications, sending out resumes, and signing up for two temporary agencies. (*Id.* at 83:1-14). He was offered a one-day job through a temporary agency at Pepsi Bottling Company, but was unable to take it because his wife had a doctor's appointment that day. After that, he never heard from them again. (*Id.* at 83:15-84:2). O'Hara stopped actively looking for work at the end of 2011. (Chapman Ex. 13; Ex. P-143).

O'Hara has not worked anywhere since his employment at Laurel Crest ended except as a bartender at the American Legion in Southport. He worked there from around August 2011 until about June of 2012. He would go to work in the afternoons, and also worked one evening. He did not earn an hourly rate, but earned about $70-$80 per week in tips. (*Id.* at 84:3-21). His earnings from that job totaled $1,470.00 in 2011. (Chapman Ex. 13).

O'Hara was very depressed after not being hired by Grane and needed insurance for his daughter. (*Id.* at 84:22-25). He started taking antidepressants prescribed by his family doctor and still was taking them at the time of trial. (*Id.* at 85:2-8).

### h. Kathy Washic

Kathy Washic became employed at Laurel Crest as a nurse's aide in December of 1990. (Tr. Vol. II at 93:3-9). After working as a nurse's aide for about three or four years, she became a therapeutic activity aide at Laurel Crest. (Tr. Vol. II at 93:13-16). After working in that position for about five years, Washic got a switchboard position for a couple of years. (*Id.* at 93:22-94:4). A couple of years later an EMT position became available, and Washic was the most senior person qualified for that position. In that position she provided residents with non-emergency medical transport to the hospital and to doctors' offices for surgeries and other scheduled appointments. (*Id.* at 94:5-15). Approximately four years later, around 2009, her job was eliminated and she returned to the switchboard. (*Id.* at 94:17-25). As a switchboard operator, Washic's job duties included answering incoming phone calls, transferring calls out, signing people in when they entered, assigning them a badge with a number for identification, inputting payroll records into the computer system, and typing for various departments. (*Id.* at 95:1-10). Her last rate of pay was $11.56/hour, and she worked full-time, daylight. She had benefits, including eye coverage, health coverage, dental coverage, and sick days. (*Id.* at 95:11-24).Washic's last day of employment was December 31, 2009. (*Id.* at 96:2-4).

Washic filled out an application for employment with Grane in which she asked for a non-emergency transport, external transport, or switchboard position. (Tr. Vol. II at 96:9-97: 10 and Exhibit P-82). As part of the application process, Washic underwent a physical examination. (*Id.* at 97:17-18). Prior to the physical examination, Washic was required to fill out a written medical history. (*Id.* at 97:21-98:2; Exhibit P-83). Washic

disclosed on her form that she had been injured at work. She told the person administering her physical exam that she had been injured 17 or 18 years ago when a resident threw her against a wall, and she injured her back. She was put on light duty for a couple of weeks. (*Id.* at 98:5-25). Washic also disclosed during her examination that she had undergone triple bypass surgery after being diagnosed with a blockage approximately fourteen years prior. (Tr. Vol. II at 99:1-10, 99:13-19; Ex. P-83). Washic further disclosed during the exam that she suffers from psoriasis, which she had been diagnosed with approximately ten years prior, and for which she sees a dermatologist for treatment. (Tr. Vol. II at 99:10-12, 99:20-21). Washic was also required to give a urine specimen. (*Id.* at 100:4-11).

At no time prior to Washic's physical exam was she offered a job by Grane or Cambria Care Center. (Tr. Vol. II at 100:25-101:11). Washic also testified that she did not receive a job offer after she took the exam. (*Id.* at 101:9-11). Washic testified that Lengle informed her that they did not have a position for her, and that they did not have to give a reason. (*Id.* at 101:12-23).

The reason given by Defendants during discovery for Washic's non-hire was that the transport position for which she had applied was eliminated. (Ex. P-111). Lengle testified at trial that as she did not have a switchboard position for Washic, she had offered her a CNA position because she knew that she had worked as a CNA in the past, but Washic declined the offer. (Tr. VII at 50:21-51:8).

Washic applied to several places for employment, in both Cambria and Blair Counties. (Tr. Vol. II at 102:19-23). Washic applied for jobs at a fruit market, at grocery

stores, at a pharmacy, to do clerical work, and at a Dollar General store. (*Id.* at 102:24-105:2). She applied for jobs by personally going to places and asking if they were hiring, and she filled out applications to keep on the record even if they were not currently hiring. (*Id.* at 103:3-9). Washic eventually found a job two years prior to trial providing home care for a man. (*Id.* at 103:10-15). The home care job is the only employment she has been able to secure. (*Id.* at 103:16-18). Since 2013, Washic has worked between six and twenty-eight hours per week, at a rate of $10.79/hour. (Tr. Vol. II at 103:12-22; 104:16-25).

In 2013, Washic's total income was $1,272.60. (Chapman Ex. 21). In 2014, Washic's total income was $7,898.00. (Chapman Ex. 21).

Washic testified that not being hired by Grane caused her to lose her health benefits, which she now has to pay for out of her own pocket. She has to pay for prescriptions and doctors' visits out of her own pocket. (Tr. Vol. II at 105:15-106: 15).

The hourly wage for switchboard operators at Cambria Care Center was $11.00 per hour, forty hours per week. (Chapman Ex. 2; Chapman Ex. 21).

Lengle testified that she only looked at the back page of applicants' medical questionnaires to verify they were capable of performing the essential functions of the job. Lengle testified that she did not look at other sections of the questionnaire if an applicant did not have a positive drug screen. (Tr. Vol. VII at 28:2-20).

Washic started collecting her county pension a few years ago, about the same time as she obtained her current job. She then stopped sending out resumes and looking for work. (Tr. Vol. II at 108:10-17).

### i. Sue Ellen Schoenfeld

Sue Ellen Schoenfeld began working at Laurel Crest as a nurse's aide in 1991. (Tr. Vol. II at 112:18-21). She first got her job at Laurel Crest in 1991 when she had just finished nurse aide school. She then took a year off to go to LPN School at Vo-Tech in order to increase her income. (*Id.* at 112:15-25). She obtained an associate's degree as a Licensed Practical Nurse. (*Id.* at 113:6-10). She obtained an LPN license, which remained current through the time of trial. (Tr. Vol. II at 113:8-20). She worked full-time as an LPN after finishing school. (*Id.* at 113:24-114:3).

Schoenfeld took a leave in 2005 to take care of an elderly relative. She returned to Laurel Crest in 2008 as a full-time LPN. (*Id.* at 114:13-115:2). Schoenfeld was laid off on January 1, 2009, but was called back two weeks later as a per diem. (*Id.* at 115:3-14). As a per diem, Schoenfeld was limited to working no more than one thousand hours, and worked on average 32 to 36 hours per week. (Tr. Vol. II at 115:24-25). She remained in the per diem position through the remainder of her employment. (*Id.* at 116:1-3).

Schoenfeld applied for a full-time LPN position with Grane, preferring the second shift. (Tr. Vol. II 116:23-117:12; Ex. P-60). After submitting her application, Schoenfeld underwent a physical examination and filled out a medical questionnaire. (Tr. Vol. II at 117:13-23; Ex. P-61). In the section asking for "Medications Currently Used," Schoenfeld disclosed that she was taking Xanax, Paxil, and Tylenol. Schoenfeld took Xanax for anxiety in order to help her sleep. She had been experiencing anxiety all her life and had been treating with Xanax for 20 or 25 years. Schoenfeld testified that if she did not have Xanax, she would be nervous a lot more. (*Id.* at 118:5-119:11). Schoenfeld testified that she

took Paxil for depression, and had been taking Paxil for about 10 years at the time she applied for the job with Grane in 2009. (Tr. Vol. II at 119:12-22). Schoenfeld took Tylenol IV, which is Tylenol with codeine, at night for arthritis in her hips and lower back. (Tr. Vol. II at 119:23-120:2).

Schoenfeld was also required to undergo a urine test, which was being administered by Hoover. Schoenfeld informed Hoover that her test would come out positive because she was on medication. Schoenfeld testified that the test did in fact come out positive. She informed Hoover of the names of the medications she was taking. (*Id.* at 120:25-121:13). Schoenfeld was not offered a job prior to filling out the medical questionnaire, prior to going through the physical exam or the drug testing. She testified that she was never offered a job at any point in time. (Tr. Vol. II at 122:5-13).

Lengle testified at trial that she called Schoenfeld several times to offer her a job, but that Schoenfeld never returned her calls. (Tr. Vol. VII at 69:8-70:9). Lengle further testified that she needed LPNs and needed Schoenfeld. (*Id.* at 70:9).

At the time of Schoenfeld's application for employment, she had lived at her address for approximately 35 years. At the time of trial she was still living at that address. She had had the phone number that was listed on her application for at least 35 years, and the phone number listed on her application was the phone number she had at the time of her application. In addition, she testified that at the time of her application for employment at Grane, her phone number had voicemail or an answering machine that were in working order, and her phone was in working order. Schoenfeld testified that she never received a phone call from either Grane or Cambria Care Center asking her to call

back or offering her a job. She also testified that she never received a message on her answering machine, and that her husband did not give her any messages that anyone from Grane had called her. Schoenfeld also testified that if she had received a call from Grane or Cambria Care Center, she would have called them back, and if she had been offered a job, she would have accepted it. (*Id.* at 122:14 -124:10).

Schoenfeld's employment at Laurel Crest terminated at the end of 2009. She looked for another job by submitting an application with the state, at the state school, going to the Pennsylvania Career Center, and applying to Homestead. She got hired by Maple Winds in July for an LPN position. She worked at Maple Winds for not quite three months. She continued to look for work after leaving Maple Winds, but had not been successful in finding a new position as of the time of trial. (*Id.* at 124:11-127:18).

Schoenfeld's only earnings since leaving Laurel Crest were from Maple Winds, where she earned $3,729.57 in 2010. (Tr. Vol. at 127:9-19; Ex. P-62).

LPNs were paid by Defendants an hourly wage of $16.88 plus a shift differential of $.30 per hour for those who worked shifts other than daylight, forty hours per week. (Ex. P-126; Ex. P-128 at pp. 4-6; Chapman Ex. 14).

Schoenfeld felt humiliated by not being hired by Defendants. She felt her anxiety levels rise, became very depressed, and felt a financial burden. (Tr. Vol. at 127:20-24).

Schoenfeld began receiving her retirement from Cambria County at age 60 in 2011. (*Id.* at 128:21-25).

### j. Nancy Piatek

Nancy Piatek first worked at Laurel Crest in September 1986 as a staff registered nurse. She obtained an associate's degree in nursing in 1983 and started working at Laurel Crest in September of 1986. Her first position at Laurel Crest was as a staff nurse. Her duties as staff nurse were passing out medication, doing treatments, and assessing residents. She was a staff nurse for approximately one year or less. She was then asked to take over the RN position on the second floor, which entailed sometimes passing out medications, but mainly assessing residents and doing rounds with doctors. Piatek's job was a supervisory position which involved supervising LPNs, a unit clerk, and the nurse aides. She was in that position on the second floor for about two years before they decided to close the second floor. She was then moved up to the fourth floor as the unit manager. When Piatek became unit manager it increased the number of people she supervised. Piatek was a unit manager for about two years, until her employer decided to eliminate the unit managers and she was moved into the shift supervisor's office. As shift supervisor Piatek was in charge of the entire facility, which consisted of 705 residents, as well as staff, and her duties included replacing people who had called off. Piatek worked as a shift supervisor until she became a registered nurse assessment coordinator (RNAC) for approximately one year, which involved assessing new and current residents. (*Id.* at 138:1-141:13).

Piatek left Laurel Crest in 1996 to become the assistant director of nursing and the director of staff development at Beverly Health Care Haida Manor, a long-term care facility, where she worked for seven and a half years. Piatek then worked as an agency

nurse for approximately two years, before returning to Laurel Crest in January 2002 as a per diem RN. In January of 2002 Piatek went back to Laurel Crest as an RN on a per diem basis. As a per diem nurse she filled in whenever she was needed on whatever floor she was needed. In October of 2002 she became a full-time staffing nurse at Laurel Crest, and in November 2002 she became a charge nurse for a unit. She held that position until she retired from her employment at Laurel Crest at the end of 2005.

In February of 2006 Piatek returned to Laurel Crest in a staff development position on a per diem basis. Her main duty was to teach nurse aides, but she was also involved in doing orientation for new employees, and in helping to do some of the required in-servicing. She taught the nurse's aides the skills that are required by the Pennsylvania Department of Education so that they could become certified nurse's aides. Piatek was there until 2008 when Laurel Crest hired a full-time employee who took over the nurse aide program, and she was officially on layoff, though she was subject to re-call. (*Id.* at 142:25-144:3).

After learning that Laurel Crest had been sold, Piatek applied for a position with the new owner, which she understood to be Grane HealthCare. She filled out an application for employment asking for a staff development or supervisor's office position. Piatek did not interview for a job with Grane or Cambria Care Center. After submitting the application for employment, Piatek underwent a physical examination. Piatek was also required to fill out a form about her medical history, which asked for medications she currently used. Piatek disclosed that she was taking Ranexa, Neurontin, Accupril, Vytorin, and Singulair. Piatek testified at trial that she took Ranexa for cardiac

microvascular dysfunction, a woman's heart disease that prevents the smallest arteries of the heart from dilating, and which she had had since around 2001. She further testified that she took Neurontin for peripheral neuropathy, which she experienced as numbness in her toes, and which she had had since 2005. Piatek testified that she took Accupril for a study she was in for her cardiac microvascular dysfunction, which she had been taking for about the same amount of time as she had been taking Ranexa, and which she was still taking in 2009. She further testified that she took Vytorin for elevated cholesterol, and had been taking it for seven years. Finally, she testified that she took Singulair for both her seasonal allergies and asthma. She testified that she had suffered from asthma since she was 21 years old. Piatek also underwent a drug screen. (*Id.* at 148:15-153:14).

Piatek did not receive an offer of employment prior to filling out and submitting the medical questionnaire or prior to undergoing the medical examination. Piatek never received an offer of employment from Grane or Cambria Care Center. At the time Piatek applied for employment, her nursing license was current. (*Id.* at 153:25-154:11).

The reason given by Defendants for not hiring Piatek was receipt of a poor reference. According to Defendants' Exhibit 166, Piatek was not hired due to a poor recommendation. The exhibit states "Poor references and attitude" next to Piatek's name. Rebecca Nelen, the former director of nursing, testified that she did not remember Nancy Piatek. (Tr. Vol. VI at 96:12-20). At the time of Piatek's last position with Laurel Crest, her direct supervisor was Rebecca Brisini, and the director of nursing was Eileen Dishong. (Tr. Vol. II at 144:4-6; 148:4-13). Piatek testified that she never received negative feedback on her work performance or her attitude at any time during her employment with Laurel

Crest. (Tr. Vol. II at 147:16-23, 145:10-22, Ex. P-58). Piatek also testified that she does not know Rebecca Nelen, and that Nelen was not the director of nursing when Piatek was employed with Laurel Crest. (Tr. Vol. II at 147:24-3, 148:10-12).

Piatek was still subject to re-call up until the end of December 2009. After that period of time ended, she was no longer subject to re-call. Piatek looked for other employment by watching the newspaper, checking online and sending out applications. She was looking mainly for something on a per diem basis, preferably long-term care, and for jobs in the area of teaching. She submitted applications for a school nurse in Somerset, at Golden Living and at Greater Johnstown Career and Technology Center. She obtained a job at Greater Johnstown Career and Technology Center. She interviewed in June, 2010, and her first official day on the payroll was August, 2010. She worked as the primary instructor for the nurse aides at Greater Johnstown Career and Technology Center. She was not employed there full-time. She was still employed there at the time of her trial testimony. (*Id.* at 155:6-157:4).

Piatek's interim earnings were $4,640.00 in 2010, $7,620.00 in 2011, $11,246.25 in 2012, $12,986.65 in 2013, and $9,185.25 in 2014. (Tr. Vol. II at 157:17-158:12; Ex. P-59; Chapman Ex. 5).

The hourly rate of pay for a staff development employee with Defendants is $24.76 per hour, forty hours per week. (Ex. P-126).

Piatek found it disturbing that she was not hired by Grane or Cambria Care Center. She felt less than desired, though she felt she had a lot of knowledge and a lot to give people. She enjoyed helping other people and teaching. (*Id.* at 158:19-24).

### k. Marie Simmers

Marie Simmers first became employed at Laurel Crest around September 2008 as a per diem Registered Nurse (RN). As a per diem RN, Simmers worked on all of the facility floors, and worked all shifts. She took care of anything that encompassed what a registered nurse does. In the beginning she worked about one to two days a week. Towards the end of her employment with Laurel Crest, she worked more hours because her children were getting older. At that time, she was also able to fill in as the supervisor. In the fall of 2009 she was asked by Rebecca Nelen to be on a committee to help Laurel Crest get into compliance with regulations. (Tr. Vol. III at 4:21-6:20).

After learning that Laurel Crest would be sold, Simmers applied for employment with the new owner, which she understood to be Grane HealthCare. She testified that she never heard the name Cambria Care Center at that time. Simmers' first choice on her application was an RN per diem position, and her second choice was an RN per diem position for staff development. She also indicated on her application that she would be willing to do part-time employment. (Ex. P-70). Simmers was not interviewed for either position. After turning in her application for employment, Simmers underwent a physical, for which she had to fill out a medical questionnaire. (Ex. P-71). In the section under the heading "Medications," Simmers wrote that she was on Nexium and Prozac. She testified that she took Nexium for esophageal reflux disease. She also testified that she took Prozac for Premenopausal dysphoric disorder (PMDD), which caused her to have increased anxiety and depression in connection with her menstrual cycle. She had been taking

Prozac for that condition for at least two years. She discussed her medical condition with the person conducting the physical. (Tr. Vol. III at 6:21-11:10).

The person conducting Simmers' physical examination deemed her to be fit to do her job. (*Id.* at 34:8-11). Simmers testified that she did not believe that anyone at Laurel Crest knew that she had PMDD while she was working there. (*Id.* at 34:12-17).

According to Defendants, Simmers was not hired due to her reference check, which indicated she had a problem with her attitude. (Ex. P-125).

Simmers was not offered a job by Grane. (Tr. Vol. III at 12:6-7). She stated that she did not receive an annual performance evaluation at any time. She testified that she had a lot of contact with Terry Mesoras, who was in charge of staffing. She assumed that she was doing a good job because she had been asked to do the special project for the compliance and been asked to assist with "fills." She testified that Rebecca Nelen had never given her any kind of feedback with respect to how she was performing. She also testified that nobody had ever told her that she had a bad attitude. (*Id.* at 12:16-13:8).

Simmers looked for employment through several agencies after her employment with Laurel Crest ended. She stayed employed at Trauma Services through Conemaugh, working as their injury prevention liaison, which involved going into the community and educating people about injury prevention. She also continued to work in a pediatrics office as a nurse. Finally, she reapplied to Grane for their staff development position. Simmers was able to find other employment after nursing school. She received her Bachelor of Science degree from DeVry University, graduating in 2011. Simmers then went into hospice and now works for Conemaugh Home Health. She started working for

Horizons Hospice in November 2011, and for Conemaugh Home Health in 2012. (*Id*. at 13:11-14:10; Ex. P-72). At some point in August 2012 Simmers started working part-time at Conemaugh Home Health because one of her children had a medical issue. At the time of trial, Simmers had just spoken to her boss about going to work full-time again. (*Id*. at 30:14- 31:12).

Simmers' interim earnings were $5,441.75 in 2010; $10,440.52 in 2011; $37,859.43 in 2012; $60,770.51 in 2013; and $43,111.68 in 2014. (Ex. P-72; Chapman Ex. 17).

The hourly wage for RNs hired by Defendants was $25.46, forty hours per week. (Ex. P-126).

Simmers was initially very upset when she was not hired by Grane. She also experienced financial difficulty because she had planned on using the money from working at Laurel Crest and Grane to pay for her college. She had to take out a loan for her degree which costs her roughly $400 a month. She testified that she found it demoralizing not to have been hired, to collect unemployment and have to explain to her children why she was not working for Laurel Crest anymore. (Tr. Vol. III at 15:13-16:14).

l. **Brenda Kelly**

Brenda Kelly began employment at Laurel Crest as an LPN in 1989, and worked there as an LPN until December 31, 2009. Her LPN license lapsed last year. Before last year, her license had not lapsed at any time between 1989 and 2014. Her duties as an LPN included passing medications, doing treatment, filling out lab slips, and completing turnover paperwork. Kelly testified that her supervisors in 2009 were Al Daisley and

Bernie Varner. She further testified that she had never had any discipline problems at Laurel Crest. (Tr. Vol. III at 36:4-38:24).

Upon learning that the facility was being sold, Kelly filed an application for employment with the new facility, which she understood to be Grane. She stated on her application that she was applying for an LPN position. She also stated that she was available to work third shift. In addition to filling out the application, she underwent a physical and drug test. She also filled out a medical questionnaire, in which she disclosed that she was using Zoloft. Kelly testified at trial that she was treating with Zoloft, an antidepressant, because she was going through a divorce at the time. She also disclosed that she was treating with Lantis, a long-acting insulin, and Humalog, a fast-acting insulin, because she is a Type 1 diabetic. Kelly further disclosed that she had fractured her left heel on September 5, 2009. As a result, she was placed on modified duty. The night before her physical exam she had been released to full duty, and she had worked full duty the night prior to the physical exam. She communicated this information to the person who was conducting her physical exam. (Tr. Vol. III at 39:17-43:23; Ex. 40; Ex. 41).

Kelly was never offered a job by Grane or Cambria Care Center, and was never given a reason for why she was not selected. (Tr. Vol. III at 43:25-44:4).

Defendants' proffered reason for not hiring Brenda Kelly was that she was on modified duty. According to Lengle, "Cambria Care Center would not hire any modified duty positions." (Tr. Vol. VIII at 73:19-74:1; Ex. P-125). Lengle further testified that when she made the decision regarding Kelly, she was not aware that when she returned to Laurel Crest to go through the physical exam process, she was no longer on modified

duty. (Tr. Vol. III at 73:19-74:5). Lengle testified that Deborah Nesbella of Laurel Crest had given her a list of all employees on modified duty and all employees on leave, very early in the process. (Tr. Vol. III at 74:21-75:4).

Lengle further testified that she reviewed the final page of every applicant's Corporate Care Pre-Placement Services medical evaluation forms to determine whether there was a medical contraindication to perform the essential functions of the job for which they had applied. (Tr. Vol. VII at 28:3-12). The final page of Kelly's Corporate Care Services Pre-Placement Evaluation Form indicates that Kelly has no medication contraindication to performing the essential functions of her job. (Ex. P-41).

Kelly testified that she was emotionally distraught when she found out that she had not been offered a job by Grane. She had worked for Laurel Crest for 20 years, and had expected to retire from that job. She also testified that she was a single mother at the time with two kids. She was a diabetic and needed medication for herself as well as for her boys. She applied for medication through an agency called "Free Meds," and in the meantime she lowered the amount of insulin she took and got some of her sister's unopened insulin. She also reused needles until they were dull. (Tr. Vol. III at 44:23-45:24).

Kelly was able to find part-time employment as an LPN in April 2010 at Haida Manor, which she found through CareerLink, earning $18.00 per hour. She found another part-time LPN job at the Ebensburg Center in July 2010, earning a little over $19.00 per hour. Eventually the opportunity arose for Kelly to work five days in a pay period, so she reduced her schedule at Haida Manor to two days. (Tr. Vol. III at 45:25-47:10).

Kelly earned a total of $12,516.14 in 2010. (Chapman Ex. 4). She earned a total of $11,713.60 in 2011. (Chapman Ex. 4). Kelly has been unable to work due to disability (bilateral frozen shoulders due to her diabetes, neuropathy in her feet, stress, anxiety, and depression), since May 2011. (Tr. Vol. III at 47:16-48:1). She filed for disability in July of 2011. (*Id*. at 47:16-17).

The average hourly wage paid to LPNs at Cambria Care Center was $16.88 per hour, plus a $.30 shift differential for those working second or third shift. (Chapman Ex. 2, Chapman Ex. 4).

### m. Rebecca Brisini

Rebecca Brisini began working at Laurel Crest in or about 1995. From March 2003 until the end of December 2009, Brisini held the title of director of staff development. (Tr. Vol. III at 55:20-21; 56:6-8). Brisini's job duties as director of staff development included overseeing the activities of the staff development department, which provided education to all employees throughout the facility. In addition, her department oriented all new employees, and taught nurse aides through a nurse aide program. (Tr. Vol. III at 55:22-56:5).

Prior to working as director of staff development, Brisini also held the positions of director of quality assurance/infection control and case manager. (Tr. Vol. III at 56:15-25). Brisini's last pay rate at Laurel Crest was approximately $27 per hour. (Tr. Vol. III at 57:19-22).

Brisini's last supervisor was the director of nursing, Rebecca Nelen, who had the opportunity to observe her job performance through the educational programs she

developed and provided, and through the directives that she gave her to do. Brisini testified that Nelen did not do any of her performance evaluations. Brisini testified that her overall evaluation for 2008 to 2009 was satisfactory, and that Jessica Coover had performed this performance evaluation. Though Coover did the evaluation, Brisini reported to Nelen or the administrator. Rebecca Nelen noted the following on her evaluation: "Becky works well with others and manages the employees accordingly. She works extra hours as needed. She does need an increased amount of directional assistance when developing plans, education programs, decision-making, etc." (Tr. Vol. III at 57:23-60:2; Ex. P-10).

Brisini filled out an application for a position with Grane. She indicated on her application that she was applying for a staff development position as her first choice and quality improvement, infection control as her second choice. She applied for a full-time job. (Tr. Vol. III at 63:21-62:9; Ex. P-8).

As part of the application process, Brisini underwent a physical examination. (Tr. Vol. III at 64:19-65:4). She was also required to complete a written health history. (Tr. Vol. III at 65:5-19; Ex. P-9). Under "Medications Currently Used," Brisini listed that she was taking Lasix, Potassium Chloride, Aciphex, Benicar hydrochloride, Inderal LA, Lipitor, and Syntax-D. She testified that she was taking Lasix as a mild diuretic because she was retaining water, and Potassium Chloride because the diuretic could deplete the potassium in her system. She further testified that she took Aciphex for GERD/gastric reflux, Benicar Hydrochloride for hypertension, and Inderal LA for migraine headaches. She took Lipitor

for high cholesterol, Zyrtec for allergies. (Tr. Vol. III at 65:22-67:5). Brisini also underwent a urine drug test. (Tr. Vol. III at 69:10-12).

Brisini was not offered a job by Grane or Cambria Care Center. She testified that nobody ever gave her a reason for her non-selection. Brisini asked a Grane employee, Angel Waddell, if she would be offered a job, and Angel told her that they did not have a place for her. (Tr. Vol. III at 74:14-75:11).

Defendants' proffered reason for not hiring Brisini was receipt of a poor reference. (Ex. D-166). Rebecca Nelen, the former director of nursing at Laurel Crest, testified that she did not have any trouble with Brisini, as Brisini did what Nelen told her to do. (Tr. Vol. VI at 98:24-99: 4).

Brisini started looking for a job in 2010 by sending out resumes, looking online, applying to the civil service, and applying to the state. She was looking for RN jobs including jobs in education, infection control, quality assurance, staff development and nursing management. She applied for at least 40 jobs before obtaining one. (Tr. Vol. III at 76:25-77:17).

In December 2010 Brisini started working part-time for Johnstown Career and Technology Center as a clinical instructor for practical nurse students. At the time she started she was making $20 an hour. (Tr. Vol. III at 76:1-76:18). She received several raises and ultimately was earning approximately $24 an hour. (*Id.* at 78:3-10).

In 2012 Brisini became an instructor in the adult education program for nurse aide classes, where she works on a per diem basis earning $22 an hour. (Tr. Vol. III at 78:11-24). At some point between 2011 and 2014 Brisini stopped teaching the practical nursing

students, but she still works at the school on a per diem basis. In February 2014 Brisini obtained a full-time job in staff development in a long-term care facility. (*Id.* at 78:11-79:8).

Brisini sought a full-time job continuously between January 2010 and February 2014. (Tr. Vol. III at 79:9-11).

In 2011, Brisini earned a total of $17,331.05. (Chapman Ex. 3). In 2012, Brisini earned a total of $36,578.27. (Chapman Ex. 3). In 2013, Brisini earned a total of $39,181.30. (Chapman Ex. 3). In 2014, Brisini earned a total of $57,108.44. (Chapman Ex. 3).

Brisini testified that she was devastated by not receiving a job offer from Grane or Cambria Care Center. She had worked at Laurel Crest for 35 years, and 29 of those years had been in management positions. She carried her family's health care benefits. Brisini's husband, Samuel Brisini, had also been employed at Laurel Crest and was also not hired by Cambria Care Center. (Tr. Vol. III at 81:20-83:6).

The hourly wage paid to staff development employees at Cambria Care Center was $24.76 an hour, forty hours per week. (Ex. P-126).

### n. Samuel Brisini

Samuel Brisini began working at Laurel Crest as a licensed RN in June of 1994. (Tr. Vol. III at 92:18-21). Brisini left Laurel Crest in February of 2003 because he had obtained another full-time job with Justice Resource Institute in Cresson, PA, working as a full-time RN. He still works there now as an RN. In 2006 Brisini went back to Laurel Crest as a per diem. He worked there in addition to his job at Justice Resource Institute. Brisini worked shifts as needed, but never more than 1,000 hours per year. Brisini's job duties as an RN at Laurel Crest included drawing blood, doing IVs, shots, and distributing medication. His

last rate of pay was $30 an hour. He had no regular supervisor, as it depended on who the supervisor was on shift on any given day. Brisini testified at trial that he did not know Rebecca Nelen. (Tr. Vol. III at 92:5-95:5).

Brisini stopped working at Laurel Crest in December 2009. He applied for a job with Grane, indicating that his first choice was a part-time RN supervisor staff position. He also underwent a physical as part of the application process, which was some time after he had filled out the employment application. In addition, Brisini had to fill out a medical questionnaire in conjunction with his application. Under "Medications Currently Used," Brisini disclosed that he was taking NovoLog and a Novolin N, both of which are insulins. He also disclosed that he was taking Metformin for diabetes, Cynapril for high blood pressure, Atenolol for high blood pressure, Lipitor for cholesterol, Zetia to prevent the absorption of cholesterol into his system, Allopurinol for gout, and Lipacide for diabetes. Brisini testified that he had been diagnosed with Type 2 diabetes in 1995, and that he is insulin dependent. Brisini also testified that he was diagnosed with high blood pressure around the mid-1990s. He was diagnosed with high cholesterol in the mid-1980s. Brisini also underwent a drug test. He did not have a conversation with Hoover about his urine specimen. Brisini subsequently heard Hoover say that he was "dumping glucose." Brisini understood this to mean that Hoover had performed a urinalysis on his urine sample, and had checked it for sugar. On the medical paperwork generated at Brisini's medical examination, "glucose" and "1000" are written next to "urinalysis." (Tr. Vol. III at 95:10-100:23; Ex. P-13).

Brisini was not offered a job by Grane or Cambria Care Center. (Tr. Vol. 102:1-2). The reason given by Defendants for not hiring Brisini was receipt of a poor reference. (Ex. D-166). Brisini testified that he received yearly performance evaluations while he was at Laurel Crest. Brisini received a "Satisfactory" rating on his performance evaluation for year 2008-2009. Brisini testified that he believed the evaluation to have been signed by Bernie Varner, who was a supervisor at the time. (Tr. Vol. III at 102:22-103:20; Ex. P-14).

Lengle testified that she reviewed the back page of applicants' applications. She only looked at the medications page if the applicant tested positive for a controlled substance. (Tr. Vol. III at 28:9-16).

Brisini's Corporate Care Services Form indicates there are no medical contra-indications to performing the essential functions of the job. (Tr. Vol. III at 112:25-113:1).

Brisini testified that he was affected by not being offered a job at Laurel Crest because he suffered a loss of income and his daughter was in college at the time. (Tr. Vol. III at 102:17-21).

o. **Deborah Farrell**

Deborah Farrell was employed at Laurel Crest as a licensed practical nurse (LPN) beginning in 2000. She had the same position throughout the rest of her employment with Laurel Crest. (Tr. Vol. III at 123:20-124:11).

Farrell had a valid LPN license at the time of her hire at Laurel Crest, and her license remained current since she first obtained it. (Tr. Vol. III at 123:10-19).

At the beginning of Farrell's career at Laurel Crest she first worked as a floater, then she mostly worked on the second floor for approximately eight years. She worked

day shift and second shift, and worked a set schedule. She then worked on the first floor for approximately a year, and towards the end she floated. She was working full-time in 2009, and had worked full-time for the most part throughout her employment at Laurel Crest. Farrell was supervised by the charge nurse assigned to her particular floor. Farrell knew Rebecca Nelen, but did not have much interaction with her throughout her employment at Laurel Crest. Farrell did not recall having any meetings with her to discuss her performance. Farrell received a "satisfactory" rating on her 2009 performance review. Farrell was subject to discipline once while she was at Laurel Crest when two new aides had taken someone to therapy who was not properly dressed and whose hair was not combed. She received a one-day working suspension. She testified that other than that, she had not received any other disciplines while working at Laurel Crest. (Tr. Vol. III at 124:12-125:1).

After learning that the facility was going to be sold, Farrell applied for a full-time LPN position with the new owner, which she understood to be Grane Healthcare. She stated on her application that she was applying for a full-time LPN position. After submitting her application, Farrell underwent a medical examination and filled out a medical questionnaire. Under "Medications Currently Used" Farrell listed Prevacid, Inderal, Benadryl, Bentyl, Baclofen, Lyrica, Multivitamin, Calcium, Tetracycline, Retinal, allergy shots, Percocet, and Voltaren gel. She testified at trial that she took Prevacid for gastroesophageal reflux disease (GERD), Inderal for Hashimoto's disease, Bentyl for irritable bowel syndrome, and Baclofen as a muscle relaxer for nerve damage to her neck that had occurred as a result of a car accident. She had taken Percocet since the accident as

needed and did not use the Voltaren all the time. Farrell testified that she had been taking all medications as prescribed. Farrell testified that she discussed her neck injury and other medical conditions with the PA conducting her physical. Farrell further testified that she was informed at the time of her physical that she would have to go to Creighton to do additional testing because of her previous injury, but nobody ever set it up for her. Farrell also underwent a drug screen. Nobody told her whether she had passed or failed the drug screen. (Tr. Vol. III at 129:2-138:2; Ex. P-21 and Ex. P-20).

Farrell was not interviewed for an LPN position and did not receive an offer of employment from Grane. Lengle helped prepare a document which stated that Farrell was not hired due to poor references. (Tr. Vol VII at 40). Nobody from Grane explained to her why she had not been hired. After learning that she had not been hired, she immediately began looking for other jobs. She looked in the newspaper, online and took a civil service test. Farrell was able to find another full-time position at Skills of Central PA in November 2010. She first worked as a nurse in a home earning $13 an hour, but at the time of trial was working as a medical coordinator overseeing all the medical needs, earning $15.30 an hour. She had been working full-time since she was hired. The job came with hospitalization, dental, vision, retirement and life insurance benefits. (Tr. Vol. III at 138:5-139:25). Farrell started working in the case management around 2013 or 2014. She was still employed by Skills of Central PA as of the time of trial. (Tr. Vol. III at 141:9-18).

Farrell's interim earnings are as follows: $2,602.00 in 2010; $27,598.52 in 2011; $26,633.21 in 2012; $29,350.76 in 2013; and $31,407.48 in 2014. (Chapman Ex. 7). LPNs hired by Defendants were paid on average $16.88 per hour, forty hours per week.

Farrell testified that it was very upsetting not to be hired by Laurel Crest and to have to start all over again. She was worried about leaving behind residents whom she had taken care of for a long time. (Tr. Vol. III at 141:19-142:3).

Farrell's employment file at Laurel Crest included documentation of disciplinary issues while she was working there, including a one-day working suspension on May 4, 2009 for an incident that occurred on April 29, 2008, a written warning on March 24, 2009 for failing to follow a supervisor's directed assignment, counseling for absenteeism on May 3, 2009, a one day suspension for absenteeism on December 19, 2006, a written warning for absenteeism on March 22, 2006, counseling for her attitude toward coworkers and other staff on February 15, 2001, and a comment in her 2001 performance evaluation where she was described by the reviewer as "blunt and discourteous." (Tr. III 142:12-144:11; Ex. D192).

### p. Linda Sidor

Linda Sidor first became employed at Laurel Crest in 1983, working in the dietary department. She worked in the dietary department until about 2000, when she left for medical reasons. She was diagnosed with a mood disorder, depression and traumatic stress disorder. After about three years she applied for a job with Laurel Crest again. She obtained a part-time job in dietary. About six months later, around 2003 or 2004, she started working full time again. Sidor then went to school to become a nurse's aide, and worked in the kitchen on her days off. She was working full-time when she started working as a nurse's aide, and was working as a nurse's aide in 2009. Though she was not

scheduled to work in a particular unit, she testified that it seemed like she was always assigned to the fourth floor. She worked three to eleven. Sidor testified that she did not remember who her supervisors were, as she did not see them often. She testified that she received a couple of performance evaluations while she was there, which were all good. She further testified that at no time during her employment at Laurel Crest was she told that she had a poor attitude or that her performance was poor. She testified that she did not know who Rebecca Nelen was. (Tr. Vol. III at 157:20-163:21).

Upon learning that the facility was to come under new ownership, which Sidor understood to be Grane, she applied for a job there. She stated on her application that she was first of all interested in a nurse's aide position, and secondly interested in a dietary aide position. After she turned in her application for employment, she was required to undergo a physical. She was also required to undergo a drug screen, which was administered by Debbie Hoover. The day of her drug screen, Sidor was asked by a Grane employee to come with her to the personnel office, where she was notified that she had failed her drug screen. She was taken into a room with a Grane employee who asked her what drugs she had taken that day. Sidor told the employee that she had not wanted to disclose on her medical questionnaire that she was taking Mucinex and DayQuil. She listed on her questionnaire that she was taking Ambien, to help her sleep, and Xanax for anxiety and panic attacks, both of which she had been taking since 2000 and had been prescribed by a psychiatrist. Sidor testified that she had taken half of a Percocet, for which she had a prescription, on the day of the drug test. She stated that she had been feeling pain in her head before she went to work, due to a car wreck that she had been in in 2007.

A Grane employee wrote on the back of Sidor's form that she had taken Percocet. Sidor was sent home for the day by officials at Laurel Crest, and was then sent to Johnstown for another drug test. Sidor was paid for the time she was made to go home, and she then returned to work. (Tr. Vol. III at 163:22-175:1).

Sidor was never interviewed for a job with Grane and never received an offer of employment with Grane. She testified that she was never told why she was not hired. After learning that she would not be hired, Sidor put in applications for jobs at other places, including the Veteran's Home in Altoona. She also looked for jobs in car detailing. At the time of trial, Sidor had not been able to find another job. After being unable to find another job, Sidor became depressed and began receiving disability benefits retroactive to March of 2012. (Tr. Vol. III at 175:22-177:15).

Nurse's aides hired by Defendants were paid on average $11.68/hour, forty hours per week.

Sidor testified that not being hired by Grane affected her because she loved her job and loved working with people. She testified that her residents remembered her and that she missed seeing them. Sidor further testified that her husband was not offered a position with Grane, causing them to almost lose their home. (Tr. Vol. III at 177:16-179:3).

Defendants' reasons for not hiring Sidor were a failed drug screen and poor reference. (Ex. P-111, at p. 7, listing "poor references and attitude"; Ex. P-125, at p. 14, listing "failed drug screen"; Tr. Vol. VII at 87:13-88:2). Lengle testified that she had not sought a reference from Nelen. (Tr. Vol. VII at 91:15-18).

Lengle testified at trial that Sidor had failed the drug test. (Tr. Vol. VIII at 2-4). She also testified that Sidor had not told her that she had a prescription for Percocet. (Tr. Vol. VII at 82:13-15). Sidor told Lengle that she had taken half of a pill of her husband's Percocet the night before the drug test. (Tr. Vol. VII at 82:6-10).

### q. Clay Sidor

Clay Sidor started working at Laurel Crest in 1995 as a dietary aide. He also worked in sanitation and started working as a dietary cook in 2006. When Mr. Sidor learned that Laurel Crest would be sold, he applied for a position with the new owner, whom he understood to be Grane Healthcare. Mr. Sidor applied for a position as a dietary supervisor or a dietary cook or prep cook. Sidor testified that throughout his employment at Laurel Crest he had performance evaluations done. In his 2008 – July 2009 performance evaluation he was rated as "dependable." (Ex. 65). Mr. Sidor testified that his supervisor, Kari Shirk, had never told him that he had a bad attitude with her. Mr. Sidor further testified that he had never been convicted of a misdemeanor or felony. Mr. Sidor also worked as a volunteer at FCI Loretto, and had yearly background checks in conjunction with volunteering there. He stated that he had never failed a background check with them. (Tr. Vol. III at 188:25-196:6).

After Mr. Sidor turned in his application, he was required to undergo a physical and fill out a medical questionnaire. He stated on the questionnaire that he was taking Percocet, Motrin and Norflex. He testified at trial that he was taking Percocet for back pain, which he suffered as a result of a ruptured disc in his back. He stated that it did not affect his ability to perform his job duties. In addition, he disclosed that he was taking

Motrin for back pain. He also testified that he took Norflex as a muscle relaxer because he occasionally had spasms. Mr. Sidor discussed the back injury he had sustained at work with the person conducting his physical. She told him that because of his injuries he would have to undergo a lifting test in order to be hired. She did not inform him where or when the exam was going to happen, but only that they would contact him within the next week. Mr. Sidor testified that he never heard back from anyone about the lifting test. Mr. Sidor testified that he had been prescribed Percocet by Dr. Paul Raymond, and had been prescribed Motrin and Norflex by Dr. Mundorf. He stated that he was taking all of the prescription as they were prescribed to him. Mr. Sidor was also required to undergo a urine test. Nobody contacted him to tell him whether he had passed or failed the test. (Tr. Vol. III at 196:9-201:25).

Mr. Sidor was never interviewed by Grane, and never received an offer of employment. He assumed that he would not be hired on December 31, when he had not been notified about a job. Nobody from Grane ever told him that he was not being hired. He looked for other work after his last day of employment with Laurel Crest. He applied for cook positions in nursing homes, but did not get any interviews. Mr. Sidor stopped looking for work after he applied for and received disability benefits, which were retroactive to July 2010. (Tr. Vol. III at 202:1-203:15).

Mr. Sidor testified that not being hired by Grane caused him a lot of financial problems. He had to borrow money from parents and other people to pay for health care. (Tr. Vol. III at 203:16-24). He stated that he was a hard worker, and that not being hired made it look like he was not a good worker. (Tr. Vol. III at 204:23-205:7).

r.   **Nora Nyland**

Nora Nyland began working full-time at Laurel Crest as Nurse Aide in 1997. She initially worked per diem until she reached one thousand hours of work. In 2009 she was not a per diem employee. She worked the daylight shift on the third floor. Her last pay rate in 2009 was $11.77/hour. Her job duties as a nurse's aide were caring for the patients, feeding, dressing, and bathing them. She had eye, dental, and health benefits through her employment. Her last supervisor was Sheila Knee, and her last date of employment with Laurel Crest was December 2009 because she was not hired by Grane. Nyland filled out an application for a nurse aide job with Grane. After filling out the application she was required to get a physical. She was also required to fill out paperwork prior to undergoing the physical exam. She disclosed on her application under "Medications Currently Used" that she was treating with Synthroid. She testified at trial that she was treating with Synthroid at the time. She also disclosed that she had a thyroid problem. She testified at trial that she took Synthroid for hyperthyroidism. Nyland was also required to undergo a urine test. (Tr. Vol. IV at 7:6-11:17).

Nyland testified that she has never had any symptoms from her hyperthyroidism and it never affected any aspect of her life. She testified that no one during the exam process discussed her hyperthyroidism. (Tr. Vol. IV at 16:14-17:2).

Nyland was not offered a job by Grane or Cambria Care Center, and was not given a reason for not being hired. Nyland was able to find employment in August 2011 at Indiana Regional Medical Center. She testified that she did not work in 2010, though she did look for a job in 2010. Nyland looked for nurse aide jobs by applying online and in the

newspaper. She testified that she applied for about 50 jobs in 2010. Nyland's job at Indiana Regional Medical Center was a CNA job at which her starting pay rate was $10/hour. She initially worked eight hours a week and then started working part-time at 24 hours a week in 2012. Nyland's employment at Indiana Regional Medical Center has remained part-time, although at some point in or about 2011 she worked a full-time schedule to cover for an injured colleague. Nyland began earning $13/hour in 2012, and currently works approximately thirty-two (32) hours per week. She has benefits at her job. (Tr. Vol. IV at 11:19-14:5).

Nyland testified that not being hired by the Cambria Care facility meant that she did not have insurance, and she was unable to pay some bills. (Tr. Vol. IV at 14).

Nyland's total earnings in 2012 were $17,184.67. (Chapman Ex. 12). Nyland's total earnings in 2013 were $26,594.89. (Chapman Ex. 12). Nyland's total earnings in 2014 were $25,942.81. (Chapman Ex. 12).

The average hourly wage for nurse's aides at Cambria Care Center was $11.68, forty hours per week. (Chapman Ex. 12; Chapman Ex. 2).

Defendants assert that Lengle made Nyland an offer of employment, but she declined. (Ex. D 166). Defendants' Exhibit 166 states "Declined offer" next to Ms. Nyland's name.

### s. Claudia Merryweather

Claudia Merryweather began working at Laurel Crest as a licensed practical nurse (LPN) in 1983. Merryweather worked daylight shift at Laurel Crest, and her final rate of

pay was around $18.50/hour. Her job duties as an LPN were passing medications, doing treatments, overseeing the nurse aides, updating care plans, doing ADL (activities of daily living) papers for the nurse aides, making rounds with doctors, checking on residents, doing resident care, and doing tube feedings. Merryweather knew who Rebecca Nelen was, but did not know her personally. Her last date of employment with Laurel Crest was December 23, 2009. Merryweather applied for a full-time staff LPN position at Grane. As part of the application process, she underwent a urine drug test and a physical. Prior to her physical examination, Merryweather filled out a written medical history. She stated on her medical questionnaire that she was treating with Dyazide and Zestril, which were used in combination to eliminate edema, for blood pressure. She also disclosed that she was treating with Singulair for asthma, with Mobic for moderate degenerative joint disease, with Albuterol for asthma, and with Robitussin AC for a sinus infection. Finally, she disclosed that she was treating with Glucophage for diabetes.

Merryweather was not offered a job by Grane or Cambria Care Center. She was never given a reason for her non-selection. Merryweather received regular performance evaluations in the course of her employment. She received a "commendable" overall rating on her 2008 to 2009 evaluation.

Merryweather was not able to obtain employment until a couple years after not being hired by Grane. She testified that she was mentally and physically devastated, and believed she was suffering from depression.

On December 28, 2011, Merryweather obtained full-time employment at Blair Medical Associates as a triage contact person, at a starting rate of $13.40/hour. She

received regular pay increases at Blair Medical Associates, and at the time of trial was earning $14.73/hour.

Merryweather's total earnings in 2012 were $27,821.06. (Chapman Ex. 11). Merryweather's total earnings in 2013 were $27,469.56. (Chapman Ex. 11). Merryweather's total earnings in 2014 were $27,093.87. (Chapman Ex. 11).

The average hourly wage paid to LPNs at Cambria Care Center was $16.88/hour, forty hours per week. (Chapman Ex. 11, Chapman Ex. 2).

Lengle testified that she did not hire Merryweather due to Nelen's poor recommendation.

Documentation of Merryweather's poor performance was contained in her employment file at Laurel Crest. This included documentation showing that Merryweather was disciplined for medication errors on January 5 and March 9, 2009; for "failure to complete a resident's treatment" and "failure to obtain medication powder to perform treatment" on January 1, 2009; for failure to properly document and follow up on patient care and failure to supervise nurse aides on December 5, 2007; for tardiness and absenteeism on November 30, 2006; for medication errors on September 25, 2006; for failure to change gloves during wound care on August 10, 2005; for failure to follow policies on September 14, 2004; for not punching in on August 29, 2004; for being tardy on June 1, 2001 following being late ten times in the prior pay period as well as in other pay periods; for inaccurate transcription of medicine on January 13, 1989; for failure to follow policies resulting in a patient not receiving medication on January 12, 1989; for failure to compare a medication card to a medication administration record on December 20, 1988;

for altering a legal document on April 15, 1988; a one day suspension for refusing to work a mandatory double shift on February 1, 1988; for failure to sign a legal document with a full signature in December 1987; for being late on August 9, 1986; for failure to report to work or call off on August 6, 1986; for failure to sign the pharmacy policy in April 1986; a suspension was requested for abuse and misrepresentation of sick time on March 10, 1986; for absences on January 18 and 19, 1986; for reporting off sick after two scheduled days off on November 14, 1985; for reporting off on the day prior to scheduled days off on October 24, 1985; and for reporting sick on September 2, 1985 and July 18, 1985. (Tr. Vol. IV at 38-48; Ex. D 190).

### t.   Jeanne Hess

Jeanne Hess began working at Laurel Crest as a licensed practical nurse (LPN) in or around 1987. She obtained her RN certification while she was working at Laurel Crest. She was employed at Laurel Crest as an RN between 2003 and 2009. Hess's last day of employment at Laurel Crest was December 31, 2009. Her last rate of pay at Laurel Crest was $26.75 an hour. She worked full-time, 7 a.m. – 3 p.m. Hess applied for a full-time RN position with Grane. At the time she submitted her application for employment with Grane in October 2009, Hess was off work on medical leave, as she had just had arthroscopic knee surgery to repair a torn meniscus. Hess was required to undergo a physical examination as part of the application process. Hess was no longer on medical leave at the time of her physical exam. Prior to her physical examination, Hess was required to fill out a written medical history. Hess disclosed that she was treating with Daypro, a prescription anti-inflammatory for joint pain; Synthroid for an underactive

thyroid, with which she had been diagnosed in the 1990s; Wellbutrin for depression, with which she had been diagnosed in the 1990s; Lasix for water retention; and Lortab to treat pain arising from her recent knee surgery.

Hess also disclosed that she had suffered a scapular sprain at work approximately eight years before, when an Alzheimer's resident became violent while she was caring for him. (Tr. Vol. IV at 55:13-25; Ex. P-37). Hess also disclosed that she had problems with her wrists, as she had undergone carpal tunnel surgery in or around 2001, and problems with her knees, because she had just had knee surgery. (Tr. Vol. IV at 56:4-10).

Hess was not offered a job by Grane or Cambria Care Center. The reason given by Defendants for not hiring Hess was receipt of a poor reference. For rating period 2008-2009 at Laurel Crest, Hess was rated "Satisfactory" on her yearly performance evaluation.

Hess first obtained employment in March of 2011. She looked for a job between January 2010 and March of 2011 by going to nursing homes in the area, calling, reading the newspapers, and applying online to several different areas. She also applied for jobs with the state and the Veteran's Administration. She finally obtained employment as an RN with the Select Specialty Hospital. Her starting hourly rate was approximately $27 an hour. Hess received regular pay increases, and at the time of trial was earning approximately $31.01 an hour. She has health insurance, dental, and PTNA benefits there.

In 2011, Hess earned a total of $36,040.80. (Chapman Ex. 10). In 2012, Hess earned a total of $48,282.62. (Chapman Ex. 10). In 2013, Hess earned a total of $35,581.73. (Chapman Ex. 10). In 2014, Hess earned a total of $49,799.73. (Chapman Ex. 10).

Hess testified that she was emotionally affected by not being hired by Cambria Care facility. It affected her self-esteem, after having worked at Laurel Crest for over twenty years, because she had thought she would retire from the facility. She further testified that her mother was ill at the time, and that Hess was partially supporting her as the main breadwinner in the household. Hess was upset because she was no longer able to take care of the residents for whom she had cared for a long time, some as long as twenty years.

The hourly wage paid to RNs at Cambria Care Center was $25.46 per hour. (Ex. P-126; Chapman Ex. 10).

### u. John Wojno

John Wojno became employed as a full-time registered nurse (RN) at Laurel Crest in or about August, 2004, and worked there as a full-time RN until December 31, 2009. As of December 31, 2009, Wojno was earning approximately $25 an hour as an RN at Laurel Crest. Wojno's duties included passing medication, doing wound treatments, and processing admissions.

Wojno applied for a full-time RN position with Cambria Care Center. As part of the application process, he was required to go through a medical examination. He also filled out a medical history form at the time of his medical examination. It was noted on Wojno's medical forms that he was treating with Diazen for high blood pressure, and Sulfasalazine for ulcerative colitis. He also disclosed at the time of his exam that he suffered a work-related injury in approximately 1990, resulting in his meniscus being removed. He also disclosed that he suffered from high blood pressure.

Wojno was not offered a position. Defendants' given reason for not hiring Wojno was receipt of a poor reference.

Wojno sought employment after January 1, 2010. He applied at several facilities for RN positions, and applied for approximately 40 or 50 jobs through the unemployment office.

As of June 2012, Wojno was unable to work due to terminal cancer. He did not have any interim earnings.

The hourly wage paid to RNs at Cambria Care Center was $25.46 per hour. (Ex. P-126; Chapman Ex. 22).

### v. Dana Fresch

Dana Fresch first began working at Laurel Crest in June of 1982 as a nurse's aide. She held that position until 2006, when she took a position as a dietary sanitation aide. As a dietary sanitation aide, Fresch worked alone from 10 p.m. to 6 a.m. cleaning the kitchen. Her supervisor was Kari Shirk, the director of the dietary department. Fresch did not work in the housekeeping department. After learning that Laurel Crest would be sold, Fresch applied for a job with the new owner. Fresch applied for a job as a dietary sanitation aide and as a nurse's aide as a second choice. She was not interviewed for either position.

After submitting her application, Fresch was required to undergo a medical examination and a urine drug screen. Fresch also filled out a medical questionnaire, in which she disclosed that she was taking Darvocet, Ultram and Mobic for pain and swelling in her knees due to osteoarthritis, a condition she had been diagnosed with 15

years before; Nexium for a bleeding ulcer; and Ativan for anxiety associated with her knee pain. She was also taking Prednisone and Lexapro. Fresch testified that her osteoarthritis affected her ability to perform tasks of daily living, such as bathing, taking care of her house and her children. She testified that she was able to function because she was taking medication. Fresch was never offered a job with Defendants.

Fresch began looking for employment in March 2010 after her job with Laurel Crest had ended and after recovering from knee replacement surgery. She looked for jobs online, in the newspaper, and by walking into potential employer jobsites.

Fresch eventually started working at Sheetz part-time in October 2012, between 24 and 32 hours per week. She earned $8.50 at the start, and eventually was earning $9.25 per hour at the time of trial. She does not receive benefits through her job with Sheetz.

Fresch's interim earnings are as follows: $335.59 in 2012; $7,058.63 in 2013; and $9,351.17 in 2014. (Ex. P-25; Chapman Ex. 8). The hourly rate for dietary aides hired by Defendants was $10.25.

Fresch testified that she felt hostile and confused after not being hired by Defendants. She experienced worry and was upset. She was the sole provider for herself and her two children, who were 11 and 14 at the time of trial, and she had to use her retirement money to pay for her house because she was unemployed. (Tr. Vol. VI at 15:5-19).

### vi. The Cambria Care Center Hiring Process

Beth Lengle is the Vice President of Nursing at Grane. Along with her staff of sixteen nurses, she provides consulting services for the twelve nursing home facilities

Grane manages, which includes training and education for the staff members. (Tr. Vol. IV at 88; Tr. Vol. VII at 13, 14). Lengle's supervisor is Len Oddo, Chief Operating Officer of Grane Healthcare. Oddo was Lengle's supervisor in 2009, and has been Lengle's supervisor for her entire tenure as Vice President of Nursing Services. (Tr. Vol. IV at 89:11-19). Deborah Hoover and Angel Waddell both report directly to Lengle. (Tr. Vo. IV at 90:1–6). In late 2009, on behalf of Cambria Care Center and at the direction of Len Oddo, Lengle oversaw the employment processing of Laurel Crest staff for the transition from Laurel Crest to the future Cambria Care Center. (Tr. Vol. IV at 91:5-92:2). Lengle made the decision to require job applicants to undergo medical examinations prior to offering them jobs. (Tr. Vol. IV at 96:21-23).

A physician's assistant from Corporate Care Services conducted the medical examinations, and at times Grane nurses assisted with blood pressures and temperature taking. In addition, Deborah Hoover performed some urinalyses. (Tr. Vol. IV at 98:11-99:3). After medical examinations were performed, the medical history forms filled out by the applicant and the individual performing the medical exam were collected by Corporate Care Services and then turned over to Beth Lengle, who would place those medical forms into each potential employee's personnel file. (Tr. Vol. 99:6-13). Lengle had these documents in her possession at the time that she made decisions whether to offer employment to applicants. Lengle reviewed the final page on each and every medical form, on which the physician's assistant performing the medical examination indicated whether the applicant was able to perform his or her job duties, and then recorded that information on an Excel spreadsheet. (Tr. Vol. IV at 99:9-23, Exhibit P-125).

To determine whose information she was looking at, Lengle had to look at the name on the medical forms, which appears on the front page of the packet. (Tr. Vol. IV at 100:23-101:9, Exhibits P-9, P-13, P-17, P-20, P-24, P-31, P-37, P-41, P-44, P-52, P-55, P 57, P-61, P-64, P-68, P-71, P-74, P-77, P-80, P-83, and P86). In addition, Lengle checked the medication list in the event an applicant had a positive drug result. (Tr. Vol. IV at 99:24-25).

Lengle performed reference checks for all nursing and clerical staff after the physical exams were performed. (Tr. Vol. IV at 105:6-12). Lengle stated that she alone sought "references" from Laurel Crest's director of nursing for each nursing and clerical applicant. (Tr. Vol. IV at 112:6-23; 114:5-9). When asked how she kept straight who received a negative reference, Lengle testified that she had a banker's box of applicant files, and when someone "failed a reference check," she placed their file into a "no" box. (Tr. Vol. IV at 113:24-114:4). Lengle testified that she determined who "failed their reference check" based primarily on whether the former employer would have hired them again. (Tr. Vol. IV at 115:2-11). Lengle testified that if Laurel Crest (or a former employer) stated that they would not rehire a particular applicant, then that applicant did not get an offer of employment. (Tr. Vol. IV at 115:19-20). Lengle was authorized to make hiring decisions for the initial nursing, clerical, and switchboard staff members at Cambria Care Center, and she made those decisions. (Tr. Vol. IV at 115:21-24).

Lengle's prior experience was limited to smaller applicant pools with a greater time period available to complete the application process, and in those circumstances

Lengle had always correctly administered the physical examinations post-offer. (Tr. Vol. IV at 96-97; Tr. Vol. VII at 29-31).

Lengle had to work through the existing Laurel Crest administration to access information about current Laurel Crest employees, and she started the application process as soon as she could, which was in mid to late October, 2009. (Tr. Vol. VII at 15-16). The Administrator of Laurel Crest, Deborah Nesbella, did not want to disrupt the care of the residents and would only permit Lengle and her team to be at Laurel Crest for two or three days per week, for five to six hours per day. (Tr. Vol. IV at 93; Tr. Vol. VII at 15-16). Lengle gave Nesbella blank applications to hand out to her staff, and Nesbella posted times and days when Laurel Crest employees could complete the application process. (Tr. IV 93). Applicants would report to a conference room on the first floor, where they would fill out applications and provide copies of W-2s and I-9s. (Tr. Vol. IV at 9, 99; Tr. Vol. VII at 16; Ex. D 60).

As it neared the end of December 2009, Lengle faced a number of obstacles in addition to the hiring process. In addition to hiring, Lengle had to perform other transition tasks such as making a working schedule, ensuring there was sufficient equipment and medical supplies to take care of the residents, and confirming that the equipment was safe and in working order. (Tr. Vol. VII at 17).

As part of the hiring process, Lengle had to meet the mandatory federal requirements for employees working in long-term care facilities, which includes obtaining criminal background checks, conducting Tuberculosis skin tests ("TB tests"), and attempting to obtain references from two different prior employers. A minimum of one

reference was required if an individual did not have two different employers or if two references were not available. (Tr. Vol. IV at 105; Tr. Vol. V at 51-52; Tr. Vol. VII at 19, 32-33). Lengle attempted to obtain references for the Laurel Crest employees from the Human Resources Department at Laurel Crest, but Christine Sandusky, the Assistant Director of Human Resources, refused to cooperate. (Tr. Vol. IV at 112). Lengle did not have access to the personnel files because Laurel Crest had taken all of the filing cabinets which contained them off the premises, and the filing cabinets were not returned until 6:30 p.m. on December 31, 2009. (Tr. Vol. VI at 198-199). Because the Laurel Crest Human Resources Department would not help her, Lengle sought references for the nursing and clinical staff from Rebecca Nelen, the Laurel Crest Director of Nursing, and for the Department Heads from Owen Larkin, the Laurel Crest Assistant Administrator, and Steven Dale, the Finance Officer. (Tr. Vol. VI at 197; Tr. Vol. VII at 33).

Rebecca Nelen was hired by Laurel Crest in February, 2008 and had been the Director of Nursing for Laurel Crest for roughly a year at the time of the hiring process, managing the operations of the nursing department on a day-to-day basis and supervising the RNs, LPNs, CNAs, Unit Clerks, and staffing. She reported to Larkin and Nesbella. (Tr. Vol. VI at 130). Nelen spent the majority of her time during 2009 on Department of Health surveys and other documentation, responding to regulatory issues. There were approximately 500 nursing staff at Laurel Crest in 2009, and employee performance was "not [Nelen's] focus at that point in time." (Tr. Vol. VI at 105, 109, 142, 146). Nelen recalls interacting with Lengle during the course of the negotiation process with Grane and Cambria County, but does not remember whether or not she had

substantive conversations with Lengle about any nurse or nursing assistant during the course of the hiring process. Nelen acknowledges that she and Lengle may have had conversations about employees, but cannot affirm that these conversations did or did not happen, or the circumstances of any conversation. (Tr. Vol. VI at 104-105, 107, 143, 144, 146).

Lengle recalls involving Nelen in reference checks and asking Nelen about specific employees, including the required question whether those employees had performance, attendance or attitude issues, and asking Nelen's opinion as to whether she would re-hire a particular employee. (Tr. Vol. VII at 33-34).

Nelen did not appear to testify at trial. The process server attempted multiple times, saw Nelen, even spoke with her, but she indicated that she was not going to appear. In fact, she told the process server, "And anyway, this case has taken up too much of my time and I'm just not coming." (Tr. Vol. VI at 53-54). Nelen stated that 2009 was the worst year of her life working for any employer. When Oddo offered Nelen the position of Director of Nursing at Cambria Care Center she turned it down because Laurel Crest was "a horrible place to work." (Tr. Vol. VI at 105, 135-136).

Lengle kept two banker's boxes with application materials and made files for each applicant, sorted according to Nelen's recommendation regarding whether she would rehire an applicant or not. (Tr. Vol. IV at 114; Tr. Vol. VII at 34). Lengle kept some informal notes, but they were meant only as a quick reference for her own use, and they

contained mistakes. Her chart was a working tool for her own use that she never thought anyone would see. (Tr. Vol. IV at 104; Tr. Vol. VII at 74).

Grane required all applicants to be screened for controlled substances and illicit street drugs. (Tr. Vol. V at 51-52; Tr. Vol. VII at 19). Deborah Hoover is an RN who was hired by Grane as a nurse consultant when the purchase of Laurel Crest was imminent. One of her responsibilities was to administer the Redi-Test Panel to Cambria Care Center applicants, which tested the applicants for controlled substances and illicit street drugs. (Tr. Vol. I at 104-105). The Redi-Test Panel tested only for the following controlled substances: Amphetamine, Methamphetamine, Barbiturates, Benzodiazepines, Buprenorphine, Cocaine, Marijuana (THC), MDMA (Ecstasy), Methadone, Opiates, Oxycodone, Phencyclidine, and Propoxyphene, and Tricyclic Anti-Depressants. These drugs are not legal without a prescription. (Tr. Vol. VII at 20; Ex. P-94). A positive result for Oxycodone indicated the presence of a pain relief narcotic such as Oxycodone or Percocet. (Tr. VII 21).

Applicants filled out a form and after Hoover checked their identification, went into a restroom, where Hoover handed them a specimen cup and asked them to urinate into it and leave it on the back of the toilet. (Tr. Vol. I at 107). The process was private with a closed door. (Tr. Vol. III at 87, 108-109, 210). After the applicant finished, Hoover would re-enter the restroom to collect the specimen cup, open the Redi-Test kit, pull off the cap, and dip it into the urine. After it was developed, Hoover would read the different panels and would mark on the form whether the test was negative or positive, and for positive tests, the substances detected. (Tr. Vol. I at 107-108; Ex. D 60). Approximately fifty-six

applicants failed the drug test. Twenty-one of those applicants were not hired because of the positive drug screen result, but thirty-one of those applicants were hired despite the positive drug screen result because the positive result was caused by prescription drugs that were disclosed on the Corporate Care Services Form. The remaining four applicants were not hired for other reasons such as poor references. (Tr. Vol. VII at 22; Ex. D197).

Applicants were also required to undergo a physical exam. Lengle "absolutely did not know" when she was hiring employees for Cambria Care Center that it violates the Americans with Disabilities Act to conduct a physical exam prior to making an employment offer, although she knows that now. (Tr. Vol. VII at 29). Lengle decided to have pre-offer physicals for time management reasons. (Tr. Vol. VII at 76). She had more than 300 applications to process within eight weeks, and as of January 1, 2010 there had to be sufficient employees hired to take care of Cambria Care Center's 326 residents. (Tr. Vol. IV at 97; Tr. Vol. VI at 200; Tr. Vol. VII at 30, 76). James Woodley from Grane contracted with Corporate Care Services, which is not affiliated with Grane, to conduct physical examinations ("physicals"). (Tr. Vol. IV at 96). A Physician's Assistant from Corporate Care Services conducted the physicals, which consisted of vital signs, eye exams, hearing tests, and agility testing. (Tr. Vol. V at 18-19; Tr. Vol. VI at 135; Tr. Vol. VII at 27, 96). The Corporate Care Services Physician's Assistant wrote the results of the physicals on the applicants' Corporate Care Services Pre-Placement Evaluation ("Corporate Care Services Form") and checked one of the four boxes on the last page of the Form:

**RECOMMENDATIONS:**

- No medical contraindications to performing the essential functions of this job without restriction
- No medical contraindications to performing the essential functions of this job with the following recommendations
- Based upon the probability of substantial harm, this employee co[u]ld pose a direct threat to self or others and therefore is not medically qualified
- Referral made to personal physician for medical condition which will not impair job performance.

Neither of the last two boxes was checked on any Form. (Tr. Vol. IV at 99; Ex. D21; Ex. D60). After the physicals were performed, Corporate Care Services gave the Forms to Lengle, who looked at the last page to see if the applicants were medically able to perform the job duties. Beyond that quick review, unless an applicant registered a positive result on the drug screen, Lengle did not have the need or the time to review the additional information on the Forms. (Tr. Vol. IV at 99-100; Tr. Vol. VII at 28). Lengle was not aware of the Claimants' alleged medical conditions, or even if they had any medical conditions, at the time she was making hiring decisions. (Tr. Vol. VII at 67).

In the event of a positive drug screen for a controlled substance from the Redi-Test, Lengle would cross-check the medications applicants listed on the Corporate Care Services Forms against the drug test to see if a listed prescription medication caused the positive result. If an applicant identified a controlled substance and had a prescription, it would not preclude them from employment. Lengle reviewed the medication list for applicants who tested positive for illegal street drugs. Otherwise, Lengle did not review the medication lists. (Tr. Vol. VII at 20-22). Lengle cross-checked the medication list for

applicants who had positive drug screens. This included Farrell, Merryweather, Clay Sidor, Linda Sidor, Siska, Fresch and Schoenfeld. (Tr. Vol. VII at 78; Ex. D197).

### vii. Richard Graciano - Chief Operating Officer of Grane Healthcare, Vice President of Cambria Care Center

According to Richard Graciano, the purpose of Ebensburg Care Center d/b/a Cambria Care Center ("Cambria Care Center") was "to hold the real estate of the nursing home," which Graciano and his partners, Ross Nese, David Graciano, and Jeffrey Graciano, purchased from Cambria County. (Tr. Vol. VI at 65:18-66:7). Graciano was the chief executive officer of Cambria Care Center. To the best of Graciano's recollection at the time of his deposition on 12/27/14, David Kearney was the chief financial officer and Len Oddo was the chief operating officer, but Graciano could not "remember offhand specifically what role or title each person is." (Tr. Vol. VI at 66:11-16).

Cambria Care Center is a shell corporation. (Tr. Vol. VI at 68:16-24). Richard Graciano and his partners, Ross Nese, David Graciano, and Jeffrey Graciano, own Grane Healthcare, a consulting company, which oversees and assists with facilities, some of which, such as Cambria Care Center, are also owned by the Graciano brothers and Nese. (Tr. Vol. VI at 69:21-70:5). Graciano and these same three partners also own Grane Associates, which owns Grane Healthcare. (Tr. Vol. VI at 72:20-24; 184:3-5; 84:22-25). Grane Associates also owns Cambria Care Center. (Tr. Vol. VI at 73:6-8; Tr. Vol. VI at 184:6-8). Graciano is also the chief executive officer of Grane Healthcare. To the best of Graciano's recollection at the time of his deposition on 12/27/14, Ross Nese was president, Len Oddo was Chief Operating Officer, and Dave Kearney was the chief financial officer.

(Tr. Vol. VI at 72:12-16). Graciano and his partners, Ross Nese, David Graciano, and Jeffrey Graciano, also own a partnership called Grane Associates which "holds real estate and various business activities" such as title and elder care. (Tr. Vol. VI at 72:17-73:1).

According to Graciano, having several corporate entities is preferable in light of the U.S. Department of Housing and Urban Development ("HUD") regulations, as well as defending against prosecution by attorneys. (Tr. Vol. VI at 75:8-14). Graciano stated that HUD requires that Cambria Care Center, as a mortgaged property, undergo independent audits. (Tr. Vol. VI at 77:15-78:4). Graciano is "not sure" if Grane Healthcare submits itself to independent audits. (Tr. Vol. VI at 77:20-25). The pharmacy vendor and construction consultants utilized by Cambria Care Center are both owned by the same four individuals that own Grane Healthcare. (Tr. Vol. VI at 79:6-18). According to Graciano, it is "obvious" which laundry service Cambria Care Center should utilize, since Preferred Laundry Service is located in the same building as Cambria Care Center. Preferred Laundry Service is also owned by the same four partners that own Grane Healthcare. (Tr. Vol. VI at 75:15-21; 80:2-12).

According to Graciano, the nursing homes he owns with his partners utilize the services of Preferred Laundry Service, which he and his partners also own, because "[i]nstead of getting it from someone else, we provide it ourselves. We think we do a better product." (Tr. Vol. VI at 75:15-76:7). Despite the fact that she technically works for another Grane-affiliated organization called Construction and Healthcare, Terry Creagh is in-house counsel for both Grane Healthcare and Cambria Care Center, represents both

corporations in this litigation, and Graciano "thinks" she may be an officer. (Tr. Vol. VI at 80:13-17; also see ECF No. 7).

The Management Agreement between Grane and Cambria Care Center, signed 12/4/09, states that "all dealings between the operator and the manager shall be implemented through the chief operating officer of the manager or his representative…and the operator's representative for the operator." (Ex. P-116). As defined by the management contract, agreement, the chief operating officer of Grane Healthcare is, and was at the time the agreement was executed, Leonard Oddo. As defined by the management agreement, the representative of Cambria Care Center, at the time the agreement was executed, was Oddo's subordinate, Owen Larkin. (Tr. Vol. VI at 81:4-82:2). The "checkbook" for Cambria Care Center is accessible by Grane Healthcare. (Tr. Vol. VI at 82:3-83:2).

Cambria Care Center carries liability insurance for extended care facilities. On its liability insurance declarations, Grane Healthcare, not Cambria Care Center, is listed as the insured entity. (Tr. Vol. VI at 83:10-23; Ex. P-123). When asked who at Grane Healthcare made the decision to hire the initial complement of employees at Cambria Care Center, Graciano testified, in part, that there were no employees of Cambria Care Center, because the deal had not closed yet, but things had to be done six months earlier, so the management company was used "to help pull it together." (Tr. Vol. VI at 85:6-86:21). Graciano also testified that the four partners who had purchased the nursing facility that was to become Cambria Care Center "[w]ere certainly going to use our own management company." (Grane Healthcare, also owned by the same four partners.) (Tr.

Vol. VI at 85:20-86:3). Ebensburg Care Center d/b/a Cambria Care Center got its initial injection of funding from the four partners. (Tr. Vol. VI at 86:22-87:1).

## III. CONCLUSIONS OF LAW

### a. Single employer

The Court was unable to determine at summary judgment whether or not Grane and Cambria Care Center constituted a single employer for purposes of the ADA. The Court now finds that the evidence presented at trial establishes that Grane and Cambria Care Center constitute a single employer for purposes of the statute.

The Third Circuit has held that nominally separate entities should be considered a single "employer" and aggregated to establish employee numerosity for purposes of the ADA when any one of these three circumstances is proven: (1) "[w]hen a plaintiff proves that a company has split itself into multiple entities to evade coverage under [the ADA]"; (2) "[w]hen the companies sought to be aggregated for [ADA] purposes are in a parent-subsidiary relationship . . . [and] the parent has directed the subsidiary to perform the allegedly discriminatory act in question"; or (3) "substantive consolidation," which is to say, where the evidence shows that "two or more entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice." *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 86 (3d Cir. 2003).

The Court will examine whether substantive consolidation has been established in this case. The evidence at trial established that Defendant Grane's workforce in 2009, which satisfies the statutory numerosity requirement under the ADA, should also be

considered employees of Defendant Cambria Care for purposes of ADA coverage. The Court finds that EEOC has established substantive consolidation, which requires the Court to apply an open-ended, equitable inquiry that examines the degree of operational, rather than financial, entanglement between the two entities. *See Nesbit*, 347 F.3d at 87.

Relevant operational factors to be considered, no one of which is dispositive standing alone, are as follows: "(1) the degree of unity between entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters); (2) whether they present themselves as a single company such that third parties dealt with them as one unit; (3) whether a parent corporation covers the salaries, expenses, or losses of its subsidiary; and (4) whether one entity does business exclusively with the other." *Id.* at 87. Ultimately, the question answered by this third test is "whether two or more entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice." *Id.* at 86.

The Court finds here that EEOC has established sufficient unity and interconnection between Grane and Cambria Care to establish that the two Defendants were substantively consolidated and should be regarded as a single entity under the statute. In particular, the Court finds that there was substantial unity of ownership, management, and key business functions between Cambria Care Center and Grane. Three of the four factors outlined above weigh in favor of a finding of substantive consolidation in this case.

First, with respect to ownership and management, there is a high degree of unity between the two entities. The same four partners, Richard Graciano, Ross Nese, David

Graciano, and Jeffrey Graciano, own Grane Associates, which owns both Grane Healthcare and Cambria Care Center. (Tr. Vol. VI at 72:20-24; 184:3-5; 84:22-25). Further, Richard Graciano served as the Chief Executive Officer of both entities; Leonard Oddo served as the Chief Operating Officer of Grane Healthcare and as Vice President of Cambria Care Center; Ross Nese served as President of both entities. (Tr. Vol. VI at 185:13-24; Vol. V at 31:21-33:8; Vol. V at 33:24-34:9). Similarly, with respect to business functions, there is a high degree of unity between Grane and Cambria Care Center. In 2009, Beth Lengle, the Vice President of Nursing at Grane, oversaw the employment processing of Laurel Crest staff for the transition from Laurel Crest to the future Cambria Care Center. Lengle oversaw this processing on behalf of Cambria Care Center and at the direction of Len Oddo, the Chief Operating Officer of Grane Healthcare. (Tr. Vol. IV at 91:5-92:2). During this process, at times Grane nurses assisted with blood pressures and temperature taking of Cambria Care Center applicants. Deborah Hoover, an RN who was hired by Grane and who reported directly to Lengle, performed urinalyses of applicants. (Tr. Vol. IV at 98-11-99:3). Hoover also administered the Redi-Test Panel to Cambria Care Center applicants. (Tr. Vol. I at 104-105). These facts demonstrate that there is a high degree of unity between Grane Healthcare and Cambria Care Center, which supports a finding of substantive consolidation.

Second, in at least some instances, these two entities present themselves as a single company such that third parties deal with them as one unit. For example, Cambria Care Center carries liability insurance for extended care facilities, but Grane Healthcare, rather than Cambria Care Center, is listed as the insured entity on Cambria Care Center's

liability insurance declarations. (Tr. Vol. VI at 83:10-84:10). Additionally, Terry Creagh serves as in-house counsel to both entities and represents both Grane Healthcare and Cambria Care Center in litigation against third parties. (Tr. Vol. VI at 80:13-17). Grane Healthcare and Cambria Care Center also share a corporate address. (Tr. Vol. V at 32:11-18). These facts indicate that Grane Healthcare and Cambria Care Center present themselves as a single company such that third parties deal with them as one unit. This factor thus weighs in favor of a finding of substantive consolidation.

As to the third factor, there is evidence that Ebensburg Care Center d/b/a Cambria Care Center got its initial injection of funding from the four partners who also own Grane Healthcare, but Graciano testified that this money came from the partners' personal checkbooks or monies borrowed from banks. (Tr. Vol. VI at 86:22-87:10). On the other hand, Graciano testified that the organizations did not draw money from a single account but rather had separate checkbooks, income statements, loans, and balance sheets. (Tr. Vol. VI at 82:15-20). These facts do not support a finding that the parent corporation covered the salaries, expenses, or losses of its subsidiary. The third factor thus does not weigh in favor of a finding of substantive consolidation.

Fourth, there is evidence to support the notion that Cambria Care Center uses Grane or Grane-affiliated entities for many of its outsourced functions. For example, according to Graciano's testimony, Cambria Care Center uses Grane or Grane-affiliated entities for its laundry, pharmacy, and construction consulting services. (Tr. Vol. VI at 75:15-76:7; 79:6-18). These facts indicate that Cambria Care Center dealt exclusively with

Grane for several of its necessary functions. This factor thus weighs in favor of a finding of substantive consolidation.

Three of the four non-dispositive factors weigh in favor of a finding of substantive consolidation. Accordingly, the Court finds that there was substantial unity of ownership, management and key business functions between Cambria Care Center and Grane such that the two entities were substantively consolidated and should be regarded as a single entity under the ADA.

### b. Whether or not the Redi-Test constituted a medical examination

The Court found for purposes of deciding the summary judgment motions that the drug tests conducted in this case qualified as "medical examinations" because each urine sample was tested for both medical and drug-use purposes before being discarded. (ECF No. 143 at 56). This finding was based upon the submissions of the parties without the benefit of the testimony and evidence offered at the trial of this case. In consideration of the testimony presented at trial, the Court now finds that the drug tests were proper drug screens and did not constitute medical examinations under the ADA.

Under Title I of the ADA, "any employee who is currently engaging in the illegal use of drugs" is not considered "a qualified individual with a disability" entitled to protection from discrimination. 42 U.S.C. § 12114(a). The ADA specifically permits a covered entity to "hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance

or behavior is related to the drug use or alcoholism of such employee." 42 U.S.C. § 12114(c)(4).

The Third Circuit has construed these statutory provisions to mean that the ADA does not require covered employers to reasonably accommodate individuals whose shortcomings are attributable to ongoing "drug and alcohol addiction." *Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998).

The ADA provides that drug screens are not considered medical examinations within the meaning of § 12112(d):

**(d) Drug testing**
  (1) In general
  For purposes of this subchapter, a test to determine the illegal use of drugs shall not be considered a medical examination.
  (2) Construction
  Nothing in this subchapter shall be construed to encourage, prohibit, or authorize the conducting of drug testing for the illegal use of drugs by job applicants or employees or making employment decisions based on such test results.

42 U.S.C. § 12114(d).

The statutory definition of the term "illegal use of drugs" expressly excludes "the use of a drug taken under supervision by a licensed health care professional." 42 U.S.C. § 12111(6)(A).

"[A]n employer may only rely on a test for illicit drug use to make employment decisions based on that illicit use." *Connolly v. First Personal Bank*, 623 F. Supp. 2d 928, 931 (N.D. Ill. 2008). A pre-offer drug test may not be administered under the guise of testing for illicit drug use when in fact the results are used to make employment decisions based on both legal and illegal drug use alike. *Id.* The provision of Title I governing the use of

drug tests "is given more precise content by the neighboring [provisions] with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). The language excluding users of illegal drugs from the category of persons entitled to statutory protection is limited by a rule of construction extending protection to any individual who "is erroneously regarded as engaging in such use, but is not engaging in such use." 42 U.S.C. § 12114(b)(3).

In order for a drug test to be considered a medical examination under the ADA, a claimant must show that (1) the drug test in question "was not administered to determine the illegal use o[f] drugs," and (2) that the drug test did not, in fact, return a positive result for the illegal use of drugs. *See Meyer v. Qualex, Inc.*, 388 F. Supp. 2d 630, 637 (E.D.N.C. 2005).

Defendant presented testimony at trial to satisfy the Court that its only intent in performing pre-offer drug tests was to determine whether or not applicants were using illicit drugs. The Redi-Test panel used by Defendant tested for Amphetamine, Methamphetamine, Barbiturates, Benzodiazepines, Buprenorphine, Cocaine, Marijuana (THC), MDMA (Ecstasy), Methadone, Opiates, Oxycodone, Phencyclidine, and Propoxyphene, and Tricyclic Anti-Depressants. (Tr. Vol. VII at 20; Ex. P-94). Beth Lengle testified at trial that when an applicant tested positive for a controlled substance, she would cross-check the positive results for controlled substances with the applicant's list of medications. It was only at this point that Lengle would discover whether an applicant was taking a lawfully prescribed medication. The drug screen itself did not reveal whether or not applicant was taking a lawfully prescribed medication. The reason

given by Defendants at trial for conducting pre-offer drug tests was to determine the illegal use of drugs. The Court has found Lengle to be credible in this matter. The evidence at trial also established that the drug test resulted in certain applicants testing positive for illegal drugs. While EEOC contends that the majority of these applicants in fact had valid prescriptions for drugs, the Court observes that Lengle cross-checked drug test results with applicants' disclosed drug prescriptions and only intended to make employment decisions based on illegal drug use, rather than merely a positive test result.

The protocol to administer the Redi-Test drug screens and then, if a positive illegal drug was indicated, to check the list of drugs for which the applicant had a valid prescription, is acceptable under the ADA. Under this protocol, the Redi-Test was not a medical examination. Accordingly, the Court finds that the Redi-Test panel is a drug test that is not a medical examination pursuant to 42 U.S.C. § 12114(d), and therefore, EEOC may not base its claims for violation of 42 U.S.C. §§ 12112(a) and 12112(d)(2)(A) on the fact that the Redi-Test was administered or its results.

### c.  Dinsmore, Grove, Siska, and Linda Sidor

Ellen Dinsmore, Mary Jane Gove, Chelsea Siska, and Linda Sidor all tested positive for illegal drugs and were not hired based upon that positive test. EEOC has not established that the positive drug tests were in fact incorrect.

Defendants are entitled to judgment in their favor on these claims because Plaintiff did not produce sufficient evidence to contradict the positive drug test result for Dinsmore and Grove. Dinsmore tested positive for THC, and while she asserted not to have taken marijuana at any time in 2009, EEOC offered no further evidence to contradict

this positive drug test result. Grove tested positive for PCP, and the EEOC offered no evidence other than Grove's testimony to contradict this positive drug test. Dinsmore and Grove's testimony on this issue is not found to be credible.

EEOC also asserts that Chelsea Siska and Linda Sidor had prescriptions for Methadone (Siska) and Percocet (Sidor) from licensed health care professionals. However, no evidence of such prescriptions was produced at trial. Sidor testified at trial that she had a prescription for Percocet, but later admitted that her prescription had expired in December 2007, which was two years before her Redi-Test drug screen. Thus, EEOC cannot contradict Defendants' proffered reason for conducting pre-offer drug tests, namely in order to make employment decisions based on illegal drug use. Since Siska did not disclose her use of Methadone and Linda Sidor was unable to produce a valid prescription for Percocet, Defendants were justified in making employment decisions based on their drug test results. Since EEOC offered no reliable, admissible evidence that either Siska or Sidor was using the controlled substances detected by the Redi-Test under the supervision of a licensed health care professional, the Court finds that these two employees were not hired for the reason proffered by the Defendants, namely illegal use of drugs. As previously set forth, the Court also finds that the methodology used by Defendants to determine illegal drug use is proper under the ADA.

Based on this lack of supporting evidence by Plaintiff, the Court finds that Defendants are entitled to judgment on EEOC's claims regarding, Siska, Sidor, Grove and Dinsmore.

### d. Christine Berish

EEOC claims that Defendants are liable for disability discrimination under 42 U.S.C. § 12112(a) and 42 U.S.C. §§ 12112(d)(2)(A) because hiring decisions were allegedly made based on information obtained in the pre-offer physical examination process. EEOC has failed to meet its burden of proof for the claim on behalf of Christine Berish. The testimony at trial established that Berish did not complete a Corporate Care Services Form and did not undergo the physical examination. EEOC has presented the Court with no legal theory upon which to base a finding that Defendants could be liable for a medical examination they did not conduct.

Since EEOC has failed to meet its burden of proof for Berish, Defendants are entitled to judgment in their favor regarding EEOC's claims relating to her.

### e. EEOC's § 12112(a) claims

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Court finds that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), is the appropriate standard to apply to EEOC's claims under § 12112(a) of the ADA. *Shaner v. Synthes (USA),* 204 F.3d 494, 500 (3d Cir. 2000).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. Once a plaintiff has done so, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for an adverse

employment action. *Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir. 2000) (citation omitted). If the defendant carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason proffered by the defendant was a pretext for discrimination. *Id.* The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones v. School Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir. 1999) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53 (1981)).

To establish a prima facie case of disability discrimination, EEOC had to submit evidence sufficient to prove that each Claimant: (1) is disabled; (2) can perform the essential functions of her job with or without reasonable accommodations; and (3) has suffered an adverse employment action as a result of discrimination based on his or her disability. *Terry v. Town of Morristown,* 2011 WL 4526773 *3 (3d Cir. Sept. 30, 2011); *Shaner,* 204 F.3d at 500.

The Court found at summary judgment that it was not convinced that *McDonnell Douglas* should apply to an ADA claim such as this one, involving a number of applicants, though it chose to analyze the claims under *McDonnell Douglas* for summary judgment purposes. (ECF No. 143 at 44). Having considered the party's submissions, and in consideration of the evidence presented at trial, the Court finds that the *McDonnell Douglas* framework is the appropriate framework to analyze the present case.

The Court finds that EEOC has failed to meet its burden of proof to establish a *prima facie* case of disability discrimination under 42 U.S.C. § 12112(a), because it failed prove that each claimant is a person with a disability under the meaning of the ADA, and,

additionally, it failed to present evidence sufficient to support an inference that the Claimants were not hired as a result of discrimination based upon disability. The Court also finds that EEOC has failed to meet its *McDonnell Douglas* burden of proof because it has not presented evidence sufficient to prove that Defendants' articulated reasons for their employment decisions were pretext for intentional disability discrimination. To prevail, EEOC must convince the Court "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer[s'] action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### f. EEOC has failed to establish that Claimants are disabled

The Court will analyze the claims first by looking at EEOC's claims overall and then considering each Claimant individually.

To establish a prima facie case of discrimination, a plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subject to an adverse employment decision as a result of discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

In order to meet the ADA's definition of "disability," the Court must find that the Claimant has (A) a physical or mental impairment that substantially limits one or more major life activities of the individual; (B) there is a record of such impairment; or (C) that the Claimant is being regarded as having such an impairment. 42 U.S.C. § 12102 (1990).

### i. Physical or mental impairments that substantially limit any major life activity, 42 U.S.C. § 12102(1)(A)

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1)(A) (2010).

EEOC regulations define an impairment as "[a]ny physiological disorder, or condition … affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." *Sulima,* 602 F.3d 177, citing 29 C.F.R. § 1630.2(h)(1) (2006). "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.,* citing 29 C.F.R. § 1630.2(i). A major life activity is substantially limited if an individual is unable to perform it or is "[s]ignificantly restricted as to the condition, manner or duration" under which it is performed, as compared to an average person in the general population. *Id.,* citing 29 C.F.R. § 1630.2(j)(1). In determining whether a substantial limitation exists, the regulations require the consideration of three factors:

1. the "nature and severity of the impairment";
2. the "duration or expected duration of the impairment";
3. the actual or expected "permanent or long term impact" resulting from the impairment.

*Id.,* citing 29 C.F.R. § 1630.2(j)(2). A nonpermanent or temporary condition cannot be a substantial impairment under the ADA. *Id.* (citing *Williams v. Phila. Hous. Auth.,* 380 F.3d 751, 765 (3d Cir.2004)).

Congress enacted the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110–325, 122 Stat. 3553, which became effective January 1, 2009. *Id.* § 8, 122 Stat. at 3559. Congress intended the amendments to "reinstat[e] a broad scope of protection" under the ADA. *Id.* § 2(b), 122 Stat. at 3554. The EEOC revised its regulations, construing the definition of disability "broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630(c)(4). The EEOC noted that "[t]he question of whether an individual meets the definition of disability under this part should not demand extensive analysis." *Id.* The revised EEOC regulations provide that:

> [a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

*Id.* § 1630.2(j)(1)(ii). Whether an individual is substantially limited in performing a major life activity is a question of fact. *Williams v. Phila. Hous. Auth. Police Dep't,* 380 F.3d 751, 763 (3d Cir. 2004).

The regulations further provide that the "determination of whether an impairment substantially limits a major life activity is to be made without regard to the ameliorative effects of mitigating measures." 29 C.F.R. at § 1630.2(j)(1)(vi). With regard to the "actual disability" prong, the test is whether, *at the time of the adverse employment action,* the limitation caused by the impairment was "substantial." *Bush v. Donaoe,* 964 F. Supp. 2d

401 (citing *Koller v. Riley Riper Hollin & Colagreco*, 850 F.Supp.2d 502, 513 and n. 4 (E.D.Pa.2012)).

The Third Circuit has not yet interpreted "disability" or "substantially limited" under the ADAAA, though several district courts have performed such an analysis. *Rocco v. Gordon Food Serv.*, 998 F. Supp. 2d 422, 427 (W.D. Pa. 2014) *aff'd*, No. 14-3114, 2015 WL 4036210 (3d Cir. July 2, 2015). Another court in this circuit held that "the ADAAA was adopted to specifically address certain impairments that were not receiving the protection that Congress intended—cancer, HIV–AIDS, epilepsy, diabetes, multiple sclerosis, amputated and partially amputated limbs, post-traumatic stress disorder, intellectual and developmental disabilities—not minor, transitory impairments, except if of such a severe nature that one could not avoid considering them disabilities." *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012).

The ADA provides the following:

> The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as – (I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies; (II) use of assistive technology; (III) reasonable accommodations or auxiliary aids or services; or (IV) learned behavioral or adaptive neurological modifications."

42 U.S.C. §12102(4)(E)(i).

The ADA, as amended, defines "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,

walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2)(A). Major life activities also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. §12102(2)(B). In addition, under the ADAAA, the assessment of whether an impairment that has gone into remission or is episodic constitutes a covered "disability" is to be made by examining the effects of the impairment on major life activities when it is active. *See* 42 U.S.C. § 12102(4)(D).

The Court finds that EEOC has failed to establish that the Claimants in this case suffer from disabilities within the meaning of the ADA. EEOC has not proven that any Claimant suffered from an impairment that impacted a major life activity. EEOC's own regulations state that "the determination of whether an impairment substantially limits a major life activity requires an individualized assessment" and "should require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." 29 C.F.R. § 1630(j)(1)(iv). The Court finds that EEOC has failed to establish such impairments for any of its Claimants.

Dinsmore, Siska, Rebecca Brisini, Sam Brisini, Farrell, Hess, Fresch, Merryweather, Wojno, O'Hara, Strittmatter, Thomas, Schoenfeld, Nyland, Simmers, Clay Sidor, and Washic all affirmatively testified that their claimed conditions did not limit their activities. Linda Sidor, Grove, Kelly and Piatek did not offer any testimony regarding any impact on major life activities. Berish testified that she experiences lasting symptoms from an

aneurysm in the form of chronic migraines and expressive aphasia, making it hard for her to speak. However, the Court found above that Berish's claim fails because she did not take the physical examination.

The Court finds that EEOC presented insufficient evidence to establish that Claimants were disabled. EEOC has not met its *prima facie* burden to show that the Claimants in this case suffer from disabilities within the meaning of the ADA. Thus, EEOC's claim on behalf of Claimants for violations of 42 U.S.C. §12112(a) fails with regard to 42 U.S.C. § 12102(1)(A).

### ii. Record of such an impairment, 42 U.S.C. § 12102(1)(B)

Congress included "record of" disability claims in the ADA to ensure that employees could not be subjected to discrimination because of a recorded history of disability. *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 437 (3d Cir. 2009). A "record of" claim requires proof of a history of, or being misclassified as having, an impairment that substantially limits a major life activity. *Id.* (citing *Sorensen v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1087 (10th Cir.1999)).

Neither Lengle nor Pryzbylek had access to any Laurel Crest employees' personnel files, because Cambria County had physically removed them from the Laurel Crest premises. The filing cabinets were not returned until 6:30 p.m. on December 31, 2009. (Tr. Vol. VI at 198:18–199:5). The only record or history of any alleged disability that Lengle or Pryzbylek would have had access to were the Corporate Care Services Forms which the applicants had filled out.

Lengle could not have reviewed Berish's Corporate Care Services Form, because she did not fill one out. The Claimants who tested positive for a controlled substance were Farrell, Merryweather, Clay Sidor, Linda Sidor, Dinsmore, Grove, Siska, Fresch and Schoenfeld. (Tr. Vol. VII at 78:3–81:10; Ex. D-197). However, Lengle testified that she reviewed the Corporate Care Services Form only for purposes of cross-checking their list of medications when an applicant tested positive for a controlled substance. She testified that she did not review any of their reported medical history. She also looked at the last page to see if the applicants were medically able to perform their job duties. Lengle testified at trial that she only reviewed the list of an applicant's medications when an applicant tested positive for a controlled substance. (Tr. Vol. IV at 99:18–100:4). The Court has found Lengle to be credible. Consequently, the Court finds that Lengle did not review the list of applicants' medications when they did not test positive for a controlled substance. In addition, Pryzbylek testified that he never saw any of the Corporate Care Services Forms. (Tr. Vol. VII at 13:1–3).

Since Lengle did not review the medications list on Corporate Care Services Form for applicants who did not test positive, she did not look at the prescription list for Thomas, Strittmatter, O'Hara, Washic, Kelly, Piatek, Simmers, Rebecca Brisini, Samuel Brisini, Nyland, Hess and Wojno. (*Id*.). Lengle also affirmatively testified that she "needed every nursing member [she] could get" and that her "intent was to hire all [the Laurel Crest employees]" because she did not want to rely on any more temporary staffing than was necessary. (Tr. Vol. IV at 115:11–12; Tr. Vol. VII at 28:25–29:14).

Lengle was given insufficient information about applicants for EEOC to be able to establish that applicants were not hired on the basis of a record of disability. Even if the information provided by applicants in the Corporate Care Services Forms were sufficient to establish a record of disability, EEOC has not established that Lengle relied on that information in making her employment decisions. Lengle's testimony, which the Court has found to be credible, was that she only used the last page of the Corporate Care Services form to confirm that an applicant was able to perform the functions of the position for which he or she applied. This review does not establish that Lengle was discriminating against applicants on the basis of a record of disability. Thus EEOC's claims on behalf of Claimants for violations of 42 U.S.C. § 12112(a) fails with regard to 42 U.S.C. § 12102(1)(B).

### iii. Being regarded as having such an impairment, 42 U.S.C. § 12102(1)(C)

A person is "regarded as" having a disability if he or she:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
(3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

*Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 381 (3d Cir. 2002) (citing *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 187 (3d Cir.1999)).

For purposes of Section 12102(1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

*Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 690-91 (W.D. Pa. 2014), citing 42 U.S.C. § 12102(3) (2009). The regulations provide further guidance as to how construe the "regarded as" prong:

(1) Except as provided in § 1630.15(f), an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity. Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment

(2) Except as provided in § 1630.15(f), an individual is "regarded as having such an impairment" any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title I of the ADA only when an individual proves that a covered entity discriminated on the basis of disability within the meaning of section 102 of the ADA, 42 U.S.C. § 12112.

*Id.*, citing 29 C.F.R. § 1630.2(l).

A plaintiff proceeding under the "regarded as" prong to establish a disability no longer needs to show that his impairment limits a major life activity. *Id.* (citing 29 C.F.R. 1630, app. § 1630.2(j) (2011)). An individual need only establish that he or she has been

subject to an action the ADA prohibits "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (quoting 42 U.S.C. § 12102(3)(A)).

EEOC has failed to present evidence to establish that Lengle knew that any of the Claimants purportedly had a disability, or that she viewed any of the Claimants to be physically or mentally disabled. As noted above, Lengle testified that she only reviewed the back page of the Corporate Care Services Form to determine whether or not applicants were able to perform the essential functions of the job. Lengle only reviewed the list of applicants' medications to cross-check for applicants who had tested positive for a controlled substance. Further, Pryzbylek testified that he never saw the Corporate Care Services Forms. Thus, EEOC has failed to establish that any Claimant was regarded by Lengle or Pryzbylek as having a disability. Thus EEOC's claims on behalf of Claimants for violation of 42 U.S.C. § 12112(a) fails with regard to § 12102(1)(C).

### g. Qualified for the job

The second element of an ADA claim is that an applicant was "otherwise qualified for the job." The Court found that applicants were otherwise qualified for the job by virtue of their training and education. No evidence was presented at trial to establish that any applicant was not hired due to lack of qualification.

### h. Disability Discrimination

The third element of a prima facie ADA claim is proof that the Claimants were not hired due to disability discrimination. Disability discrimination under the ADA requires

proof that an employer knew of the disability. *Rinehimer*, 292 F.3d at 380 (3d Cir. 2002) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir.1999)).

The Court found at summary judgment that Defendants' awareness of the applicants' disabilities could be inferred from the fact that each applicant was unlawfully subjected to a pre-offer medical examination. *E.E.O.C. v. Grane Healthcare Co.*, 2 F. Supp. 3d 667, 699 (W.D. Pa. 2014), *reconsideration denied* (July 7, 2014) (citing *Sedelnik v. City of Bridgeport*, 837 F.Supp.2d 12, 18 (D. Conn. 2011)). The Court noted that Lengle had acknowledged in an affidavit executed on July 8, 2013 that she had reviewed the medical records to determine whether each applicant had been cleared to work for the Cambria Care Center. *Id.* (citing ECF No.99–2 ¶¶ 43–44). The Court found for purposes of deciding the summary judgment motions that the circumstances surrounding the hiring process gave rise to an inference of discrimination sufficient to shift the burden of production to the Defendants. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–256 (1981)).

The Court finds that with the benefit of testimony during trial, it is able to make a more informed determination of whether or not Defendants were aware of the applicants' alleged disabilities at the time of making employment decisions. As the Court noted above, Lengle testified that she only reviewed the Corporate Care Services Form to determine whether applicants were able to perform the essential job functions. She also reviewed the medications page for applicants who had tested positive for illegal drugs. The Court finds that this conduct does not create an inference that Defendants knew of

applicants' alleged disabilities or that they made employment decisions based on that knowledge.

The evidence presented at trial does not establish that Claimants were not hired due to disability discrimination. Rather, the Court is satisfied that Defendants had legitimate, nondiscriminatory reasons for not hiring Claimants. The mere fact that Claimants were required to fill out pre-employment medical questionnaires does not create an inference that Lengle knew of any applicants' disability and did not hire them on that basis.

### i. Defendants' legitimate, nondiscriminatory reasons for not hiring Claimants

The Court will consider each Claimant individually to determine whether or not they have established a claim for relief. In reviewing whether any of the Claimants are eligible for relief, the Court will consider whether Defendant's proffered reasons for not hiring Claimants amounted to mere pretext.

Defendants need only articulate "a legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. "The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates *any* legitimate reason for the [adverse action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 n. 2 (3d Cir. 1997). If Defendants succeed in meeting this burden, then EEOC must demonstrate that Defendants' "stated reason for [the adverse employment action] was in fact pretext." *McDonnell Douglas,* 411 U.S. at 804.

Once the defendant has articulated a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff bears the burden of establishing that this proffered reason is a pretext for discrimination. *Stouch v. Twp. Of Irvington*, 354 F. App'x 660, 666 (3d Cir. 2009). In order to prove that an employer's explanation is pretextual, the plaintiff must "cast [ ] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication ... or ... allow[ ] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir.1994)). Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the employer was not actually motivated by its proffered nondiscriminatory reason." *Parker v. Verizon Pennsylvania, Inc.*, 309 F. App'x 551, 556 (3d Cir. 2009) (citing *Fuentes*, 32 F.3d at 765). To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken. *Shaner*, 204 F.3d at 50 (quoting *Fuentes*, 32 F.3d at 765).

The Court found above that Lengle did not know of the Claimants' medical conditions at the time of making hiring decisions, and did not make hiring decisions on the basis of that knowledge. Furthermore, the Court notes that other individuals similarly situated to the Claimants were hired. "While not conclusive, an employer's favorable treatment of other members of a protected class can create an inference that the employer

lacks discriminatory intent." *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 524 (3d Cir. 2003). The fact that Defendants hired other applicants similarly situated to Claimants suggests to the Court that Defendants did not have a discriminatory intent when making hiring decisions. It is not necessary that the other applicants who were hired share the same disabilities as claimants, but only that they be members of the protected class. *See Ansell*, 347 F.3d at 524. Defendants presented evidence that they hired applicants who disclosed a medical condition or prescription medication on their Corporate Care Services Form similar to the ones disclosed by the applicants who were not hired. The Court finds this evidence to be probative of the fact that Defendants did not act with discriminatory intent toward the Claimants.

EEOC has not presented the Court with any evidence to substantiate a finding that Defendants' articulated legitimate reasons for not hiring Claimants should be disbelieved, or to find that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendants' action. *See Diaz v. City of Philadelphia,* 565 F. App'x 102, 107 (3d Cir. 2014) (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)). The plaintiff bears the ultimate burden of proving intentional discrimination. *Anderson v. Wachovia Mortg. Corp.,* 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994)) (internal quotation marks omitted). EEOC has failed to prove intentional discrimination here.

EEOC claims that Defendants have offered shifting and inconsistent reasons for not hiring applicants. "[I]n extreme enough cases, an employer's inconsistencies in its proffered reasons for discharge can constitute evidence of pretext." *Hoechstetter v. City of*

*Pittsburgh*, 79 F. App'x 537, 539 (3d Cir. 2003) (citing *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3d Cir. 2001) (employer offered new and unrelated reasons for termination at latter stages of litigation); *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 281 (3d Cir. 1998) (employer gave entirely unrelated rationales for termination to EEOC and trial court); *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753 (3d Cir. 1997) (deposition and trial rationales were unrelated)).

The Court recognizes that Defendants provided shifting reasons for not hiring certain Claimants, and that such shifting reasons might, in certain circumstances, constitute evidence of pretext. However, the Court finds it important to note the circumstances of the present case, namely the fact that Defendants were required to make hiring decisions about a large amount of applicants within a relatively short period of time. The District Court in *Hoechstetter* noted in a context similar to the present one that:

> This dissimilarity is significant because, unlike a termination case where the employer has a working relationship with the plaintiff, the hiring committee here had no personal contact (much less a relationship) with plaintiffs. As a practical matter, the quantity of applicants would preclude the hiring committee from documenting each and every reason why one candidate was picked over the other two candidates. Furthermore, if the committee was required to take notes on each and every reason for rejecting an applicant, the hiring process would become painstakingly inefficient.

*Hoechstetter v. City of Pittsburgh*, 248 F. Supp. 2d 407, 412 (W.D. Pa.) *aff'd*, 79 F. App'x 537 (3d Cir. 2003). The same considerations apply in the instant case. Lengle testified that she was required to make hiring decisions within a very short amount of time. Lengle had a few days a week over the course of three months to hire more than 300 applicants. She made informal notes during the hiring process, but admitted at trial that her notes

contained mistakes. She did not have time to double check that the reasons she listed were accurate. The Court will not place a significant amount of weight on the reasons for not hiring given by Lengle at the time that hiring decisions were being made. The Court recognizes that Lengle was constrained by a short timeframe and that the situation in the instant case, involving a large number of hiring decisions, prevented Lengle from precisely documenting the reasons for each employment decision. Thus, while the Court recognizes that Defendants have offered differing reasons for not having hired certain Claimants, the Court does not find that these differing reasons, in and of themselves, constitute evidence of pretext.

Having considered EEOC's claims on behalf of Claimants in the aggregate, the Court will now consider the individual Claimants' claims and Defendants' reasons for not hiring them.

### j. The Claimants

#### i. Christine Berish

As the Court already found above, Christine Berish did not undergo a medical examination or complete a Corporate Care Services Form. Consequently, there is no basis upon which the Court can conclude that Lengle knew about Berish's alleged disability.

Berish was not hired because she failed to complete the necessary paperwork and undergo the medical exam. EEOC cannot claim that Defendants' failure to hire amounted to mere pretext for disability discrimination since Defendants were unaware of Berish's medical condition.  EEOC has not referred the Court to any authority that would support

a finding that Berish is entitled to relief for disability discrimination despite the fact that Defendants had no knowledge of her alleged disability. For that reason, Berish's claim must fail.

### ii. Brenda Kelly

Lengle testified at trial that she did not hire Kelly because early in the process Nesbella gave her a list of employees who were on modified duty, which included Kelly. Lengle testified that there were no modified duty positions available at Cambria Care Center. Lengle also stated that she was not aware that Kelly had returned from modified duty as of the day of her physical examination.

"To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) (citing *Fuentes,* 32 F.3d at 765). Thus, the mere fact that Lengle was mistaken about the fact that Kelly was on the modified duty list at the time of hiring does not serve to demonstrate that Lengle's failure to hire Kelly was mere pretext.

Kelly had the requisite background and experience to render her qualified for the position of licensed practical nurse when she applied for the position in late 2009. During Kelly's pre-offer medical examination, Kelly disclosed that she was treating with Zoloft for depression, as well as two different types of insulin for her insulin-dependent Type I Diabetes, with which she had been diagnosed and suffered for over twenty years. She also disclosed during the medical examination that she had fractured her heel on September 5,

2009, that she had been on modified duty for six weeks, and that, at the time of the examination on November 18, 2009, she was 100% better.

EEOC has not established that Kelly's alleged disability substantially impaired any major life activity. In addition, Kelly's Corporate Care Services Form stated that there were "no medical contraindications to performing the essential functions of this job…" (FOF 351). However, even if the Court were to find that Kelly's diabetes constituted a disability that substantially impaired any major life activity, EEOC has not established that Lengle did not hire her on the basis of that disability.

The Court finds that Lengle did not review Kelly's medical examination form in order to make a decision about Kelly's hire. Lengle hired five applicants on similar medication for diabetes and six applicants on similar medication for depression/anxiety. (Tr. Vol. VII, 62–65; Ex. D-165). Thus, the only reason why Lengle chose not to hire Kelly is the fact that she believed her to be on modified duty at the time of hiring. Lengle's mistaken belief is insufficient to establish a discriminatory animus. *See Brewer*, 72 F.3d at 331. EEOC counters that Lengle's blanket statement that Defendants would not hire anyone on modified duty is "probative of an unwillingness to engage in individualized assessment of disability and disability based needs and to make reasonable accommodations." (ECF No. 240 at 27). However, reasonable accommodation is not at issue in this case. EEOC has not asserted a claim for reasonable accommodation, and the Court does not find it necessary to consider whether or not Lengle's failure to hire someone on modified duty amounts to a failure to provide reasonable accommodation.

At summary judgment this court found that Lengle's statement in her affidavit that Kelly had not been hired because the Cambria Care Center had no positions for someone on modified duty was "problematic," because Kelly was no longer on modified duty at the time of her physical examination. *Grane Healthcare Co.*, 2 F. Supp. at 701. The Court noted that the last page of Kelly's examination form indicated that she was cleared to perform the "essential functions" of her desired position, while the notation relating to Kelly's time on modified duty appeared four pages earlier. *Id.* The Court finds that Lengle's testimony at trial was credible when she testified that she had been provided with a list of applicants on modified duty by Nesbella, which indicated that Kelly was on modified duty. Thus, the Court concludes that Lengle was not making hiring decisions on the basis of medical information procured through unlawful medical examinations and inquiries. With the benefit of testimony and evidence presented at trial, the Court finds that Lengle's knowledge of Kelly's modified duty status does not create an inference that she reviewed Kelly's entire medical questionnaire. Rather, the Court finds that Lengle was made aware of Kelly's status as a result of the list of applicants provided to her by Nesbella.

The Court finds no connection between Lengle's hiring decision and Kelly's claimed disabilities. EEOC has presented insufficient evidence to establish that Kelly suffered adverse employment action due to her disability. Furthermore, Defendants have provided the Court with a legitimate, nondiscriminatory reason for not hiring Kelly, namely the fact that she was believed to be on modified duty at the time of hiring. EEOC has not established that Lengle's failure to hire Kelly based on her modified duty

classification was mere pretext for disability discrimination. EEOC's claim on behalf of Kelly therefore fails.

### iii. Chelsea Siska

The evidence at trial established that the drug screens performed by Defendants were only intended to test for illegal drug use, and therefore did not constitute medical examinations. Siska was not hired because she tested positive for Methadone. She did not disclose that she was treating with Methadone on her Corporate Care Services Form, because she believed it was "nobody's business." Siska also testified that she did not tell anybody about the fact that she was in a rehabilitation program.

Lengle cross-checked Siska's prescription list to determine whether she had a prescription for Methadone, but none was listed. Nothing on the Corporate Care Services Form would have alerted Lengle to the fact that Siska had been legally prescribed Methadone. Lengle testified that she would hire someone who was legally prescribed Methadone and disclosed it. (Tr. Vol. VII at 90:23–25). Siska's Corporate Care Services Form also stated that "there are no medical contraindications to performing the essential functions of this job…" (Ex. D-64).

The Court found at summary judgment that EEOC could pursue remedies for any injuries flowing from the admitted violations of § 12112(d). The Court found that to the extent that Siska had failed to disclose medications that could have explained her positive test results, she had simply provided incomplete answers to the Defendants' illegal pre-offer inquiries. *Grane Healthcare Co.*, 2 F. Supp. at 704.

Upon consideration of the evidence presented at trial, the Court finds that Defendants failed to hire Siska not because of the answer she provided in the pre-offer medical inquiry, but because of the discrepancy between her positive drug test and the answers she provided in her medical inquiry form. In *Armstrong v. Turner Industries, Inc.*, 141 F.3d 554, 560 at n. 15 (5th Cir. 1998), the Fifth Circuit noted that the lower court had found that the plaintiff was not hired because he had not truthfully answered the questions on his medical inquiry form. Similarly here, Siska did not truthfully fill out her medical inquiry form, leading Defendants not to hire her on the basis of her positive drug test. As the Court already noted above, the ADA provides that a drug test to determine the illegal use of drugs is not considered a medical examination. 42 U.S.C. § 12114(d)(1). An employer may only rely on a drug test that detects illicit drug use in order to make employment decisions based on that illicit use. *Connolly*, 623 F. Supp. at 931. That is what Defendants did in this case. They had no reason to believe that Siska's positive test for Methadone was based on the fact that she was legally treating with Methadone. As the Court noted above, Lengle testified at trial that she would hire an individual who was legally treating with Methadone. However, she had no reason to believe that that was the case here.

EEOC has failed to establish that Defendants violated 42 U.S.C. § 12112(d)(2) in failing to hire Siska. The Court has determined that the drug screen did not constitute an illegal pre-offer medical examination, but rather was administered for the sole purpose of detecting illicit drug use. Since Siska tested positive for illicit drugs, and Lengle had no

reason to believe she was treating with legally prescribed Methadone, Lengle's failure to hire her was justified.

The evidence at trial also does not establish that Siska had a qualifying disability pursuant to 42 U.S.C. § 12112(a). EEOC did not present any evidence to prove that Siska was substantially impaired in any major life activities. Though Defendants may have regarded Siska as a drug user on the basis of her positive drug test, this does not establish that they regarded her as disabled, or that they took adverse employment action on the basis of that disability for purposes of § 12112(a).

Even if EEOC were able to establish a prima facie case of discrimination, the Court finds that Lengle had a legitimate, nondiscriminatory reason for not hiring Siska, namely the fact that she had tested positive for Methadone and Lengle's cross-check with Siska's medical questionnaire did not reveal that Siska had been legally prescribed Methadone. Since Siska did not disclose the fact that she was treating with legally prescribed Methadone at the time of her application, the Court cannot find that Lengle's failure to hire her on the basis of her positive drug test amounted to pretext for disability discrimination.

As the Court also noted above in discussing Kelly's claim, a mere mistake in making a hiring decision is not sufficient to establish a discriminatory animus. *See Brewer*, 72 F.3d at 331. Thus, Lengle's mistaken belief that Siska was illegally taking Methadone, when in fact she had a legal prescription therefor, does not establish that Lengle was making discriminatory hiring decisions.

In addition, Lengle testified that she had hired a number of individuals similarly situated to Siska. She hired thirty-one individuals who had initially tested positive on the Redi-Test, but a review of their prescription list confirmed that the positive result was caused by the use of prescription drugs. (Tr. Vol. VII at 22:13–24; Ex. D-197). The fact that Lengle hired other applicants who had initially tested positive on the Redi-Test, but upon subsequent review of their prescription list revealed the use of prescription drugs, further supports a finding that Lengle was not acting in a discriminatory manner in failing to hire Siska.

For all of the foregoing reasons, the Court finds that EEOC's claim pursuant to 42 U.S.C. § 12112(a) fails, because Defendants had a legitimate, nondiscriminatory reason for not hiring Siska, that did not amount to mere pretext.

### iv. Ellen Dinsmore

The evidence at trial established that Ellen Dinsmore had the requisite background, certification, and experience to render her qualified for a position washing and drying laundry at Cambria Care Center when she applied for it in late 2009. Dinsmore tested positive for THC, a substance found in marijuana, during her pre-offer drug test. Lengle testified that she did not hire Dinsmore based on her pre-offer drug test. (Tr. Vol. VII at 87:18–25; Ex. D-166). EEOC claimed at trial that the positive test result was caused by prescription medication, but offered no evidence to support this claim. The Court found above that the drug test did not amount to an illegal medical examination, as it was only intended to test for illegal drugs.

During her pre-offer medical examination, Dinsmore disclosed that she was treating with Chantix (for smoking cessation), Nexium (for esophageal reflux), Metformin (for Type 2 Diabetes), Fluoxetine (for anxiety and depression), Simvastatin (for high cholesterol), Meloxicam, and Hydrocodone (for pain in her abdomen). Dinsmore also disclosed a past work-related injury to her meniscus.

Regarding EEOC's 42 U.S.C. § 12112(a) claim, the Court finds that EEOC has presented insufficient evidence to establish that Dinsmore is disabled pursuant to the statute. EEOC did not present sufficient evidence at trial to establish that she was disabled in the sense of being substantially limited in the activities of daily life. The mere fact that the EEOC, in its guidance, has advised that diabetes "will, as a factual matter, virtually always be found to impose a substantial limitation" on endocrine function, 29 C.F.R. § 1630.2(j)(3)(ii)-(iii), does not conclusively establish that Dinsmore was substantially impacted in her major life activities by virtue of her diabetes. The Court also does not find that Lengle regarded Disnmore as disabled. Lengle did not review Dinsmore's entire medical questionnaire before making an employment decision. She merely cross-checked Dinsmore's medications list because she had tested positive for THC. Since the Court does not find that Lengle reviewed Dinsmore's entire medical questionnaire, EEOC has also failed to submit evidence to establish that Lengle regarded Dinsmore as disabled.

It is also noteworthy that Lengle hired applicants taking medications similar to Dinsmore, including five taking cholesterol medication, five on similar medication for diabetes, eleven on similar medication for GERD, one on similar medication for depression/anxiety and three on similar medication for arthritic pain. (Tr. Vol. VII at 62–

65; Ex. D-165). The fact that Lengle did not discriminate against others in the protected class is probative of the fact that Lengle did not discriminate against Dinsmore. *See Ansell*, 347 F.3d at 525.

EEOC failed to present sufficient evidence at trial to prove that Dinsmore was either disabled or regarded by Lengle as being disabled. Though she was qualified to perform the job for which she applied, EEOC has not established that she suffered adverse employment action on the basis of her disability. Rather, Lengle did not hire her because she tested positive for a controlled substance. Consequently, the Court finds that Lengle's reason for not hiring Dinsmore, namely her positive drug test, was a legitimate, nondiscriminatory reason, and did not constitute mere pretext for disability discrimination. EEOC's claim on behalf of Dinsmore under 42 U.S.C. § 12112(a) fails because it has not established that Defendants' reason for not hiring her was pretext. A mere mistake about the drug test results does not suffice to establish pretext for disability discrimination. *See Brewer*, 72 F.3d at 331.

With regard to EEOC's 42 U.S.C. § 12112(d) claim on behalf of Dinsmore, the Court already found above that the drug test did not constitute an illegal, pre-offer medical examination. Defendants did not hire Dinsmore because she tested positive for THC in a permissibly conducted drug test which was only intended to test for illegal drugs. Based on these considerations, the Court finds that EEOC's 42 U.S.C. § 12112(d) claim on behalf of Dinsmore fails.

### v.  Mary Jane Grove

The evidence at trial established that Mary Jane Grove had the requisite background and experience to render her qualified for a position in either staffing or in a secretarial position when she applied in late 2009.

During Grove's pre-offer medical examination, Defendants performed a drug test on her urine which indicated the presence of the hallucinogenic drug PCP in her urine. Grove testified that she did not take PCP prior to the drug test. Lengle did not hire Grove because of her positive drug test.

At the time of her pre-offer medical examination, Grove disclosed that she suffered from high blood pressure for approximately ten years, and that she was treating with Benicar for this condition. She also testified that she was treating with Effexor for anxiety, a condition for which she had been receiving treatment since 1999, and that she was treating with Nexium for gastroesophageal reflux disease, for which she had been receiving treatment for approximately five years.

Though Lengle had access to Grove's medical examination, she testified that she only reviewed the medical questionnaire where an applicant had a positive drug test. The Court does not find that Lengle reviewed and considered the other information in Grove's medical inquiry form prior to making hiring decisions.

With regard to EEOC's 42 U.S.C. § 12112(d) claim, the Court already discussed above that the drug test did not constitute an illegal pre-offer medical examination. As noted above, a mere mistake about the drug test results would not suffice to establish

pretext for disability discrimination. *See Brewer,* 72 F.3d at 331. Defendants did not hire Grove because she tested positive for an illegal drug.

The evidence at trial established that approximately 56 individuals failed the drug test. (Tr. Vol. VII at 21:23–22:24; Ex. D-197). Twenty-one of those individuals were not hired because of the positive result, and Lengle hired 31 of these individuals because the positive results were caused by disclosed prescription drugs. (*Id.*).

The Court finds that Defendants are not liable for a violation of 42 U.S.C. §12112(d) because the drug test did not constitute an illegal pre-offer medical examination.

With regard to EEOC's 42 U.S.C. §12112(a) claim, the Court finds that Grove did not suffer from a disability that substantially impaired any major life activity. EEOC did not present sufficient testimony at trial to establish that Grove was disabled under the statute. Moreover, the Court finds that Lengle did not regard Grove as disabled because she only reviewed the page of the Corporate Care Services Form disclosing the medications with which Grove was treating, as well as the last page of the form to determine whether the applicant was capable of performing the job duties. Lengle hired applicants taking medications similar to Grove, including three taking high blood pressure medication, five on similar medication for depression/anxiety, and eleven on similar medication for GERD. (FOF 139). The fact that Lengle hired applicants with similar medical conditions is probative of the fact that Lengle did not discriminate against Grove. *See Ansell,* 347 F.3d at 525. Finally, Grove's Corporate Care Services Form indicated

there were no medical contra-indications to performing the essential functions of her job. (FOF 138).

Even if Grove's medical conditions were considered to render her disabled, the Court finds that Lengle had a legitimate, nondiscriminatory reason for not hiring Lengle, namely the fact that she failed her drug test. The Court finds that EEOC cannot establish that Lengle's legitimate, nondiscriminatory reason for not hiring Grove constituted mere pretext for disability discrimination. As a result, EEOC's claim on behalf of Grove pursuant to 42 U.S.C. § 12112(a) also fails.

### vi. Linda Sidor

Linda Sidor had the requisite background and experience to render her qualified for the position of Nurse Aide when she applied in late 2009. At the time of her application, Linda Sidor had depression and anxiety, for which she was treating with Ambien and Xanax.

During Linda Sidor's pre-offer medical examination, Defendants performed a drug test on Linda Sidor's urine, which indicated the presence of Oxycodone. Lengle testified at trial that she did not hire Linda Sidor because she had tested positive for Oxycodone, but did not list any medication which would cause this result. Upon being questioned about it, Linda Sidor told Lengle that she had taken a Percocet the night before, for which her husband had a prescription. Linda Sidor admitted at trial that her only prescription for Percocet had expired in 2007. She did not present evidence of a valid prescription at trial.

With regards to EEOC's 42 U.S.C. § 12112(d) claim, the Court finds that the claim fails because Linda Sidor was not hired due to a positive drug test, which the Court has found not to be an illegal pre-offer medical examination. Since the Court has found the drug test to have been permissible under the statute, EEOC's § 12112(d) claim must fail.

With regards to EEOC's 42 U.S.C. § 12112(a) claim on behalf of Linda Sidor, the Court finds that she was not disabled within the meaning of the statute. EEOC has not established that Linda Sidor was substantially impaired in any major life activity. Furthermore, the Court finds that Lengle did not regard Linda Sidor as disabled. Lengle only reviewed Linda Sidor's Corporate Care Services Form in order to cross-check her positive drug test, as well as the back page of the form to determine whether she was capable of performing her job duties. This does not establish that Lengle regarded Linda Sidor as disabled, or that she did not hire her because of her alleged disability. The Court also observes that Sidor's Corporate Care Services Form stated that, "there are no medical contraindications to performing the essential functions of this job . . ." (Ex. D-60).

Further, the Court finds that Lengle had a legitimate nondiscriminatory reason for not hiring Sidor, namely her positive drug test and the fact that she did not have a valid prescription for Percocet at the time of her application. The Court finds that Defendants' reason for not hiring Sidor did not amount to mere pretext. In addition, Lengle hired applicants taking medications similar to Linda Sidor, including six who were on similar medications for depression and anxiety. (Tr. Vol. VII at 62–65; Ex. D-165). The fact that Lengle hired other applicants on similar medications as Sidor is probative of the fact that Lengle did not discriminate against her. *Ansell*, 347 F.3d at 525.

In Lengle's July 8, 2013 affidavit, she stated that had Sidor not failed the drug screen she would not have been hired because she received a poor reference from Nelen. (Tr. Vol. VII at 91:11–14). Lengle testified at trial that she had not sought a reference from Nelen. (*Id.* at 91:15–20). When asked about the discrepancy, Lengle stated that she had simply made a mistake. (*Id.* 91:21–22) The Court noted above that such a mistake as to hiring does not establish pretext. *Brewer*, 72 F.3d at 332. Thus, the mere fact that Lengle was mistaken regarding Nelen's reference does not establish that her reason for not hiring Sidor was pretext.

The Court concludes that EEOC's 42 U.S.C. § 12112(a) claim must fail because Defendants had a legitimate, nondiscriminatory reason for not hiring Linda Sidor, and EEOC has failed to establish that this reason was mere pretext.

### vii. Clay Sidor

Clay Sidor was qualified for the position of cook, as he had the requisite experience and had been performing the job for many years at Laurel Crest. Sidor suffered from chronic back pain, which at times caused him to miss work and ultimately led to his receipt of Social Security disability benefits after his rejection for employment with Defendants.

With regards to EEOC's 42 U.S.C. § 12112(a) claim on behalf of Clay Sidor, the Court finds that he was disabled within the meaning of the statute and was qualified for the job for which he applied. However, the Court does not find that he suffered adverse employment action due to his disability. Kris Przybylek, who was charged with hiring the staff for the Cambria Care Center dietary department, testified that he did not hire Sidor

because Sidor's supervisor at Laurel Crest, Kari Shirk, had provided Sidor with a poor reference. (Tr. Vol. VII at 8:2–25). Przybylek did not see a Corporate Care Form at any time during the process. (*Id*. at 11:20–13:4). The Court finds that since Przybylek did not see the Corporate Care Services Form, and was not aware of Sidor's claimed disabilities in any other way, Przybylek could not have made Sidor's hiring decision with a discriminatory purpose.

EEOC cannot establish that the reason given for not hiring Sidor, a poor reference from his supervisor, was pretext for disability discrimination. EEOC notes that Defendants provided shifting reasons for their failure to hire Clay Sidor. (ECF No. 240 at 45). EEOC notes that documentation allegedly made at the time of the hiring decision indicates that Clay Sidor was rejected for failing a criminal background check. Also, at the time Defendants responded to Sidor's charge of discrimination, Defendants claimed that Clay Sidor was rejected because he failed the drug screen and did not complete a functional agility test. EEOC states that it was only after the lawsuit was filed, and discovery had begun, that Defendants claimed to have rejected Sidor because of a poor reference. (ECF No. 240 at 45).

The Court does not find that Defendants' shifting reasons for not hiring Clay Sidor suffice to establish that Defendants' reason for not hiring him was mere pretext for disability discrimination. The Court notes that Defendants were required to make hiring decisions about a large number of applicants within a very short period of time. Defendants were unable to keep precise track of the reasons for not hiring individual applicants. However, the Court finds it persuasive that Clay Sidor was not hired due to a

poor reference, and does not find this reason to be mere pretext. Thus, the mere fact that Defendants offered shifting reasons for their failure to hire Clay Sidor does not establish that their reasons for not hiring him were discriminatory. Therefore, EEOC's 42 U.S.C. § 12112(a) claim on behalf of Clay Sidor fails.

The Court also finds that EEOC's 42 U.S.C. § 12112(d) claim on behalf of Clay Sidor fails. The evidence at trial established that Clay Sidor was not hired due to his poor reference, and not due to information gleaned from his pre-offer medical examination. In addition, as already noted above, the Court finds that the drug test did not constitute an illegal pre-offer medical examination.

### viii. Rebecca Brisini, Samuel Brisini, Deborah Farrell, Jeanne Hess, Claudia Merryweather, Nancy Piatek, and John Wojno

Defendants presented evidence at trial the above individuals were not hired due to poor references given by Rebecca Nelen. (Ex. 166).

Nelen's testimony, which was read into the record, conflicts with Lengle's testimony, as well as with the evidence presented by Defendants at trial. Nelen's testimony asserted that it was not her practice to give references, while Lengle testified at trial that she had obtained references from Nelen. Regarding Rebecca Brisini, Nelen testified that she knew her, did not have any trouble with her, and that Brisini did what Nelen asked her to do during Nelen's tenure at Laurel Crest. (ECF No. 240 at 51). Nelen also testified that she did not remember Samuel Brisini and that it was not her practice to give references. (ECF No. 240 at 55). Nelen testified to the same regarding Farrell, Hess, and Merryweather. (*Id.* at 43, 58, 61). Piatek testified that she never worked with Nelen,

and Nelen denied having any memory of Piatek. (*Id.* at 36). Regarding Wojno, Nelen testified that although she knew who Wojno was and was aware that he had been disciplined by her assistant while at Laurel Crest, she was not directly involved in the discipline and did not know what the discipline was for. (*Id.* at 64).

As finder of fact in this case, the Court must make a credibility determination as to whether Nelen or Lengle is deemed to be the more credible witness. "Credibility determinations are the unique province of a fact finder, be it a jury, or a judge sitting without a jury." *Scully v. US WATS, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001) (quoting *Dardovitch v. Haltzman*, 190 F.3d 125, 140 (3d Cir. 1999)). The Court had an opportunity to observe Lengle's demeanor while testifying at trial and determines that she is credible. Lengle's testimony was corroborated by Owen Larkin, who testified that Lengle had asked Rebecca Nelen, the Laurel Crest Director of Nursing, Steven Dale, the Finance Officer, and him for their opinions on whether employees should be hired. (Tr. Vol. VI at 196:24–197:10; Tr. Vol. VII at 33:14–34:22). Lengle also testified that she had met with Nelen. (Tr. Vol. VII at 33:14–34:22). The Court finds that Lengle's recollection, as corroborated by Larkin, is more credible than Nelen's recollection. Therefore, her testimony shall be given more weight than Nelen's testimony.

The Court finds that in each of the above cases, Lengle had a legitimate, nondiscriminatory reason for not hiring the above applicants, namely receipt of a poor reference. Furthermore, the fact that there is a discrepancy between Lengle's testimony and Nelen's testimony does not in and of itself establish pretext. Lengle's testimony at trial was corroborated by Owen Larkin. The Court has deemed Lengle to be a credible

witness and does not find that receipt of poor references was mere pretext for disability discrimination. EEOC's 42 U.S.C. § 12112(a) on behalf of the above Claimants therefore fails.

Further, EEOC's 42 U.S.C. § 12112(d) claim on behalf of the above Claimants fails because the Court does not find that they were not hired due to pre-offer medical examination. Rather, the Court finds that they were not hired due to their poor references, which were unrelated to any alleged disability.

### ix. Dana Fresch

Dana Fresch had been suffering from osteoarthritis for fifteen years at the time she applied for a job as a dietary sanitation aide. She also experienced anxiety relating to knee pain caused by her osteoarthritis. Defendants stated that Fresch was not hired due to "poor references."

Defendants note that they informed the Court that they did not have a witness to testify at trial as to the specifics of why Fresch was not hired. (ECF No. 242 at 41). However, Defendants further observe that documentation of Fresch's prior poor performance was contained in her employment file at Laurel Crest. (Tr. Vol. VI at 42, 44, 47-48; Ex. D196). .

Regarding EEOC's 42 U.S.C.§ 12112(d) claim on behalf of Fresch, the Court does not find that Defendants failed to hire Claimant on the basis of information gleaned from an illegal, pre-offer medical examination. Rather, the Court finds that Fresch's poor references were the reason for her non-hire. Thus, EEOC's § 12112(d) claim fails.

With regards to EEOC's 42 U.S.C. § 12112(a), EEOC claims that Defendants have failed to provide any admissible evidence to support their explanation for her non-hire and to rebut Fresch's *prima facie* case of disability discrimination. However, the Court finds that EEOC has failed to establish a prima facie case of disability discrimination, because Lengle did not rely on the medical questionnaire in making her employment decision, and did not regard Fresch as disabled. EEOC has also failed to establish that Fresch was disabled within the meaning of the statute. The Court also finds that Fresch did not suffer adverse employment action on the basis of her disability.

EEOC has not presented sufficient evidence to support a finding that the reason for Fresch's non-hire is disability discrimination, that her medical condition was known to anyone, or that it was considered in the hiring decision. The evidence at trial also established that other applicants taking medications similar to Fresch were hired, including five applicants on medication for thyroid problems, ten on medication for depression/anxiety, seven on medication for pain, eleven on medication for GERD and one on medication for an ulcer. (Ex. D-165). As the Court already observed above, the fact that Defendants hired applicants with similar medical conditions is probative of the fact that Fresch was not discriminated against.

EEOC has presented insufficient evidence to establish that Defendants' proffered reason for not hiring Fresch, namely poor references, was mere pretext for disability discrimination. Thus, EEOC's 42 U.S.C. § 12112(a) claim on behalf of Fresch also fails.

The Court finds the *Hoechstetter* case, discussed above, to be instructive here. Though Defendants were unable to produce a witness to testify as to the specifics of why

Fresch was not hired, the Court recognizes that Defendants were hiring applicants within a short period of time and were unable to document the precise reasons for each applicant's non-hire. Defendants' failure to produce a witness to testify to this does not necessarily suggest that their reasons for not hiring Fresch were due to disability discrimination.

### x. Sue Ellen Schoenfeld, Kathy Washic, Nora Nyland

Lengle testified that she made offers of employment to the above applicants. She stated that she left messages for anyone she could not reach. She also stated that she called Schoenfeld several times to offer her a job, but Schoenfeld did not return her calls. (Tr. Vol. VII at 69:13–70:7).

### a. Sue Ellen Schoenfeld

At the time of Schoenfeld's application for employment with Defendants, Sue Ellen Schoenfeld had anxiety, depression and arthritis. She had suffered from and received medical treatment for these conditions for between ten and twenty years. Schoenfeld was qualified for a position as an LPN. Her urine dug screen was positive, which Lengle testified would cause her to review and cross-check the list of medications on her medical exam form.

Lengle testified at trial that she needed Schoenfeld because she was an LPN. (Tr. Vol. VII at 70:9). Lengle further testified that she called Schoenfeld more than once about a job. (*Id.* at 69:13–70:8). Schoenfeld denies that Lengle called her. Schoenfeld also testified that she used to work full-time as an LPN, but was laid off in January, 2009. Several weeks

later she was called back to work per diem, meaning that Laurel Crest was able to choose how many hours she worked, up to 1,000 in one year.

The Court finds no basis upon which to conclude that Schoenfeld was not hired due to her disability. With respect to EEOC's § 12112(d) claim on behalf of Schoenfeld, the Court finds that EEOC has not established that Schoenfeld was not hired because of information gleaned from an illegal, pre-offer medical examination and inquiry. The Court found Lengle to be credible when she testified that she had attempted to call Schoenfeld several times. This statement was further corroborated by the fact that Lengle testified that she wished to hire Schoenfeld because she was an LPN and needed her. (Tr. Vol. VII at 70:9).

With respect to EEOC's Section 12112(a) claim on behalf of Schoenfeld, the Court finds that EEOC has not established that Schoenfeld suffered from a disability within the meaning of the statute. EEOC has failed to prove to the Court that Defendants regarded Schoenfeld as disabled as a result of the information provided in her medical questionnaire, and that her non-hire was because of disability discrimination in violation of § 12112(a).

The evidence at trial established that Lengle hired applicants taking medications similar to Schoenfeld, including three prescribed similar medication for arthritis and ten applicants on similar medications for depression and anxiety. (Tr. Vol. VII at 62-65; Ex. D165).

This is probative of the fact that Schoenfeld was not discriminated against. *See Ansell*, 347 F.3d at 525. In addition, Schoenfeld's Corporate Care Services Pre-Placement

Evaluation states that "there are no medical contraindications to performing the essential functions of this job…" (Ex. D-57). In light of the fact that Lengle hired applicants taking similar medication as Schoenfeld, and the fact that Schoenfeld's Corporate Care Services Form stated that there were no medical contraindications, the Court finds no reason to determine that Schoenfeld was not hired due to her alleged disability, or that Lengle regarded her as disabled. EEOC has not proven disability discrimination with respect to Schoenfeld, and therefore has not proven a violation of 42 U.S.C. § 12112(a).

**b. Kathy Washic**

Washic applied for the positions of non-emergency transports and external transports. Her second choice was switchboard. (Tr. Vol. II at 96, 97). Washic acknowledged that the transports were eliminated. She also knew that there were four switchboard operators at Laurel Crest and only three at Cambria Care Center. (Tr. Vol. VII at 51). Lengle testified that she knew that Washic had once been a CNA, and that she offered Washic a CNA position, but Washic declined it. (Tr. Vol. VII at 50–51). Due to this conflicting testimony, the Court as trier of fact must make a credibility determination of Washic and Lengle. The Court finds that Lengle's testimony at trial was credible overall and should also be given due weight regarding this Claimant.

At the time of her pre-offer medical examination, Washic disclosed that she had suffered a back injury when a resident pushed her up against a wall, that she had undergone triple bypass surgery after being diagnosed with a heart blockage approximately fourteen years previously, and that she suffered from psoriasis, with which she had been diagnosed approximately ten years previously. At the time of

Washic's pre-offer medical examination, the individual performing the physical noted that Washic should follow up with her primary care physician for high blood pressure. (Ex. P-83).

Washic denied that Lengle had offered her a position as a CNA. (Tr. Vol. II at 110). The Court finds that Lengle was credible at trial when she testified that she had offered Washic a job. Lengle's testimony was more credible than the testimony of Washic. With regard to EEOC's § 12112(d) claim, the Court finds no evidence to believe that Washic was not offered a position on the basis of information gleaned from her pre-offer medical examination.

With regard to EEOC's 42 U.S.C. § 12112(a) claim, the Court does not find Washic to have been disabled within the meaning of the statute. EEOC did not prove that Washic was substantially impaired in any major life activities. The Court also finds no basis upon which to conclude that Lengle regarded Washic as disabled, or did not hire her because she wore glasses, had had a triple bypass fourteen years prior, and had psoriasis. (Tr. Vol. II at 99, 109). Lengle testified at trial that she did not see the Corporate Care Services Pre-Placement Evaluation Form for anyone who did not test positive for a controlled substance. Since Washic did not test positive for a controlled substance, Lengle did not look at her form, except the back page to verify that she was capable of performing the essential functions of the job. (Tr. Vol. IV at 101; Tr. Vol VII at 28). In addition, Lengle hired nine applicants who were prescribed medication for a heart condition and one applicant on medication for a blood clot. (Tr. Vol. VII at 62–65; Ex. D-165). This is probative of the fact that Washic was not discriminated against on the basis of her alleged

disability. *See Ansell*, 347 F.3d at 525. Furthermore, Washic's Corporate Care Services Pre-Placement Evaluation states, "there are no medical contraindications to performing the essential functions of this job…" (Ex. D-72).

EEOC argues that Defendants offered no admissible evidence to explain why Washic was not hired for a switchboard position. (ECF No. 240 at 79). However, the testimony at trial established that Defendants did not consider any of the applicants' second choice position, and therefore their failure to consider Washic for her second choice is not demonstrative of disability discrimination.

EEOC asserts that Lengle claimed for the first time at trial that she had in fact offered Washic the position of Certified Nurse's Assistant. (ECF No. 240 at 79). Washic stated that she did not apply for the position of Certified Nurse's Assistant. Washic also testified that she approached Grane employee Angel Waddell in December 2009 and inquired as to whether she would be offered employment, and Waddell stated that she would not be offered employment. EEOC argues that Defendants did not produce evidence in the form of testimony or any documentary evidence to rebut the assertion that Washic had not been offered a job. (ECF No. 240 at 79–80).

While the Court recognizes that Defendants have not produced such evidence, the Court also takes into account the fact that Defendants were required to make hiring decisions about applicants within a short period of time. The Court has deemed Lengle's testimony to be credible and finds that EEOC has not proven that Washic was not hired due to disability discrimination. Thus, the Court finds that EEOC has not established that Washic's non-hire amounted to a violation of Section 12112(a).

### c. Nora Nyland

Nyland testified that she applied for a position as a CNA. Lengle, who hired the CNAs, offered Nyland a position but she declined it. (Ex. D-166). Nyland denies that she was offered a position. (Tr. Vol. IV at 8, 11). Due to this conflicting testimony, the Court as trier of fact must make a credibility determination of Nyland and Lengle.

The Court finds Lengle to be the more credible witness. Further, Lengle did not look at Nyland's Corporate Care Services Pre-Placement Evaluation Form because she did not test positive for a controlled substance, except the last page of the form to verify that she was capable of performing the essential functions of the job. (Tr. Vol. VII at 28). Nyland suffered from a thyroid condition. However, Lengle hired five applicants who were also on medication for a thyroid condition. (Tr. Vol. VII at 62–65; Ex. D-165). This is probative of the fact that Lengle was not discriminated against due to her thyroid condition. *See Ansell*, 347 F.3d at 525. In addition, Nyland's Corporate Care Services Pre-Placement Evaluation states that "there are no medical contraindications to performing the essential functions of this job…" (Ex. D-51). EEOC has not established that Nyland is disabled for purposes of the statute, that Lengle regarded her as disabled or that she suffered adverse employment action due to her disability.

EEOC claims that the evidence submitted by Defendants in support of the fact that Nyland was offered a job is insufficient. EEOC notes that the only evidence offered in support of Defendant's assertion is Exhibit 166. (ECF No. 240 at 76). Since the Court found above that Defendants had not reviewed Nyland's Corporate Care Services Form, the Court finds that EEOC has not established by a preponderance of the evidence that

Nyland was not hired based on information gleaned from an illegal, pre-offer medical examination and inquiry. The Court also found Lengle to be credible when she testified that she had offered Nyland a position. EEOC's Section 12112(d) claim therefore fails, because EEOC has not proven that Nyland was not offered a position on the basis of information gleaned from an illegal, pre-offer medical examination.

Regarding EEOC's Section 12112(a) claim on behalf of Nyland, the Court finds that Nyland did not suffer from an impairment amounting to a disability for purposes of the statute. EEOC did not prove that Nyland was substantially impaired in any major life activity. The Court also finds no basis upon which to conclude that Defendants regarded Nyland as disabled, or that her non-hire was because of disability in violation of § 12112(a). EEOC's claim under § 12112(a) on behalf of Nyland therefore fails.

### xi. Gloria Thomas, Shirley Strittmatter, Richard O'Hara

The evidence at trial established that Cambria Care Center had eliminated some of the positions held by Laurel Crest employees.

### a. Gloria Thomas

Thomas applied for a unit clerk position with Cambria Care Center. (Tr. Vol. II at 6). She also applied for the position of "case management technician." (*Id.*). Laurel Crest employed four unit clerks, but Cambria Care Center only budgeted for two. (Tr. Vol. II at 19; Tr. Vol. VII at 47, 52). Lengle testified that she hired the two unit clerk applicants with the best references. (Tr. Vol. VII at 46–47). There were no case management technicians at Cambria Care Center, and therefore Lengle hired no case management technicians. (Tr. Vol. VII at 52).

Thomas had diabetes, high blood pressure and high cholesterol. She did not testify that they had any impact on her ability to work or any aspect of her life. (Tr. Vol. II at 8, 9, 19). Lengle hired five applicants who were on similar medication for diabetes, eight on similar medication for high blood pressure and seven on similar medication for high cholesterol. (Tr. Vol. VII at 62–65; Ex. D-165). The fact that Lengle hired applicants on similar medication to Thomas is probative that Thomas was not discriminated against. *See Ansell*, 347 F.3d at 525. In addition, Lengle did not review Thomas' Corporate Care Services Pre-Placement Evaluation because she did not test positive for a controlled substance, except to look at the last page to verify that she was capable of performing the essential functions of the job. (Tr. Vol. IV at 101; Tr. Vol. VII at 28). Thomas' Corporate Care Services Pre-Placement Evaluation also states that "there are no medical contraindications to performing the essential functions of this job…" (Ex. D-69).

With regard to EEOC's 42 U.S.C. § 12112(a) claim, the Court finds no basis upon which to conclude that Thomas was disabled or that Defendants regarded Thomas as disabled. The Court finds Defendants' reason for not hiring Thomas to be credible, namely the fact that Cambria Care Center was eliminating all or some of Thomas' desired positions, and the fact that other applicants had better references. EEOC has not established that Lengle's legitimate, nondiscriminatory reason for not hiring Thomas is mere pretext for disability discrimination.

The Court also finds that EEOC's 42 U.S.C. § 12112(d) claim fails, because Defendants have satisfied the Court that they did not fail to hire Thomas on the basis of information gleaned from an illegal pre-offer medical examination, but rather because

they had fewer positions at Cambria Care Center than at Laurel Crest and other applicants had received better references.

### b. Shirley Strittmatter

Strittmatter applied for the positions of staffing clerk or clerical at Cambria Care Center. (Tr. Vol. II at 25). Laurel Crest employed three secretarial pool staffing clerks, but Cambria Care Center only budgeted for one. (Tr. Vol. VII at 47–49). Lengle testified that she hired the applicant with the best references. (Tr. Vol. VII at 49–50, 53).

Strittmatter had a heart condition and high cholesterol. (Tr. Vol. II at 28–30). Lengle hired five applicants on similar medication for high cholesterol and nine applicants on similar medication for a heart condition or high blood pressure. (Tr. Vol. VII at 62–65; Ex. D-165). This is probative of the fact that Strittmatter was not discriminated against. *See Ansell,* 347 F.3d at 525. In addition, Lengle did not see Strittmatter's Corporate Care Services Pre-Placement Evaluation because she did not test positive for a controlled substance, and she only reviewed the form for applicants who had tested positive, except to verify that an applicant was capable of performing the essential functions of the job. (Tr. Vol. IV at 101).

Strittmatter's Corporate Care Services Pre-Placement Evaluation states that "there are no medical contraindications to performing the essential functions of this job…" (Ex. D-67). The Court finds that Strittmatter was not disabled within the meaning of the statute, and that Defendants did not regard her as disabled. Furthermore, the Court finds that Defendants' legitimate, nondiscriminatory reason for not hiring is not mere pretext.

Therefore, the Court finds that EEOC's 42 U.S.C. § 12112(a) claim on behalf of Strittmatter fails.

EEOC's Section 12112(d) claim fails because the Court finds that Defendants did not review Strittmatter's Corporate Care Services Pre-Placement Evaluation, and did not make their hiring decision on the basis of that information.

### c. Richard O'Hara

At the time of Richard O'Hara's application for employment, he had heart disease leading to multiple heart attacks and treatments over several years, most recently just months before his application for employment.

O'Hara worked in maintenance in 2009, doing general repairs, but applied for a position at Cambria Care Center in security, with a second choice of maintenance. (Tr. Vol. II at 67–70). O'Hara testified that he knew the security guards at Laurel Crest and they were told that their positions would be eliminated. (Tr. Vol. II at 71, 88, 91). O'Hara also testified that he knew that Laurel Crest had ten or twelve maintenance people, and that Cambria Care Center hired about four, including one maintenance person brought in from security. (*Id.*). He acknowledged that there were no security positions at Laurel Crest. O'Hara was not offered a position in security or maintenance. There is no evidence that Defendants considered any applicant's second choice. Thus, Defendants do not have to explain why they did not consider O'Hara for a maintenance position, which was his second choice on his application.

As the Court already discussed above, it is cognizant of the fact that Defendants were forced to make hiring decisions within a very short period of time. *See Hoechstetter,*

248 F.Supp.2d at 412. Thus, Defendants' inability to present a witness regarding O'Hara's second choice of employment does not mean that Defendants were proceeding in a discriminatory manner against him.

With regard to EEOC's § 12112(a) claim, the Court finds no basis upon which to conclude that O'Hara was not offered a position due to disability discrimination. The Court finds that O'Hara was not disabled within the meaning of the statute. EEOC has not established that O'Hara was substantially impaired in any major life activity. EEOC has also not proven that Defendants regarded O'Hara as disabled. Further, the Court finds that Defendants had a legitimate, nondiscriminatory reason for not hiring O'Hara that was not mere pretext, namely the fact that no security guards were hired at Cambria Care Center. EEOC's § 12112(a) claim fails because EEOC has failed to establish that O'Hara was not hired for discriminatory reasons.

Regarding EEOC's § 12112(d) claim, the Court also finds that EEOC has not established by a preponderance of the evidence that O'Hara was not hired because of information gleaned from an illegal, pre-offer medical examination and inquiry. The Court finds that Defendants did not have knowledge of O'Hara's medical condition and did not make their hiring decision based on that information.

### xii. Marie Simmers

Marie Simmers was qualified for a position as a registered nurse. At the time of her application, Simmers had premenstrual dysphoric disorder, for which she had been taking Prozac for more than two years.

Defendants listed in their business record that Simmers was not hired due to her "attitude." (Ex. P-125). Defendants were unable to present a decision-maker to testify as to this reason. (ECF No. 242 at 49).

With regard to EEOC's § 12112(a) claim, EEOC has not proven that Simmers suffers from a disability within the meaning of the statute. EEOC has not established that Simmers' premenstrual dysphoric disorder substantially impairs her in any major life activities. EEOC has also not presented sufficient evidence to establish that Lengle or anyone else was aware of Simmers' purported disability when the hiring decision was made. The mere fact that Simmers took part in the application process and was not hired is insufficient to establish that she was not hired due to disability discrimination. Moreover, Defendants presented the Court with a legitimate, nondiscriminatory reason for not hiring Simmers, namely her "attitude." Since the Court has found that Lengle did not review Simmers' entire medical questionnaire, the Court finds no basis upon which to conclude that Defendants' given reason for not hiring Simmers was mere pretext for disability discrimination. The Court is again mindful of the fact that Defendants were required to make hiring decisions within a short period of time, and were not able to adequately document the reasons for each applicant's non-hire. Thus, the fact that Defendants were unable to present a witness to testify about Simmers' non-hire is not determinative of her claim. EEOC's § 12112(a) claim therefore fails.

EEOC's § 12112(d) claim also fails here because EEOC has presented insufficient evidence that Simmers was not hired on the basis of information gleaned from her pre-offer medical examination.

### k. Damages

#### i. EEOC's § 12112(d)(2)(A) claims

EEOC asserts that Defendants are liable for a violation of 42 U.S.C. § 12112(d) because the medical examinations conducted by Defendants constituted prohibited pre-offer medical examinations and inquiries as defined by § 12112(d).

A violation of the prohibition against pre-employment medical examinations and inquiries is not a per se violation that gives rise to damages liability. *See Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 561 (5th Cir. 1998). "[D]amages liability under section 12112(d)(2)(A) must be based on something more than a mere violation of that provision. There must be some cognizable injury in fact of which the violation is a legal and proximate cause for damages to arise from a single violation." *Id.* at 562. "[A] violation of § 12112(d), without such a showing, presents no 'injury' capable of remedy, and thus affords no basis for suit." *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 519 (3d Cir. 2001). Thus, EEOC must show, in addition to the fact that the medical examinations occurred, that each Claimant suffered an injury in the form of emotional, pecuniary or compensative damages, and that such damages are causally related to the medical examination.

EEOC cannot recover damages with respect to Berish because she did not undergo the medical examination, and therefore no violation of § 12112(d) occurred. With respect to the other Claimants, EEOC must establish that each individual suffered an injury-in-fact which manifested itself in compensable damages to that individual.

The Court already noted above with regard to individual Claimants that EEOC has failed to establish a claim for disability discrimination against Defendants, and has failed to causally link any Claimant's alleged damages to the pre-offer medical examination. Since the Court has found that there is no evidence that Defendants' employment action of using pre-employment medical examinations was tainted by disability discrimination, it also finds that the employment action does not constitute compensable injury.

EEOC offered evidence that Claimants were caused distress and suffered harm by virtue of the fact that they were not hired. However, EEOC offered no evidence or testimony sufficient to establish that any Claimant was damaged in any compensable way, either emotionally or physically, by virtue of the medical examination itself.

The majority of the Claimants who addressed the medical examination in their testimony averred that it did not affect them. The Claimants' testimony does not support a finding that they sustained actual or imminent harm in the form of emotional, pecuniary or compensative damages related to the medical examinations. Only two Claimants expressed negative feelings related to the medical examination. Linda Sidor testified that it was rushed and that it was not in a private room, but did not offer any testimony as to how the medical examination negatively impacted her. (Tr. Vol. III at 165). Strittmatter also testified that the examination was not very private, but could not testify to any specific problems it caused her. (Tr. Vol. II at 61). However, neither of these two Claimants' testimony asserted that they were actually harmed by the medical examination.

EEOC has failed to prove injury-in-fact caused by the medical examination or compensable damages causally related to that injury. As noted above, absent such a showing, EEOC could only recover if it had succeeded in proving disability discrimination. Since EEOC has failed to prove disability discrimination, it cannot recover damages on behalf of Claimants for violations of 42 U.S.C. § 12112(d)(2)(A).

### ii. EEOC's claims for back pay, compensatory and punitive damages

### 1. Back pay

EEOC seeks back pay on behalf of all Claimants, as well as compensatory and punitive damages. EEOC cannot recover back pay in behalf of Claimants because it has failed to establish disability discrimination. The statute provides the following:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay […] or any other equitable relief as the court deems appropriate.

42 U.S.C.A. § 2000e-5. "Back pay is a form of equitable relief awarded at the discretion of the court." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 315 (3d Cir. 2006).

There is "no indication either in the text of the ADA or in its legislative history that a violation of the prohibition against pre-employment medical examinations and inquiries, in and of itself, was intended to give rise to damages liability." *Armstrong*, 141 F.3d at 561–62.

Back pay is limited to those Claimants for whom EEOC has proven disability discrimination, since back pay is not available to remedy a violation of either 42 U.S.C. §

12112(a) or § 12112(d) absent a showing of disability discrimination. EEOC has not met its burden to prove disability discrimination as to any Claimant. Further, since back pay is an equitable remedy awarded at the discretion of the Court, the Court finds here that EEOC is not entitled to back pay on behalf of any Claimants.

## 2. Compensatory and punitive damages

For the reasons discussed above, the Court finds that EEOC has failed to establish entitlement to any compensatory damages. The mere fact that Defendants conducted pre-employment medical examinations does not render Claimants entitled to compensatory damages absent proof of such damages. EEOC has failed to establish that Claimants suffered damages as a result of Defendants' conduct of pre-employment medical examinations. Defendants satisfied the Court that they had legitimate, nondiscriminatory reasons for each Claimants non-hire.

EEOC has also failed to prove its claim for punitive damages because it has not carried its burden to prove that Defendants acted with malice or reckless indifference to the federally protected rights of any Claimant. The Court found Lengle to be credible when she testified at trial that she "absolutely did not know" when she was hiring employees for Cambria Care Center that pre-offer physical examinations violated the ADA. (FOF 98). Thus, the Court finds that Lengle's decision on behalf of the Defendants to conduct pre-employment medical inquiries and examinations does not warrant the imposition of punitive damages.

**IV. CONCLUSION**

The Court concludes that judgment shall be awarded in favor of Defendants. EEOC has failed to prove to the Court that any of its Claimants are entitled to relief for alleged violations of 42 U.S.C. §§ 12112(a) or (d).

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| | ) | CIVIL NO. 3:10-250 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| | ) | |
| GRANE HEALTHCARE CO. and EBENSBURG CARE CENTER, LLC, d/b/a CAMBRIA CARE CENTER, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this _15th_ day of September, 2015, the Court having conducted a

nonjury trial on Equal Employment Opportunity Commission's claims against Grane

HealthCare Co. and Ebensburg Care Center, LLC, d/b/a Cambria Care Center, in

consideration of the parties having filed their Proposed Findings of Fact and Conclusions

of Law (ECF Nos. 239 – 242), and in accordance with the foregoing Memorandum

Opinion, **IT IS HEREBY ORDERED** that Plaintiff's request for relief is **DENIED.**

BY THE COURT:

**KIM R. GIBSON
UNITED STATES DISTRICT JUDGE**